# EXHIBIT H

Deposition Of:

# Joshua Bishop

## January 30, 2025

---

Henry Barnhill

vs

City of Hemet, et al.

---

Job Number 241938



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


HENRY BARNHILL,                          )
                                         )
                    PLAINTIFF,           )
                                         )
        VS.                              )        CASE NO.
                                         )        5:23-CV-00589-JGB-SB
                                         )
CITY OF HEMET; OFFICER BRETT             )
MAYNARD; OFFICER JOSHUA BISHOP;          )
OFFICER PEDRO AGUILA; CORPORAL           )
DOUGLAS KLINZING; JAMIE GONZALEZ;        )
CATHERINE TIPTON; AND DOES 1-10,         )
INCLUSIVE,                               )
                    DEFENDANTS.          )
_____ )




DEPOSITION OF OFFICER JOSHUA BISHOP

TAKEN ON

THURSDAY, JANUARY 30, 2025




Sandra Concialdi
C.S.R. 12553
Job No. 241938

```
 1                    UNITED STATES DISTRICT COURT

 2                    CENTRAL DISTRICT OF CALIFORNIA

 3

 4   HENRY BARNHILL,                    )
                                        )
 5                      PLAINTIFF,      )
                                        )
 6        VS.                           )    CASE NO.
                                        )    5:23-CV-00589-JGB-SB
 7                                      )
     CITY OF HEMET; OFFICER BRETT       )
 8   MAYNARD; OFFICER JOSHUA BISHOP;    )
     OFFICER PEDRO AGUILA; CORPORAL     )
 9   DOUGLAS KLINZING; JAMIE GONZALEZ;  )
     CATHERINE TIPTON; AND DOES 1-10,   )
10   INCLUSIVE,                         )
                        DEFENDANTS.     )
11   _____)

12

13

14            DEPOSITION OF OFFICER JOSHUA BISHOP, taken on

15   behalf of the Plaintiff via videoconference, Hemet,

16   California, commencing at 2:02 P.M., Thursday, January 30,

17   2025, before Sandra Concialdi, C.S.R. 12553, pursuant to

18   Notice.

19

20

21

22

23

24

25
```

Deposition Of Joshua Bishop

```
 1    APPEARANCES:

 2    For the Plaintiff, HENRY BARNHILL:

 3         LAW OFFICES OF GRECH & PACKER
           BY:  TRENTON C. PACKER, ESQ.
 4         7095 INDIANA AVENUE, SUITE 200
           RIVERSIDE, CALIFORNIA 92506
 5         (951) 682-9311
           E-MAIL: TPACKER@GRECHPACKERLAW.COM
 6
      For the Defendants, CITY OF HEMET, ET AL.:
 7
           MANNING & KASS, ELLROD, RAMIREZ, TRESTER LLP
 8         BY:  ANDREA K. KORNBLAU, ESQ.
           801 SOUTH FIGUEROA STREET, 15TH FLOOR
 9         LOS ANGELES, CALIFORNIA 90017
           (213) 624-6900
10         E-MAIL:  ANDREA.KORNBLAU@MANNINGKASS.COM

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Deposition Of Joshua Bishop

```
 1                          I-N-D-E-X

 2

 3                                                        PAGE

 4            EXAMINATION BY MR. PACKER                     5

 5

 6                      E X H I B I T S

 7

 8   NUMBER              DESCRIPTION                       PAGE

 9   EXHIBIT A   - Hemet Police Department Policy           13
                   Manual
10
     EXHIBIT B   - APRIL 29TH, 2022 REPORT                  50
11
     EXHIBIT C   - OFFICER BISHOP'S VIDEO CAM 4/29/2022     65
12
     EXHIBIT D   - OFFICER AGUILA'S VIDEO CAM 4/29/2022     70
13
     EXHIBIT E   - PHOTOGRAPH - HENRY BARNHILL              78
14
     EXHIBIT F   - PHOTOGRAPH - HENRY BARNHILL              80
15
     EXHIBIT G   - PHOTOGRAPH - HENRY BARNHILL              81
16

17            QUESTIONS INSTRUCTED NOT TO ANSWER

18                        (NONE)

19

20             INFORMATION REQUESTED

21                        (NONE)

22

23

24

25
```

Deposition Of Joshua Bishop

```
 1        RIVERSIDE, CALIFORNIA, THURSDAY, JANUARY 30, 2025
 2                        AT 2:02 P.M.
 3
 4                   OFFICER JOSHUA BISHOP,
 5                  having been duly sworn,
 6             was examined and testified as follows:
 7
 8                        EXAMINATION
 9   BY MR. PACKER:
10        Q    Good afternoon, Officer.
11        A    Good afternoon.
12        Q    Can you please state and spell your last
13   name -- so state your full name, spell your last name
14   for the record.
15        A    Full name is Joshua Michael Bishop, and my last
16   name is spelled B-I-S-H-O-P.
17        Q    Okay.  Have you ever had your deposition taken
18   before?
19        A    I have not.
20        Q    So have you testified in court before?
21        A    Yes.
22        Q    Similar process.  The oath you took is the same
23   oath you take in court, but it is a little less formal.
24   So I'll ask that the same rules that apply in court
25   apply here.  I'll ask the question, if your attorney has
```

Deposition Of Joshua Bishop

1    an objection, she'll make it.  Unlike in court, we won't

2    get a ruling, but she can direct you not to answer a

3    question.  So let's just try not to talk over each other

4    so the court reporter can take everything down.

5              Does that all make sense?

6         A    Yes.

7         Q    If you need a break at any point, please feel

8    free to let us know.  I just ask that it not be while a

9    question is pending.

10        A    Okay.

11        Q    I'm entitled to your best answer, but if you

12   don't know or don't understand a question, please feel

13   free to -- to clarify with me; okay?

14        A    Okay.

15        Q    All right.  Have you done anything to prepare

16   for today's deposition?

17        A    Yes.

18        Q    So aside from speaking with your attorney, have

19   you reviewed any materials?

20        A    Yes, I reviewed my report and body-worn camera.

21        Q    Okay.  I should have asked this before, but

22   approximately how many times have you testified in

23   court?

24        A    I would say over 20 times.

25        Q    Okay.  Did you graduate high school?

Deposition Of Joshua Bishop

```
1       A    Yes.

2       Q    What year was that?

3       A    2014.

4       Q    Okay.  Was that in Riverside County?

5       A    Yes.

6       Q    Did you do any college?

7       A    Yes.

8       Q    Did you go there directly out of high school?

9       A    Yes.

10      Q    Did you graduate college?

11      A    Yes.

12      Q    Where did you graduate?

13      A    Arizona State University.

14           MS. KORNBLAU:  Hold on.  Hold on.

15           I'm going to object to law enforcement privacy

16 privilege.

17           MR. PACKER:  Okay.  Are you --

18           MS. KORNBLAU:  I'll -- I'll instruct him not to

19 answer.  He can go ahead and provide the city and the

20 state but just not the name of the school.

21           MR. PACKER:  Okay.  Are you okay with me asking

22 him what he studied, just general questions like that?

23           MS. KORNBLAU:  Yes.  Yes.

24           MR. PACKER:  Okay.  So we're just worried about

25 locations?
```

Deposition Of Joshua Bishop

1            MS. KORNBLAU:  Yes.  It can connect to someone
2    to where he lives and family and things of that nature.
3            MR. PACKER:  That's fair.
4    BY MR. PACKER:
5        Q    What -- what did you study?
6        A    I studied communication.
7        Q    Okay.  And did you get to answer what year you
8    graduated?
9        A    I did not.
10       Q    Okay.  What year was that?
11       A    2019.
12       Q    All right.  Did you go straight to the academy
13   after you graduated undergraduate?
14       A    No.  I actually postponed my senior year of
15   college to go to the academy.
16       Q    Okay.  And then at some point, you went back
17   and finished your senior year?
18       A    Yes, I finished online.
19       Q    So what year did you enter the academy?
20       A    In 2018.
21       Q    And was that with the Hemet Police Department
22   at that point?
23       A    No.
24       Q    What agency was it with?
25       A    The South Gate Police Department.

Deposition Of Joshua Bishop

1        Q     Okay.  Did you then join the South Gate Police
2    Department?
3        A     Yes.
4        Q     What year was that?
5        A     Still 2018.
6        Q     What was your initial assignment with the South
7    Gate Police Department?
8        A     As a patrol officer.
9        Q     Did you have any other positions while you were
10   with South Gate?
11       A     No.
12       Q     So at -- let me ask you this:  How long did you
13   spend at the academy?
14       A     Six months.
15       Q     So you did six months at the academy, finished
16   that in 2018, and became a patrol officer at South Gate
17   PD at that point?
18       A     Yes.
19       Q     Was your next job with the Hemet Police
20   Department?
21       A     Yes.
22       Q     And what year was that?
23       A     2020.
24       Q     Did you have any additional training before
25   joining the Hemet Police Department?

Deposition Of Joshua Bishop

```
 1      A    No.

 2      Q    While you were at the academy, were you trained

 3  on police tactics?

 4      A    Yes.

 5      Q    And how about use of force?

 6      A    Yes.

 7      Q    Did that include the use of deadly force?

 8      A    Yes.

 9      Q    And the use of non-deadly force; is that fair

10  to say?

11      A    Yes.

12      Q    Okay.  At the time of your training, were you

13  trained on the POST learning domains?

14      A    Yes.

15      Q    And that included those regarding the use of

16  force?

17      A    Yes.

18      Q    Before joining the Hemet Police Department,

19  were you required to review Hemet's own policy manual?

20      A    Yes.

21      Q    And do you keep up-to-date on that policy

22  manual?

23      A    Yes.

24      Q    Have you had any training on the use of -- I'm

25  going to ask -- force, generally, while you've been with
```

Deposition Of Joshua Bishop

1   the Hemet Police Department?

2       A    Yes.

3       Q    What sort of training have you had?

4       A    Any trainings that were tied into the use of

5   force can be a variety of things.  It could be

6   de-escalation tactics.  It could be arrest and control

7   procedures.  It could be the use of our tools and things

8   that were issued, devices that were issued, case laws,

9   things of that nature.

10      Q    Okay.  How often do you have those trainings?

11      A    I would say we go over them at least weekly,

12  whether it's briefing training, or I go over them myself

13  and review updated case laws.

14      Q    Okay.  You said there was training regarding

15  some of the instruments that you were issued.

16           Did that include Tasers?

17      A    Yes.

18      Q    Can you approximate for me how many classes you

19  have taken on the use of Tasers?

20      A    I would say at least six to seven.

21      Q    Okay.  When was the most recent course you

22  took?

23      A    I would say it's been about a couple of months.

24      Q    Okay.  Now, you told us that you received

25  training -- ongoing trainings virtually every day on use

Deposition Of Joshua Bishop

1    of force.
2          Have you had any specific trainings on the use
3    of deadly force?
4      A    Not that I can recall.
5      Q    Okay.  Are you familiar with Hemet's use of
6    force policy?
7      A    Generally, yes.
8      Q    Okay.  And are you familiar with Hemet's use of
9    deadly force policy?
10     A    Generally, yes.
11     Q    All right.  I want to show you what I have
12   marked as Exhibit 1 to this deposition.  Bear with me.
13   I'm going to try to share my screen here.
14               (Exhibit A was marked for
15               identification and is attached
16               hereto.)
17   BY MR. PACKER:
18     Q    Do you see this document labeled "Hemet Police
19   Department Policy Manual"?
20     A    Yes.
21     Q    And do you recognize this document?
22     A    Yes.
23     Q    Is this the policy manual that we discussed
24   earlier that you reviewed prior to becoming a Hemet
25   Police Department officer?

Deposition Of Joshua Bishop

1      A    Yes.

2      Q    And you continue to review this on an ongoing

3  basis; is that fair to say?

4      A    Yes.

5      Q    So I want to talk to you about the

6  definition -- or, I'm sorry, the department policy when

7  it comes to the use of deadly force.  And I'll direct

8  your attention to Section 300.4, Subdivision A.

9           Do you see that?

10     A    If you'd be able to zoom in --

11     Q    Sure.

12     A    -- because it's a little hard to see on my end.

13     Q    Is that better?

14     A    Right there is good.

15     Q    Okay.  Let me see if I can move this over.

16          So you see Subdivision A, it starts with, "An

17  officer"?

18     A    Yes.

19     Q    It says, "An officer may use deadly force to

20  protect him or herself or others from what he or she

21  reasonably believes is an imminent threat of death or

22  serious bodily injury to the officer or another person."

23          Is that what your understanding of the use of

24  deadly force policy is with Hemet?

25     A    Yes.

Deposition Of Joshua Bishop

1    Q    Are you familiar with the term "serious bodily
2  injury"?

3    A    Yes.

4    Q    What is your understanding of that term?

5    A    Well, our policy also has a definition for
6  great bodily injury, and that could mean
7  unconsciousness, a certain type of brain injury, an
8  injury causing extensive suturing, things of that
9  nature.

10    Q    Okay.  And it's your understanding that when
11  this policy uses the term "serious bodily injury,"
12  that's what it's referring to?

13    A    Yes.

14    Q    I think you said that includes injuries that
15  include extensive suturing.

16          Is that what you said?

17    A    Yes.

18    Q    What is your understanding with respect to the
19  phrase "extensive suturing"?

20          MS. KORNBLAU:  Objection.  Calls for a medical
21  expert opinion.

22          But you can answer.

23          THE WITNESS:  So my -- me, personally, I've had
24  several personal injuries throughout my life that
25  include a lot of suturing.  I've had my leg cut open

Deposition Of Joshua Bishop

```
1   before, which was around, I think, 18 stitches.
2   BY MR. PACKER:
3        Q    Okay.
4        A    To -- to me, personally, my own opinion and my
5   own definition is around that number of -- of sutures.
6        Q    Okay.  So you told us that -- excuse me -- that
7   was your understanding of the phrase "great bodily
8   injury"; is that right?
9        A    Yes.
10       Q    Do you understand the phrase "serious bodily
11  injury" to have a particular meaning in California?
12            MS. KORNBLAU:  Objection.  May call for an
13  expert opinion.
14            But you can answer.
15            THE WITNESS:  I -- I don't understand the
16  question.
17  BY MR. PACKER:
18       Q    Okay.  Are you -- let me ask it more
19  specifically.
20            Are you familiar with the California Government
21  Code Section 12525.2 that defines serious bodily injury?
22       A    No.
23       Q    Okay.
24            MS. KORNBLAU:  Objection.  Calls for a legal
25  opinion.
```

Deposition Of Joshua Bishop

```
 1              But go ahead.
 2    BY MR. PACKER:
 3        Q    Okay.  I think your answer was no?
 4        A    Correct.
 5        Q    Okay.  So as far as you understand it, the use
 6    of serious bodily injury here refers to great bodily
 7    injury.
 8              Is that what you were saying?
 9              MS. KORNBLAU:  Objection.  May misstate
10    testimony and calls for legal opinion.
11              But you can answer.
12              THE WITNESS:  My -- my definition of serious
13    and great bodily injury, I go off from what my
14    department policy describes it as.
15    BY MR. PACKER:
16        Q    Okay.  And you said that you believe the
17    definition of great bodily injury is found within the
18    same manual?
19        A    Yes.
20        Q    Okay.  I'm going to unshare my screen right
21    now.  I have not been able to find that, but let me
22    see -- if you bear with me, if I can do a search.
23              Okay.  So I don't see the use of the phrase
24    "great bodily injury," but -- and obviously, your
25    counsel will correct me if I'm wrong.
```

Deposition Of Joshua Bishop

```
1            Just to clarify, your understanding is that
2    great bodily injury, and that's what you've been trained
3    on?
4        A    Yes.
5            MS. KORNBLAU:  Objection.  And -- objection.
6    May misstate testimony.
7            Officer Bishop, just give me a couple of
8    seconds after the question is asked to, you know, assert
9    an objection if I need to.  So just wait a couple of
10   seconds after the question, please.  Thanks.
11   BY MR. PACKER:
12       Q    Okay.  I'm going to share my screen again.
13   Bear with me for a second.
14            I apologize.  I'm using a PC, and I usually use
15   Mac, so I'm kind of all over the place right now.
16            Okay.  So this is the use of force policy
17   within the department as you recognize it?
18       A    Yes.
19       Q    All right.  I'm going to go to 300.3, use of
20   force.
21            Do you see that?
22       A    Yes.
23       Q    Now, 300.3.3 says, "Factors used to determine
24   the reasonableness of force."
25            Are you trained on this, I'll call it,
```

Deposition Of Joshua Bishop

1    paragraph or section?

2        A    Yes.

3        Q    Now I want to direct your attention to sub I.

4             Do you see that?

5        A    Yes.

6        Q    And that reads, "The degree to which the

7    subject has been effectively restrained and his or her

8    ability to resist despite being restrained."

9             Is that your understanding of the -- one of the

10   factors to take into account when applying force?

11       A    Yes.

12       Q    And what do you understand the phrase

13   "effectively restrained" to mean?

14       A    To me, effectively restrained means that

15   somebody is no longer able to resist or move around or

16   pull away from officers any more or stand up, things of

17   that nature.

18       Q    Okay.  So if an individual's hands have been

19   restrained, would that constitute effective restraining?

20            MS. KORNBLAU:  Objection.  Vague and ambiguous.

21            But go ahead.

22            THE WITNESS:  I -- I don't understand that

23   question.

24   BY MR. PACKER:

25       Q    Okay.  So you said that an effective

Deposition Of Joshua Bishop

1   restraint -- well, I don't want to put words in your
2   mouth, but you understand it to mean that when, for
3   example, an individual has been immobilized; right?
4           MS. KORNBLAU:  Objection.  May misstate
5   testimony.
6   BY MR. PACKER:
7       Q    You don't understand the question?
8       A    Yes, but I don't believe I stated
9   "immobilized."
10      Q    Okay.  So they can't stand up; right?
11          MS. KORNBLAU:  Objection.  May misstate
12  testimony.  There was more to it than one part of that
13  answer.
14          MR. PACKER:  I understand.  I'm trying to break
15  it down.
16  BY MR. PACKER:
17      Q    So you understand one of the things that
18  constitutes effective restraint, one of the factors
19  includes their ability to stand up; right?
20          MS. KORNBLAU:  Objection.  Misstates testimony.
21  Incomplete.
22          But you can answer.
23          THE WITNESS:  One of the factors that I stated,
24  yes.
25  ///

Deposition Of Joshua Bishop

```
 1   BY MR. PACKER:
 2       Q    Okay.  And since it's been about a couple of
 3   minutes now, can you list for me those factors again?
 4   I'm sorry, I don't want to get them wrong.
 5       A    So again, my -- my understanding of effectively
 6   restrained means that a subject is no longer able to
 7   physically resist officers, is no longer able to pull
 8   away from officers.  And standing up is another factor
 9   that I added in there.  Correct.
10       Q    Okay.  So your counsel interjected before that
11   I was giving an incomplete list.
12            Do you consider these factors altogether, or is
13   one alone enough in your mind to constitute effective
14   restraint?
15            MS. KORNBLAU:  Objective -- objection.  Vague
16   and ambiguous.
17            But you can answer.
18            THE WITNESS:  In my opinion, I think there's
19   even more factors than that.  So cumulatively, I think
20   all three of those in addition to more than what I
21   named, not just one.
22   BY MR. PACKER:
23       Q    Okay.  Fair enough.
24            So in your mind, the fact that, for example, an
25   individual can no longer physically resist is not enough
```

Deposition Of Joshua Bishop

```
 1   on its own for you to conclude that they've been
 2   effectively restrained?
 3              MS. KORNBLAU:  Objection.  May misstate
 4   testimony.
 5              But go ahead.
 6              THE WITNESS:  Yes.
 7   BY MR. PACKER:
 8       Q    Okay.  And the same answer with -- with respect
 9   to their ability to pull away and their ability to stand
10   up?  Same answer?
11              MS. KORNBLAU:  Objection.  Vague and ambiguous.
12              Go ahead.
13              THE WITNESS:  Yes.
14   BY MR. PACKER:
15       Q    Okay.  I want to direct your attention to
16   sub Q.
17              Do you see that?
18       A    Yes.
19       Q    And it says, "Whether the conduct of the
20   individual being confronted no longer reasonably appears
21   to pose an imminent threat to the officer or others."
22              Do you see that phrase?
23       A    Yes.
24       Q    What does that phrase mean to you?
25              MS. KORNBLAU:  Objection.  Calls for
```

Deposition Of Joshua Bishop

1   hypothetical.

2            But go ahead.

3            THE WITNESS:  So do you mind if I reread it?

4   BY MR. PACKER:

5        Q    Of course.  Take your time.

6        A    So to me -- I mean, my -- my definition is the

7   conduct of the individual is what's kind of speaking out

8   to me.  So the conduct of somebody can mean a barrage

9   and a variety of things that could either be their

10   actions, their words, their physical resistance, things

11   of that nature.  And posing a threat to themselves,

12   others, I think that's included as well.  And officers.

13   In my opinion, what that means to me is, you know, are

14   they still a threat to me, my partners, or the people.

15        Q    Okay.  When you're assessing whether or not

16   they still present -- or, excuse me, I'm going to use

17   the language "pose an imminent threat to the officer or

18   others" -- do you take into account the number of

19   officers that are effectuating the arrest of the

20   suspect?

21            MS. KORNBLAU:  Objection.  Calls for a

22   hypothetical.

23            But go ahead.

24            THE WITNESS:  That could be one of the factors.

25   ///

Deposition Of Joshua Bishop

```
1   BY MR. PACKER:
2       Q    Okay.  What other factors do you take into
3   account?
4       A    The area that we're conducting this, you know,
5   arrest or apprehension of an individual.  As you said,
6   the number of officers, the proximity of weapons, the
7   severity of the crime at hand.  There's -- there are
8   several factors that come into mind.
9       Q    Okay.  You mentioned the proximity of weapons.
10           Did I hear that right?
11      A    Yes.
12      Q    What do you mean by that?
13      A    What I mean by that is sometimes where we
14  apprehend individuals, obviously, we don't get to pick
15  and choose where that happens, and sometimes that can be
16  in a front yard with gardening tools, you know, metal
17  chairs, you know, things of that nature.  So a lot of
18  other things I've seen can be used as -- as weapons, and
19  that's what I meant by "proximity of weapons."  It's how
20  close is this person that we are apprehending and
21  proximity to something that they can use as a weapon.
22      Q    Okay.  And you -- I take it from your examples,
23  gardening tools, chairs, that your understanding is it's
24  a fairly broad series of items that can be used as
25  weapons?
```

Deposition Of Joshua Bishop

```
 1        A     Yes.
 2        Q     Okay.  Now, I want to start talking
 3   specifically about the incident in this case.
 4              Do you remember what the date is?
 5        A     If I could refer to my report for the exact
 6   date of the incident.
 7        Q     Of course.
 8              And then just for the record, I'm going to ask
 9   you what report you're referring to, if that's okay.
10   But go ahead and refer to it.
11        A     It's -- it's my written, documented report.
12        Q     Okay.
13        A     And that would be April 29.
14        Q     Okay.  Of what year?
15        A     2022.
16        Q     Is the report you're looking at six pages?
17        A     This one is only four.
18        Q     Okay.
19        A     And it's just the -- the actual physical
20   narrative.
21        Q     And it's just the narrative.
22              Okay.  On the front page of that report, is it
23   labeled "DR No. 2022-02719-use of force-one report"?
24        A     Yes.
25        Q     Okay.  I just wanted to make sure we're working
```

Deposition Of Joshua Bishop

```
 1   with the same thing.
 2           So you were able to refresh your recollection
 3   with respect to the date of April 29, 2022?
 4   A     Yes.
 5   Q     Okay.  What was your assignment that day?
 6   A     A patrol officer in the city limit.
 7   Q     Were you in uniform?
 8   A     Yes.
 9   Q     Can you describe the uniform you were wearing
10   that day?
11   A     Yes.  My department-issued Class D, as in
12   David, uniform.  I was equipped with a load-bearing
13   vest, which has "POLICE" written in large block
14   lettering on the back.  And on the front, a cloth shield
15   badge over my left breast area.  And also on my
16   department-issued equipment on my vest, my Sam Browne
17   duty belt, pants, boots, and the city of Hemet patches
18   on each shoulder.
19   Q     Okay.  Did you have a -- a recording device of
20   any sort on you that day?
21   A     Yes, a department-issued body-worn camera.
22   Q     And as far as you remember, was it in working
23   order?
24   A     Yes.
25   Q     You checked it before your shift?
```

Deposition Of Joshua Bishop

```
1        A    Yes.

2        Q    Did you have pepper spray in?

3        A    Yes.

4        Q    And a firearm?

5        A    Yes.

6        Q    What about a Taser?

7        A    Yes.

8        Q    All right.  And we talked about you having --

9   again, I don't want to misquote, but it was -- six to

10  seven is what I wrote down -- trainings peculiar to or

11  specific to Tasers at that point; is that right?

12       A    Yes.

13       Q    As of April 29th, 2022, had you been named in a

14  lawsuit before?

15       A    No.

16       Q    Had you been, as far as you know, the subject

17  of an investigation into any use of force incidents in

18  which you were involved?

19            MS. KORNBLAU:  And I'll just object to the

20  extent that it calls for anything other than sustained

21  findings of excessive use of force, dishonesty, or

22  sexual misconduct within the last five years.

23            But go ahead.

24            THE WITNESS:  No.

25  ///
```

Deposition Of Joshua Bishop

```
 1   BY MR. PACKER:
 2        Q     Okay.  Subsequent to April 29, had you been
 3   named in any lawsuits?
 4        A     No.
 5        Q     Okay.  Had you been reprimanded in any way by
 6   the South Gate Police Department for any uses of force
 7   on duty?
 8        A     No.
 9        Q     And what about by Hemet Police Department?
10        A     No.
11        Q     Okay.  Do you recall what your shift hours were
12   at the time of the incident on April 29, 2022?
13        A     Yes.
14        Q     What were those?
15        A     6:00 a.m. to 6:00 p.m.
16        Q     Do you recall what time this incident took
17   place?
18        A     Yes.
19        Q     And what time was that?
20        A     It was approximately around 7:30 in the
21   morning.
22        Q     Do you recall what the initial call you were
23   responding to was?
24        A     Yes.
25        Q     What was that?
```

Deposition Of Joshua Bishop

```
 1      A    It was a call of a victim who was currently
 2  hiding in the office of a school from her husband,
 3  Mr. Barnhill.  And she had reported that Mr. Barnhill
 4  had threatened to kill her and point a -- pointed a
 5  firearm at her head the night prior to.
 6      Q    Okay.  Let me unpack that.
 7           She was currently, on April 29, hiding in her
 8  classroom.
 9           That's your understanding -- or that's --
10  excuse me.  That's what was broadcast to you?
11      A    No.
12      Q    Okay.  So what was broadcast -- let me ask you
13  this:  How did you learn this information that you just
14  described, her being in the classroom, him threatening
15  her, et cetera?
16      A    Well, I stated that she was in the front
17  office, not in the --
18      Q    Oh, I'm sorry.
19      A    -- not in the classroom.
20      Q    Okay.  Fair enough.
21           So where did you learn the information that she
22  was in the front office on April 29?
23      A    From a patrol -- or not a patrol, a detective
24  corporal who responded to the call and was speaking with
25  the victim in the front office.
```

Deposition Of Joshua Bishop

```
1        Q      Okay.  And who was that detective corporal?

2        A      Corporal Reynoso.

3        Q      Okay.  Is this Andrew Reynoso?

4        A      Yes.

5        Q      So Andrew Reynoso notified you of these facts

6   over your radio; is that fair to say?

7        A      Yes.

8        Q      You also said that you were told Mr. Barnhill

9   had made threats against this individual, the individual

10  that was hiding in the front office.

11              Where did you learn that?

12       A      Via the -- the MDT.  It's our mobile computer

13  that's in the vehicle.  It has a description of the

14  types of calls that we're going to, and that was part of

15  the call.

16       Q      Okay.  And then you mentioned that Mr. Barnhill

17  had pointed a weapon at the -- I'm just going to say

18  victim -- the night before; is that right?

19       A      Yes.

20       Q      Did you have any information that he had

21  pointed a gun at her on that day, on April 29, 2022?

22              MS. KORNBLAU:  Objection.  Vague and ambiguous.

23              But go ahead.

24              THE WITNESS:  No, just information that

25  happened the previous night.
```

Deposition Of Joshua Bishop

```
1    BY MR. PACKER:
2        Q    Okay.  Did you have any specific information
3    that Mr. Barnhill had a weapon on him on April 29th,
4    2022?
5            MS. KORNBLAU:  Objection.  Vague and ambiguous.
6            But go ahead.
7            THE WITNESS:  Yes.
8    BY MR. PACKER:
9        Q    So you had information he had a gun on him?
10           MS. KORNBLAU:  Objection.  Asked and answered.
11           Go ahead.
12           THE WITNESS:  Yes.
13   BY MR. PACKER:
14       Q    What was that information?
15       A    It was that the firearm that was used the night
16   previously was still outstanding and that he still was
17   in possession of it.
18       Q    Okay.  When you say "in possession of it," did
19   you understand that to mean it was on his person?
20       A    That is my understanding of it, yes.
21       Q    Okay.  But you were not specifically told it
22   was on his person?
23           MS. KORNBLAU:  Objection.  Vague and ambiguous.
24           But go ahead.
25           THE WITNESS:  Not specifically, no.
```

Deposition Of Joshua Bishop

1   BY MR. PACKER:

2       Q    Okay.  You were not specifically told it was in

3   his car; is that fair to say?

4       A    Yes.

5       Q    That's fair to say, you were not specifically

6   told that?  It was a bad question.

7       A    That is fair to say.

8       Q    Thank you.

9            Did you understand that Mr. Barnhill, on

10  April 29, 2022, had any prior law enforcement contacts

11  in use -- including involving his use of force against

12  an officer?

13      A    I had no knowledge of any prior contacts.

14      Q    Okay.  So no knowledge of any prior contacts of

15  any kind; is that fair to say?

16      A    Yes.

17      Q    Okay.  So you told us that Detective Reynoso

18  broadcast information from the school itself.

19           Did you report to the school?

20      A    No, I reported to the area of the school.

21      Q    Okay.  Can you describe what you saw when you

22  reported to the area of the school?

23      A    What I observed were lots of parents and

24  vehicles in the area dropping off their kids and, you

25  know, pick up and drop-off just like any other normal

Deposition Of Joshua Bishop

```
1   school area and school business.  The area is
2   residential.  There's a lot of vehicles in the area.
3   It's close to a mobile home park.  And several vehicles
4   and people in the area, as I said.
5       Q    Okay.  At some point, did you see a car that
6   you believed was associated with Mr. Barnhill?
7       A    Yes.
8       Q    Did you understand he was driving that car?
9       A    Yes.
10      Q    You know, at some point, there was a pursuit of
11  that car; is that right?
12      A    Yes.
13      Q    Were you engaged in that pursuit?
14      A    Yes.
15      Q    Where did that pursuit begin?
16      A    I believe it occurred in the area of Gilbert
17  and Stetson.
18      Q    Do you recall how long it lasted?
19      A    Could you be more specific?  I don't understand
20  that question.
21      Q    From the beginning of your participation in the
22  pursuit until the pursuit stopped -- and my
23  understanding is it was outside of Mr. Barnhill's
24  house -- what was that period of time?
25      A    I would say anywhere between approximately
```

Deposition Of Joshua Bishop

1    three to five minutes.

2        Q    Okay.  And it proceeded from the

3    Gilbert-Stetson area to where?

4        A    To in front of 354 Gardenia Circle.

5        Q    Okay.  Did you understand 354 Gardenia Circle

6    to be Mr. Barnhill's address?

7            MS. KORNBLAU:  Objection.  Vague as to time.

8            But go ahead.

9            THE WITNESS:  At the beginning of the pursuit,

10   at the termination point of the pursuit, we did not know

11   that that was his residence, no.

12   BY MR. PACKER:

13       Q    At some point, did you learn that was his

14   residence?

15       A    Yes.

16       Q    When was that?

17       A    Not until Mr. Barnhill was taken into custody.

18       Q    Okay.  So at the time of the event -- the use

19   of force event, you did not understand that to be

20   Mr. Barnhill's residence?

21       A    No, I did not.

22       Q    Okay.  And let me clarify.

23            You did not know one way or another whether it

24   was Mr. Barnhill's residence?

25       A    Not until Mr. Barnhill was taken into custody.

Deposition Of Joshua Bishop

1    Q    Okay.  Did you -- when the car stopped outside

2   354 Gardenia Circle, what happened?

3           MS. KORNBLAU:  Objection.  Calls for narrative.

4           But go ahead.

5           THE WITNESS:  Mr. Barnhill exited the vehicle

6   via the driver's door and began running away from

7   officers.

8   BY MR. PACKER:

9    Q    Okay.  You could see his hands when he was

10  running away?

11          MS. KORNBLAU:  Objection.  Vague as to time.

12          But go ahead.

13          THE WITNESS:  So at the point that he

14  immediately exited the vehicle, Mr. Barnhill dropped his

15  hands, both of them, toward the front portion of his

16  waistband area.  That's what I observed, then I lost

17  visual of his hands at that point.

18  BY MR. PACKER:

19   Q    Okay.

20   A    As he continued running away, I gave him

21  commands to show me his hands, to which he initially

22  complied, and then, however, subsequently dropped them

23  back down to his front waistband area to where I could

24  not see them.

25   Q    Okay.  So you said, at some point, he complied

Deposition Of Joshua Bishop

1    with commands to show you his hands; is that right?

2        A    Initially, he did comply with my initial

3    command of showing his hands.

4        Q    So he showed you his right hand?

5            MS. KORNBLAU:  Objection.  Vague as to time.

6            But go ahead.

7            THE WITNESS:  So again, initially, he did

8    comply with my initial command to show me both of his

9    hands, not just his right hand.

10   BY MR. PACKER:

11       Q    Okay.  Fair enough.

12           At the time he complied with your initial

13   commands, did you see his right hand?

14       A    I saw both hands.

15       Q    Okay.  And there was nothing that you saw --

16   let's start with the right hand.

17           There was nothing that you saw in the right

18   hand; right?

19           MS. KORNBLAU:  Objection.  Vague.

20           But go ahead.

21           THE WITNESS:  At the point when he complied

22   with my initial command to show me his hands, I did not

23   see anything in his right hand.

24   BY MR. PACKER:

25       Q    Okay.  So then we'll drill down on that a

Deposition Of Joshua Bishop

```
 1   little bit based on that objection.
 2           You didn't see a firearm in that right hand;
 3   right?
 4       A    No.
 5       Q    You didn't see a knife in that right hand?
 6       A    No.
 7       Q    You saw an empty hand; right?
 8       A    I saw an open hand that was empty.
 9       Q    Okay.  So you saw an open and empty right hand;
10   right?
11       A    Yes.
12       Q    With respect to the left hand, you didn't see
13   any firearm in the left hand; correct?
14       A    No.
15       Q    No knife in the left hand; right?
16       A    No.
17       Q    So you also saw an empty and open left hand; is
18   that right?
19       A    Yes.
20       Q    And again, to clarify, that was at the point
21   when he initially complied with your directive to show
22   you his hands; is that right?
23       A    Yes.
24       Q    Were you the closest officer -- let me ask it
25   this way.
```

Deposition Of Joshua Bishop

1           Were you the only officer that was pursuing him

2    on foot at the time that Mr. Barnhill got out of his car

3    and ran?

4        A    No.

5        Q    What other officers were there as far as you

6    remember?

7        A    As far as I remember, Officer Aguila was

8    actually in my vehicle during the pursuit, so he exited

9    my vehicle as well.  And then Officer Maynard arrived as

10   well and was also there.

11       Q    Okay.  Do you remember Corporal Klinzing being

12   there?

13       A    At the initial point to when he exited the

14   vehicle, no.

15       Q    Okay.  At any point, did Corporal Klinzing

16   arrive?

17       A    Yes.

18       Q    Were you the first to make contact with

19   Mr. Barnhill after the foot pursuit?

20           MS. KORNBLAU:  Objection.  Vague.

21           Go ahead.

22           THE WITNESS:  No.

23   BY MR. PACKER:

24       Q    Okay.  So to clarify, the foot pursuit did end

25   at the front door of 354 Gardenia Circle; is that fair

Deposition Of Joshua Bishop

1    to say?

2        A    Yes.

3        Q    At the time Mr. Barnhill stopped at the front

4    door of 354 Gardenia Circle, who was the first officer

5    to make contact?

6             MS. KORNBLAU:  Objection.  Vague and ambiguous.

7    Lacks foundation.  Argumentative.

8             Go ahead.

9             THE WITNESS:  I believe it was Officer Maynard.

10   BY MR. PACKER:

11       Q    Okay.  Do you recall in what order you arrived

12   at the front door of 354 Gardenia Circle?

13       A    I was second.

14       Q    Okay.  So you were the second officer to arrive

15   at that front door?

16       A    Yes.

17       Q    Could you see -- at the moment you arrived at

18   the front door, could you see Mr. Barnhill's hands?

19       A    I -- I don't recall exactly at the point when I

20   arrived at the front door where his hands were.

21       Q    What did you see Officer Aguila do as he was

22   the first one to arrive at the front door with

23   Mr. Barnhill?

24       A    I stated Officer Maynard was the first.

25       Q    I'm so sorry.  Officer Maynard.

Deposition Of Joshua Bishop

1    A    My observation was Officer Maynard immediately
2 closed the distance between himself and Mr. Barnhill and
3 pushed him away from the -- the front door of the
4 residence.
5    Q    Okay.  What happened to Mr. Barnhill when he
6 was pushed away from the front door of the residence?
7    A    So as he was kind of pushed away from the front
8 door of the residence, it seemed as if he was kind of
9 pushed into a metal patio chair, which he was kind of in
10 a sort of seated position, so he got pushed into
11 essentially that chair.
12    Q    Okay.  After he was pushed into that metal
13 chair, what happened next?
14        MS. KORNBLAU:  Objection.  Calls for a
15 narrative.
16        Go ahead.
17        THE WITNESS:  Officer Aguila was directly
18 behind me.  He also began assisting Officer Maynard with
19 attempting to gain control of Mr. Barnhill at that
20 point.  And my observations were both the officers were
21 struggling to gain control of Mr. Barnhill's person and
22 his arms and hands as Mr. Barnhill was actively pulling
23 his arms and things of that nature away from officers'
24 grasp.  And at one point, I observed Mr. Barnhill raise
25 up one of his knees and actually strike Officer Maynard

Deposition Of Joshua Bishop

```
 1   in the chest with one of his knees.
 2   BY MR. PACKER:
 3       Q    Okay.  What -- at what point did this occur?
 4            MS. KORNBLAU:  Objection.  Vague as to time.
 5            Go ahead.
 6            THE WITNESS:  I don't understand the question.
 7   BY MR. PACKER:
 8       Q    Sure.
 9            You told us that Officer Maynard pushed
10   Mr. Barnhill into a metal chair; right?
11       A    Yes.
12       Q    And then Officer Aguila arrived and attempted
13   to gain control of Mr. Barnhill with Officer Maynard;
14   correct?
15       A    Yes.
16       Q    What I want to understand is:  At what point
17   during the efforts to control Mr. Barnhill did the knee
18   strike occur?  Was he still on the metal chair, for
19   example, or was it after that point?
20       A    Mr. Barnhill was still on the metal chair.
21       Q    Okay.  At some point, was Mr. Barnhill taken to
22   the ground?
23       A    Yes.
24       Q    Who took Mr. Barnhill to the ground?
25       A    Officers Maynard and Aguila together.
```

Deposition Of Joshua Bishop

1      Q      Where were you at the time Officers Maynard and
2  Aguila took Mr. Barnhill to the ground?
3      A      I was standing approximately 2 to 5 feet away
4  or behind both of them.
5      Q      Okay.  At the point where Officer Maynard and
6  Aguila take Mr. Barnhill to the ground, you're standing
7  3 to -- 3 to 5 feet away, what are you doing?
8      A      At that point, when they took him down to the
9  ground, I'm thinking about different ways and different
10  ways that I can help.  The area that we were was a front
11  porch.  We had two walls surrounding us, a patio chair,
12  and tables, so I didn't have a lot of room to physically
13  assist with my partners' efforts.  So at that point, I
14  took a couple more steps back to observe the numbers
15  that were listed on the -- on the residence, so that
16  way, I could broadcast our exact location to my partners
17  to hopefully get more resources there to assist --
18  assist us with apprehending Mr. Barnhill.
19      Q      Okay.  After you made the call out for further
20  assistance, did you do anything?
21      A      Yes.
22      Q      What did you do?
23      A      At this point, after I broadcasted our -- our
24  location -- our exact location for more resources, I
25  then reapproached Mr. Barnhill and the two officers that

Deposition Of Joshua Bishop

1   were attempting to take him into custody.  And at that
2   point, I moved and shoved the patio chair and table out
3   of the way, so that way, I could gain some room and get
4   toward Mr. Barnhill's upper portion of his body, because
5   when we want to take control of somebody and get them
6   into custody, it's best to be toward the upper portion
7   of their body and not the lower portion.
8        Q    Okay.  Earlier, when we were discussing items
9   that you identified as potentially being weapons that a
10  suspect -- a general suspect could use, you suggested a
11  metal chair was one of them.
12            Do you remember that?
13       A    Yes.
14       Q    Aside from the metal chair and table, did you
15  see any other items on the front porch of 354 Gardenia
16  Circle that you thought could be used as weapons?
17       A    Well, at this point, I did not see any
18  physically.
19       Q    Okay.  And then you told us that you pushed the
20  chair and table out of the way; is that right?
21       A    Yes.
22       Q    When you pushed them out of the way,
23  Mr. Barnhill is on the ground with Officers Aguila and
24  Maynard; is that right?
25       A    Yes.

Deposition Of Joshua Bishop

```
 1      Q    So the table and chair were now out of his
 2 reach; correct?
 3           MS. KORNBLAU:  Objection.  Calls for
 4 speculation.
 5           But go ahead.
 6           THE WITNESS:  The -- so there was two chairs
 7 and one table that one of the chairs and the table would
 8 have been out of his reach; however, one of the chairs
 9 was still within very close proximity.
10 BY MR. PACKER:
11      Q    Okay.  So there was one chair within close --
12 close proximity after you kicked another chair and a
13 table away; right?
14      A    I did not kick any chair.  I just kind of
15 shoved them with my hands.
16      Q    Okay.
17      A    But, yes, there was just one chair that was
18 still within close proximity.
19      Q    Okay.  And at the time when the chair was
20 within close proximity, Officers Maynard and Aguila have
21 Mr. Barnhill on the ground; is that right?
22           MS. KORNBLAU:  Objection.
23           Go ahead.
24           THE WITNESS:  Yes.
25 ///
```

Deposition Of Joshua Bishop

```
 1   BY MR. PACKER:
 2       Q    Now, you told us that you, after making the
 3   call out for more assistance, reapproached
 4   Mr. Barnhill's position; is that right?
 5       A    Yes.
 6       Q    At that point, can you see Mr. Barnhill's
 7   hands?
 8       A    At this point, I can see Mr. Barnhill's left
 9   hand, but I cannot see Mr. Barnhill's right hand.
10       Q    Okay.  The left hand that you could see, did it
11   have any weapons in it?
12       A    No.
13       Q    So no gun; correct?
14       A    No.
15       Q    No knife; right?
16       A    No.
17       Q    Nothing else that you determined could be used
18   as a weapon in his left hand when you saw it; right?
19       A    No.
20       Q    When you reapproached, what, if anything, did
21   you do?
22       A    When I reapproached, I still had my
23   department-issued Taser in my right hand.  Again, I
24   could still observe one left hand was visible; however,
25   the right hand was not visible and was actually tucked
```

Deposition Of Joshua Bishop

1    underneath Mr. Barnhill's body, toward his front

2    waistband area.  And at this point, again, the totality

3    of the circumstances were that we knew Mr. Barnhill to

4    be violent from the night prior, the reports that we had

5    given that Mr. Barnhill was engaged in a vehicle pursuit

6    with us, and the wanton disregard for the public, the

7    dangerous driving.  Again, we had every reason to

8    believe that the firearm was still outstanding at this

9    point and that Mr. Barnhill was still possibly in

10   possession of it.  And once I couldn't see that right

11   hand and I had my previous observations that he had

12   reached toward that front waistband area, he had not

13   been patted down for weapons yet, I then utilized my

14   Taser as an improvised device to strike Mr. Barnhill on

15   the left side of his head twice.

16        Q    Okay.  I want to walk through that now in more

17   detail.  You said at the time you reapproached, you

18   still had the Taser in your hand.

19             At what point did you first unholster, I'll

20   call it, the Taser and hold it in your hand?

21        A    The first point I grabbed my Taser was pretty

22   much when Officer Maynard was the first contact with him

23   and then Officer Aguila showed up and attempted to

24   apprehend him as well, is when I drew my Taser.

25        Q    Okay.  You told us that you used the Taser at

Deposition Of Joshua Bishop

1    some point as an improvised weapon to strike him on the

2    left side of the head; right?

3        A    Yes.

4        Q    Did you ever use the Taser for its intended

5    purpose, in other words, to deploy prongs at

6    Mr. Barnhill?

7            MS. KORNBLAU:    Objection.    Lacks foundation.

8    Vague and ambiguous.

9            But go ahead.

10            THE WITNESS:    Yes.

11   BY MR. PACKER:

12        Q    As you recall it now, at what point did you,

13   I'm going to say, fire your Taser or deploy your Taser?

14        A    So again, as -- as I -- as I stated previously,

15   that Officers Maynard and Aguila were actively

16   attempting to gain control and take Mr. Barnhill into

17   custody, it was that initial contact when I drew my

18   Taser and pointed it at Mr. Barnhill.    At this point, I

19   gave Mr. Barnhill -- I believe it was four to five

20   warnings by yelling, "Taser out."    And it was also a

21   warning for my partners.    I wanted my partners to

22   actually move physically out of the way, so that way, I

23   could have a unrestricted view and -- I'll use the

24   word -- shot of Mr. Barnhill's body and person.    And at

25   this point, I deployed my Taser for its five-second

Deposition Of Joshua Bishop

1    cycle in probe mode.

2        Q    How many times did you deploy the Taser for

3    that five-second cycle?

4        A    So I had the initial deployment in probe mode

5    where the probes actually shoot out of the Taser.  And

6    then I observed the Taser pointer to be ineffective for

7    various reasons because our Taser were supposed to

8    observe a neuromuscular incapacitation, which means you

9    essentially lose control of your muscles and your

10   ability to move around your major muscle groups.  And in

11   addition to that, my Taser was making what we call a

12   loud arking sounds.  You hear loud electric sparking

13   sounds.

14           So at that point, I knew the Taser did not make

15   good contact with Mr. Barnhill's person.  And that was

16   the only time I deployed at that point.  And then once

17   Mr. Barnhill was on the ground, there are some cases to

18   where when there's a lot of body movement and bodies

19   touching and people roaming around and moving around,

20   the probes can have sometimes a better connection and --

21   when they get lucky.  So at one point, I reenergized the

22   Taser and attempt to see if it would be successful a

23   second time.  I did not shoot a second set of darts.  I

24   just recharged the Taser for another five-second cycle.

25       Q    Okay.  So you actually deployed the probes one

Deposition Of Joshua Bishop

```
 1   time for five seconds; right?
 2       A    Yes.
 3       Q    And then recharged the Taser for another
 4   five seconds; right?
 5       A    Yes.
 6       Q    Okay.  Is it after you recharged the Taser for
 7   another five seconds that it was used as an improvised
 8   weapon?
 9       A    Yes.
10            MR. PACKER:  Okay.  I've got to use the
11   restroom.
12            Is now an okay time for us to take a break?
13            THE WITNESS:  Absolutely.
14            MS. KORNBLAU:  Yes.
15            MR. PACKER:  Excellent.  I appreciate it.
16               (A recess was taken.)
17   BY MR. PACKER:
18       Q    So I want to talk to you about your report and
19   show you what I believe is the document we've been
20   discussing, just to make sure we're on the same page;
21   okay?
22       A    Okay.
23       Q    So earlier we talked about the use of force-1
24   report; correct?
25       A    Yes.
```

Deposition Of Joshua Bishop

```
 1      Q     And this appears to be that report?
 2            MS. KORNBLAU:  I don't see anything on my
 3   screen.
 4            MR. PACKER:  Then I should probably share it
 5   better.
 6            Okay.  Can you see it now?
 7            MS. KORNBLAU:  Yes.
 8            MR. PACKER:  Excellent.
 9   BY MR. PACKER:
10      Q     Okay.  Do you see that report?
11      A     Yeah.  If you could just zoom in again to
12   the --
13      Q     Okay.
14      A     -- same zoom that you had before.
15      Q     Is that sufficient?
16      A     That should be good.
17      Q     Okay.  So I'm going to scroll down and just ask
18   you if you recognize this to be your report from
19   April 29th?
20      A     Yes.
21            MR. PACKER:  Okay.  And for the record, I'm
22   going to ask this be marked as Exhibit B.
23                 (Exhibit B was marked for
24                 identification and is attached
25                 hereto.)
```

Deposition Of Joshua Bishop

```
 1  BY MR. PACKER:
 2      Q    And you made this report at or near the time of
 3  the April 29th, 2022, use of force incident with
 4  Mr. Barnhill?
 5      A    Yes.
 6      Q    And that was your accurate recitation or memory
 7  of the facts at that time?
 8      A    Yes.
 9      Q    Okay.  You could see in the bottom right-hand
10  corner, mine says, "Page 1 of 6."
11          Do you see that?
12      A    Yes.
13      Q    And I think earlier you described a four-page
14  narrative that you reviewed and recalled; correct?
15      A    Yes.
16      Q    All right.  So I'm going to scroll down.  This
17  would be page 4.
18          This would be the last page of the document
19  that you remember reviewing?
20      A    Yes.
21      Q    Okay.  And so the following two pages are
22  essentially biographical and other nonnarrative
23  information; is that right?
24      A    Yes.
25      Q    All right.  I want to direct your attention to
```

Deposition Of Joshua Bishop

1    where -- do you see where my cursor is pointing?  Do you
2    see that area here under "subject injury type"?
3        A    Yes.
4        Q    And you see it says, "abrasion/laceration"?
5        A    Yes.
6        Q    And "obvious disfigurement"?
7        A    Yes.
8        Q    Did you write that phrase, "obvious
9    disfigurement"?
10       A    No.  I believe it was a -- there's a
11   check-the-box-type feature on our report writing system,
12   so I believe that was already written in there.  And it
13   was just a box that was checked, so I didn't physically
14   write it in there, no.
15       Q    Okay.  Do you know who physically selected that
16   box?
17       A    It would have been me because this is my
18   report.
19       Q    Okay.  So you physically selected the box that
20   said "obvious disfigurement"?
21       A    Yes.
22       Q    Okay.  Now, before the break, you told us that
23   you used the Taser as an improvised weapon to strike
24   Mr. Barnhill twice on the head; correct?
25       A    Yes.

1    Q    And again, that was on the left side of his
2    head?
3    A    Yes.
4    Q    Had you ever used a Taser in this manner
5    before?
6    A    No.
7         MS. KORNBLAU:  Objection.  Vague and ambiguous.
8         But go ahead.
9         THE WITNESS:  No.
10   BY MR. PACKER:
11   Q    So then to be more specific, you had never used
12   your Taser as an improvised weapon before; right?
13   A    No.
14   Q    Okay.  We got up to the moment where
15   Mr. Barnhill is on the ground with Officers Maynard and
16   Aguila, and you used the probe function on your Taser
17   once and recharged it a second time.
18        Do you remember that?
19   A    Yes.
20   Q    And then you reapproached and struck
21   Mr. Barnhill twice in the left side of his head;
22   correct?
23   A    Yes.
24   Q    Okay.  So that's the right sequence of events
25   to this point?

Deposition Of Joshua Bishop

```
 1      A    Yes.
 2      Q    After you strike Mr. Barnhill twice in the left
 3   side of his head -- let me ask it this way.
 4           Immediately after you strike Mr. Barnhill in
 5   the left side of his head, can you see his hands?
 6           MS. KORNBLAU:  Objection.  Vague and ambiguous.
 7           But go ahead.
 8           THE WITNESS:  At -- at this point in time,
 9   after the strikes of the Taser, I was able to visually
10   see Mr. Barnhill's left hand.  However, at this point, I
11   saw that his right hand was just -- Officer Maynard was
12   struggling to pull that right hand from out -- from
13   underneath his body.  Mr. Barnhill was still actively,
14   you know, physically resisting our efforts to gain
15   control of his hands.  So I could see that Officer
16   Maynard was still struggling to gain control of that
17   right arm.
18   BY MR. PACKER:
19      Q    Okay.  So what do you do at that point?
20      A    At that point, as I stated earlier, the best
21   way for me to assist with gaining control of
22   Mr. Barnhill's person was to be toward the upper portion
23   of his body after the second Taser strike.  The Taser
24   ended up actually flying out of my hands, you know, to
25   the ground, again, within close proximity to
```

Deposition Of Joshua Bishop

1   Mr. Barnhill as well.  And that's where we were at that

2   point.

3       Q    Okay.  So you said that after the second

4   strike, the Taser flew out of your hand.

5            Did you understand that to be a result of the

6   force of the strike?

7       A    I don't understand the question.

8       Q    Okay.  Was it the strike that caused the Taser

9   to fly out of your hand?

10           MS. KORNBLAU:  Objection.  Vague.

11           Go ahead.

12           THE WITNESS:  I think it was more of a kind of

13  being sweaty, slippery, you know, things of that nature,

14  not having a really good grip on the Taser.  Again,

15  that's -- you know, it was an improvised method at that

16  time that hadn't been done, as I already stated.  And I

17  think as a result of all those factors, it ended up

18  flying out of my hands.

19  BY MR. PACKER:

20      Q    Okay.  Were you trained to use the Taser as an

21  improvised weapon?

22      A    Specifically not trained to use it as an

23  improvised tool.  However, my policy does state that we

24  are allowed to improvise and use improvised methods and

25  tools given rapidly evolving situations.  And when we're

Deposition Of Joshua Bishop

1    confronted with those, as long as our improvised tools

2    or methods are reasonable to accomplish a legitimate law

3    enforcement goal, which was to take Mr. Barnhill into

4    custody.

5        Q    Okay.  The -- you -- so you engaged with

6    Mr. Barnhill's upper body at the time after the Taser

7    flew out of your hands; correct?

8        A    Yes.

9        Q    Mr. Barnhill didn't reach up and -- and grab

10   the Taser and move it out of your hand; is that correct?

11       A    That's correct.

12       Q    Okay.  In fact, he -- he didn't do anything to

13   cause the Taser to leave your hand; is that fair to say?

14           MS. KORNBLAU:  Objection.  Argumentative.

15           But go ahead.

16           THE WITNESS:  Well, as I -- as I previously

17   stated, I think there's a lot of factors that resulted

18   in the Taser flying out of my hands.  And specifically

19   his physical resistance.  If that wasn't happening, I

20   wouldn't have had to, you know, strike him or improvise

21   in this aspect.  So I would say a direct action of his

22   caused it to fly out of my hands.  But the fact that he

23   was actively, physically resisting is, you know, a

24   direct result of part of what happened and why it flew

25   out of my hand.

Deposition Of Joshua Bishop

1    BY MR. PACKER:

2        Q    Okay.  So let me see if I can understand that.

3            Had he not been resisting, you would not have

4    had to strike him in the side of the head.  That's what

5    you're saying; right?

6            MS. KORNBLAU:  Objection.  Misstates testimony.

7            Go ahead.

8            THE WITNESS:  So that's -- that's part of the

9    factors.  Again, there's different reasons.  Again, with

10   my policy, I'm allowed to improvise given the rapidly

11   evolving situations.  And as long as the situation and

12   the improvision is objectively reasonable.  And I think,

13   given the totality of the circumstances in this case and

14   Mr. Barnhill being violent, assaulting officers,

15   physically resisting, that's why he was struck with the

16   Taser.

17   BY MR. PACKER:

18       Q    Okay.  I understand all that.

19           But the -- Mr. Barnhill -- no specific action

20   by Mr. Barnhill caused the Taser to fly out of your

21   hand; right?

22           MS. KORNBLAU:  Objection.  Asked and answered.

23           Go ahead.

24           THE WITNESS:  Just the active physical

25   resistance from Mr. Barnhill, which are his actions, in

Deposition Of Joshua Bishop

```
 1   my opinion --
 2   BY MR. PACKER:
 3      Q    Okay.  So aside from that, there was nothing --
 4           MS. KORNBLAU:  Okay.  Hold on.  Hold on.  It --
 5   you interrupted him.  He wasn't done --
 6           MR. PACKER:  Sure.
 7           MS. KORNBLAU:  -- with the response.
 8           THE WITNESS:  So the -- the active physical
 9   resistance, in my opinion, was Mr. Barnhill's actions,
10   and the violence and the potential to still be in
11   possession of a weapon was the result of the Taser
12   strike.  And as I stated, if his actions were compliance
13   and allowing us to take him into custody, it wouldn't
14   have resulted in that Taser strike.  So in my opinion,
15   his actions did result in the fact that -- that's why
16   the Taser ended up being used and flying out of my
17   hands.
18   BY MR. PACKER:
19      Q    Okay.  Do you recall what you were saying while
20   you were reengaging with Mr. Barnhill's upper body?
21           MS. KORNBLAU:  Objection.  Vague.
22           Go ahead.
23           THE WITNESS:  I believe I was saying, "Put your
24   hands behind your back."
25   ///
```

Deposition Of Joshua Bishop

1  BY MR. PACKER:

2      Q     Okay.  Do you recall what, if anything,

3  Mr. Barnhill was saying?

4      A     Mr. Barnhill was stating that his hands were

5  behind his back; however, they were not, and he was

6  still actively, physically resisting and pulling away

7  from officers' grasps.

8      Q     Okay.  Do you recall Mr. Barnhill, while he was

9  on the ground, saying, "I'm not resisting"?

10         MS. KORNBLAU:  Objection.  Misstates the

11  evidence.

12         But go ahead.

13         THE WITNESS:  I believe the only thing I

14  remember -- recalling him saying is, "They're behind my

15  back."  And again, as I stated, he was stating these

16  things that "they're behind my back"; however, officers

17  were still struggling to gain control of his arms and

18  hands.  And one of his hands appeared to be secured,

19  which was the left hand.  However, Officer Maynard

20  specifically was still struggling to gain control of

21  that right hand.  And Mr. Barnhill was still actively

22  pulling away from Officer Maynard's grasp.

23  BY MR. PACKER:

24      Q     Okay.  How long did this entire use of force

25  incident last, as you recall?

Deposition Of Joshua Bishop

1    A    I would estimate to be anywhere between three

2   to six minutes.

3    Q    Okay.  Do you recall if Mr. Barnhill's hands

4   were ever secured during this incident?

5    A    Yes.

6    Q    Do you know who secured them?

7    A    I believe it was a culmination and -- you know,

8   of Officers Maynard, Aguila, and Corporal Klinzing.

9    Q    Okay.  When they were secured, could you --

10  could you see Mr. Barnhill's hands behind his back while

11  he was still on the ground at any point?

12   A    Once we were able to -- I mean, those three

13  officers were able to place him into handcuffs.  This

14  handcuff -- hands behind his back is when I observed him

15  to finally be secured.

16   Q    So you -- you did not see his hands prior to

17  them being in handcuffs?

18        MS. KORNBLAU:  Objection.  Vague.

19        Go ahead.

20        THE WITNESS:  So as I -- as I stated, I saw the

21  left hand.  Officer Aguila appeared to have a decent

22  control and grasp of that left hand, but Officer Maynard

23  was struggling to gain control.  And in compliance with

24  the right hand, which was almost down by Mr. Barnhill's

25  side, and he was not allowing it to be put behind his

Deposition Of Joshua Bishop

1    back, from what I recall.

2    BY MR. PACKER:

3        Q    Okay.

4        A    And it wasn't until Corporal Klinzing arrived

5    that we had a third officer that it took to get this

6    other hand behind his back.

7        Q    Okay.  So you told us you reengaged with his

8    upper body.

9            Do you recall if you struck him again at any

10   point during the use of force event?

11       A    No.

12       Q    So you don't recall one way or another striking

13   him again?

14           MS. KORNBLAU:  Objection.  Vague.

15           THE WITNESS:  I don't understand the question.

16   BY MR. PACKER:

17       Q    Okay.  Let me ask you this:  Do you recall

18   grabbing the back of his head at any point?

19       A    Yes.

20       Q    At what point did you grab the back of his

21   head?

22       A    As -- as I stated -- so as Officer Aguila had

23   control of that -- of that left hand and Officer Maynard

24   was still struggling to gain control of that right hand

25   and after the Taser had flown out of my hand is when I

Deposition Of Joshua Bishop

1    utilized my hands to grab the hooded portion of his

2    large bulky sweater, and then I grasped his

3    ponytail-style hair to hold his down -- hold his head

4    and upper body down toward the ground.

5        Q    Okay.  When you say hold his body down towards

6    the ground, what do you mean?

7        A    So as Mr. Barnhill was still -- yes, he was

8    down on the ground.  He was still actively moving

9    around, you know, whether that be his shoulders, his

10   arms, his -- his head.  I couldn't see his legs at that

11   point; however, he was still actively moving around.  So

12   I was attempting to hold him down via the very upper

13   portion of his body.  And that was the only portion that

14   I was able to go hands-on with Mr. Barnhill due to the

15   other officers being there.

16       Q    Okay.  I want to show you again Exhibit B, your

17   report.  And I'm going to direct your attention to

18   page 3.

19            And in this report, do you see the paragraph

20   that starts, "In an attempt"?

21       A    Yes.

22       Q    And as that sentence continues, it says, "I

23   grasped Barnhill's ponytail-style hair and slammed his

24   face and head into the ground."

25            Is that what you meant when you said you pulled

Deposition Of Joshua Bishop

1  him toward the ground?

2      A    So my intent at that point, again, was to, as I

3  stated, immobilize him and keep any further movements

4  due to his active moving around.  And my intention was

5  to hold his head and upper portion of his body down

6  toward the ground.  And as -- as Mr. Barnhill continued

7  to actively move around, his head had slightly lifted

8  off of the ground, and I ended up pushing it back to the

9  ground, which caused it to slam into the ground.

10     Q    Okay.  To be clear, though, you said in your

11  report that was written on April 29th that you grasped

12  Barnhill's ponytail-style hair and slammed his face and

13  head into the ground.  Those were your words on

14  April 29th.

15          Did I read that accurately?

16          MS. KORNBLAU:  Objection.  Asked and answered.

17  Calls for a narrative.

18          But go ahead.

19          THE WITNESS:  So again, as -- as officers were

20  attempting to gain control and gain compliance and place

21  him in handcuffs, Mr. Barnhill was still actively

22  physically resisting our efforts to take him into

23  custody and gain control of his arms and hands.  At that

24  point, I didn't have my Taser anymore, and it was

25  ineffective, and it flew to the side, and it was on the

Deposition Of Joshua Bishop

1  ground, so I utilized my hands to again hold his hooded

2  portion of his sweater.  And the only thing that was

3  available to me as well was his ponytail-style hair,

4  which I grasped, held on to, pushed him down into the

5  ground.  And as a result of Mr. Barnhill's actions of

6  continuing to move around, I pushed his head back down

7  toward the ground, which caused it to slam.

8  BY MR. PACKER:

9      Q    Okay.  I want to talk about -- you said --

10 excuse me.  Sorry.  You said you had a operative body

11 camera on April 29th; is that correct?

12     A    Yes.

13     Q    Can you hear me?  I'm sorry.

14     A    Yes.

15     Q    I'm sorry, can you hear me?

16     A    Yes, I can.

17     Q    I've got a body cam -- okay.  So I'm going to

18 share my screen with you and ask you if you recognize a

19 video as being from your body cam; okay?

20     A    Okay.

21     Q    All right.  And let me see if I can do this

22 without creating tremendous noise.  Hold on just a

23 second.

24          Okay.  Can you see the video on my screen?

25     A    Yes.  It's not playing, but...

1       Q    No, I haven't played it yet.

2       A    Okay.

3       Q    I'm going to play it.  I'm going to play it

4    from the beginning to see if you recognize it is you.

5    And then I want to talk to you about this specific use

6    of force moment; okay?

7       A    Okay.

8       Q    And I don't know why the volume is not playing.

9            Can you hear it on your end?

10           MS. KORNBLAU:  It should start 30 seconds, and

11   we're not there yet.

12           MR. PACKER:  Got it.

13           There we go.  Thank you.

14   BY MR. PACKER:

15      Q    So in this video, is that you holding the

16   firearm?

17      A    Yes.

18      Q    And this is, as you recognize it, your body

19   camera?

20      A    Yes.

21      Q    And this is the one you were wearing on

22   April 29th, 2022?

23      A    Yes.

24      Q    Okay.  I'm going to continue to let it play.

25   And then for the record, I believe we're on Exhibit C.

Deposition Of Joshua Bishop

```
 1                    (Exhibit C was marked for
 2                    identification and is attached
 3                    hereto.)
 4    BY MR. PACKER:
 5        Q    So I'm just starting up.  And I'm starting.
 6                    (Video playing.)
 7    BY MR. PACKER:
 8        Q    And so just to confirm, this is your video;
 9    right?
10        A    Yes.
11        Q    And this memorializes the pursuit; is that fair
12    to say?
13        A    Yes.
14        Q    Okay.  I'm going to move forward to the end of
15    the vehicle pursuit and talk to you about the use of
16    force incident.
17             Is that okay with you?
18        A    Yes.
19        Q    All right.  So I'm going to play from 2:41 on
20    the video that has been marked as Exhibit C to today's
21    deposition.
22                    (Video playing.)
23    BY MR. PACKER:
24        Q    So is that you that's screaming, "Show us your
25    fucking hands now"?
```

Deposition Of Joshua Bishop

```
 1        A    Yes.

 2        Q    And is this the moment -- well, let me ask you

 3   this:  Do you see a figure in the upper left-hand side

 4   of the video?

 5        A    Yes.  It's kind of hard to see, but yes.

 6        Q    Sure.

 7             And is that, to your knowledge, Mr. Barnhill?

 8        A    Yes.

 9        Q    And this is the moment where you said, "Show us

10   your hands"?

11        A    Yes.

12        Q    And you see his hands are raised?

13        A    Yes.

14        Q    Okay.  So that was consistent with you -- what

15   you told us earlier about him initially complying with

16   your commands?

17        A    Yes.

18        Q    Okay.  I'm going to continue to play Exhibit C.

19             (Video playing.)

20   BY MR. PACKER:

21        Q    Okay.  So the officer that's making first

22   contact there, has "police" written across his back at

23   2:49 is Officer Maynard; is that right?

24        A    Yes.

25        Q    Okay.  Okay.  And at 2:51, approximately, is
```

Deposition Of Joshua Bishop

1    that you pulling off the Taser and yelling, "Taser"?

2         A    Yes.

3              MS. KORNBLAU:  I'll just object that a still

4    shot doesn't capture exactly what you're saying.

5              But go ahead.

6              MR. PACKER:  I understand that.

7    BY MR. PACKER:

8         Q    I'm just trying to understand who's standing

9    where at this point, okay, Officer Bishop?

10        A    Okay.

11        Q    All right.  So the individual on -- at 2:52 on

12   the far left-hand side, do you understand that to be

13   Officer Maynard?

14        A    Yes.

15        Q    And then the individual that's closer to you in

16   your view from the camera is Officer Aguila?

17        A    Yes.

18        Q    Okay.  And those are the only officers we see

19   in the frame along with Mr. Barnhill; is that right?

20        A    Yes.

21        Q    So -- okay.  So that at 2:55 is the first Taser

22   shot; is that right?

23        A    Yes.

24        Q    That's the one where you deployed the probes?

25        A    Yes.

Deposition Of Joshua Bishop

1      Q      Okay.  And at approximately 3:05 is that second
2  recharge of the Taser; is that correct?
3      A      Yes.
4                   (Video playing.)
5  BY MR. PACKER:
6      Q      So at 3:14, is that the first strike using the
7  Taser as an improvised weapon?
8      A      I believe it's both strikes.
9      Q      That was both strikes.  All right.
10             I'm going to play that back; okay?
11     A      Okay.
12                  (Video playing.)
13  BY MR. PACKER:
14     Q      So that was the two strikes to the side of his
15  head?
16     A      Yes.
17     Q      Okay.
18                  (Video playing.)
19  BY MR. PACKER:
20     Q      I'm going to let this play through the end just
21  to confirm that after we see the Taser strikes, it's
22  difficult to see anything beyond that, and ask you if
23  you agree with that.
24     A      Okay.
25                  (Video playing.)

Deposition Of Joshua Bishop

```
 1   BY MR. PACKER:
 2       Q    So at this point, at approximately 3:50, it's
 3   your understanding Mr. Barnhill has been handcuffed; is
 4   that right?
 5       A    Yes.
 6            MS. KORNBLAU:  Objection.  I can't -- I can't
 7   say that in the still shot.
 8            But go ahead.
 9            MR. PACKER:  Understood.  I'm just trying to
10   stop it for reference just so that he can catch up and I
11   can ask the questions.
12   BY MR. PACKER:
13       Q    But -- so your understanding is as of 3:50, the
14   hands have been cuffed; is that right?
15       A    From -- from my recollection, yes.
16       Q    Okay.  Is this the only video that you've
17   reviewed in preparation for today?
18       A    Yes, my own video.
19       Q    Okay.  Did you review any of the other
20   officers' videos at any point?
21       A    No.
22       Q    Okay.  I do want to share with you Officer
23   Aguila's video and just ask if it's an accurate
24   depiction of your memory of the events; okay?
25       A    Okay.
```

Deposition Of Joshua Bishop

```
 1              MS. KORNBLAU:  And I'll just object that it
 2    calls for speculation since this is not his vantage
 3    point nor his video.
 4              MR. PACKER:  Okay.
 5    BY MR. PACKER:
 6       Q    Sorry for the technological ineptitude.  My
 7    paralegal is on vacation, so this is what you get.
 8    Sorry.
 9              Okay.  This is -- we're going to mark this as
10    Exhibit D.
11                   (Exhibit D was marked for
12                   identification and is attached
13                   hereto.)
14    BY MR. PACKER:
15       Q    And I'm going to ask if you see at 2:26 an
16    officer in the camera view.
17              MS. KORNBLAU:  Again, objection to all of this
18    since it lacks foundation.  Calls for speculation.
19              But go ahead.
20    BY MR. PACKER:
21       Q    Do you recognize that to be you in the camera
22    view?
23       A    Yes.
24       Q    Okay.  I'm going to let it play through, and
25    then I want to ask you about one moment in particular.
```

Deposition Of Joshua Bishop

```
 1                    (Video playing.)
 2    BY MR. PACKER:
 3        Q    Okay.  Did you hear somebody say, "I've got his
 4    hands, I've got his hands" at that point?
 5             MS. KORNBLAU:  Objection.  Calls for
 6    speculation.
 7             Go ahead.
 8             THE WITNESS:  Personally, I -- there was a lot
 9    of things being shouted.  I don't personally recall
10    hearing somebody say, "I got his hands."
11    BY MR. PACKER:
12        Q    Okay.  So you don't recall that at that --
13    hearing that at the time of the use of force incident;
14    is that fair to say?
15        A    Yes.
16        Q    Okay.  Do you see his hands -- both of his
17    hands in Exhibit D at 2:57?
18             MS. KORNBLAU:  Objection.  Lacks foundation.
19             Go ahead.
20             THE WITNESS:  I -- I just like to point out in
21    this specific video -- I mean, this still shot image, I
22    can -- yes, I can observe two hands.  But from my
23    vantage point, it's completely different as you could
24    see earlier, and I could not see that portion from my
25    vantage point.
```

Deposition Of Joshua Bishop

```
 1   BY MR. PACKER:
 2       Q    Okay.  So you couldn't see this portion.  And
 3   then you said you don't recall hearing somebody say, "I
 4   got his hands"?
 5       A    Correct.
 6       Q    Okay.
 7            MS. KORNBLAU:  Objection.  Lacks foundation.
 8            Go ahead.
 9            THE WITNESS:  So kind of as I explained
10   earlier, that the only portion of the body camera is
11   able to assist with immobilizing Mr. Barnhill and
12   assisting with taking him into custody, was holding the
13   hooded portion of his sweatshirt and the ponytail-style
14   hair that he had.  Again, with everything that we had
15   up -- up to this point, the fact that we still hadn't
16   patted him down for weapons, we still didn't know if he
17   was in possession of a firearm or whose house we were
18   at, if anybody else was going to be victimized or taken
19   hostage, things of that nature.  I was holding him down
20   toward the ground.  And with his actions, at one point,
21   his head slightly lifted off the ground, and I pushed it
22   back down into the ground to prevent any further
23   movement of his person, which was actively -- is active
24   physical resistance.  And when I pushed his head back
25   toward the ground is what caused it to slam.
```

Deposition Of Joshua Bishop

1    BY MR. PACKER:

2        Q    Okay.  So to be clear, though, on this video,

3    the action that occurs at approximately three minutes,

4    and I'll play it again, is what you're describing as

5    that pushing the head back into the ground?

6              MS. KORNBLAU:  Objection.

7                  (Video playing.)

8    BY MR. PACKER:

9        Q    Is that correct, that action at three minutes?

10             MS. KORNBLAU:  Again, objection.  Lacks

11   foundation.  This is not his video.  And it's vague.

12             Go ahead.

13             THE WITNESS:  So as I just stated, that's -- my

14   recollection of the event is not via this -- this video,

15   this vantage point.  Mine was -- mine was different.

16   And I was holding his head and upper portion of his body

17   down toward the ground.  And as a result of his actions

18   of lifting his head off the ground, I pushed it back

19   down.

20   BY MR. PACKER:

21       Q    Okay.  I understand this isn't your video.  You

22   see in the camera view at 3:01 of Exhibit D that

23   Officer Maynard is identified on his uniform.

24             Is that where you recall Officer Maynard being?

25             MS. KORNBLAU:  Objection.  Lacks foundation.

Deposition Of Joshua Bishop

1    Vague and ambiguous.

2          Go ahead.

3          THE WITNESS:  My recollection is that

4    Officer Maynard was pretty much directly underneath me.

5    BY MR. PACKER:

6      Q    Okay.  Can you identify where you are in this

7    video?

8          MS. KORNBLAU:  Objection.  Vague as to time.

9          Go ahead.

10         MR. PACKER:  And you're right.  I should

11   clarify.

12   BY MR. PACKER:

13     Q    At the 3:01 mark, do you know where you're

14   standing?

15     A    It -- from -- from this, I mean, it looks like

16   there's a lot of arms and -- and legs kind of frozen in

17   one still shot.  But at this point, to my recollection,

18   I'm still directly above Officer Maynard.

19     Q    Okay.  And I'm going to play it one more time.

20             (Video playing.)

21   BY MR. PACKER:

22     Q    So as far as you know, at 2:59, the left hand

23   that appears to pick it in the upper left-hand portion

24   of Exhibit D with a watch on, is that your hand?

25         MS. KORNBLAU:  Objection.  Lacks foundation.

Deposition Of Joshua Bishop

1    Vague and ambiguous.

2          Go ahead.

3          THE WITNESS:  There's several watches, so I'm

4    not sure which one you're being -- which one you're

5    articulating or being specific to.

6    BY MR. PACKER:

7      Q    I'm specifically asking about the hand with the

8    watch on in the upper -- further most upper left-hand

9    corner of the video that's Exhibit D at 2:59.

10         MS. KORNBLAU:  Again, objection.  Lacks

11   foundation.  Calls for speculation.

12         Go ahead.

13         THE WITNESS:  Yes, I believe that was my

14   watchband at the time.

15   BY MR. PACKER:

16     Q    Okay.  So we did establish that at some point,

17   Mr. Barnhill was handcuffed; is that right?

18     A    Yes.

19     Q    Did you search his waistband at that point?

20     A    I did not.

21     Q    Do you know if anybody searched his waistband

22   at that point?

23         MS. KORNBLAU:  Objection.  Calls for

24   speculation.

25         But go ahead.

Deposition Of Joshua Bishop

1           THE WITNESS:  Yes, I believe he was searched.
2     And I believe I heard Officer Maynard verbally say that
3     I have to check -- he has to check him for a firearm,
4     but I personally did not observe the search of
5     Mr. Barnhill's person.
6     BY MR. PACKER:
7           Q     Okay.  To your knowledge, was any firearm found
8     on Mr. Barnhill's person on April 29th, 2022, at the
9     time of the use of force event?
10          A     Not to my knowledge.
11          Q     To your knowledge, was a knife found at that
12    point?
13          A     Not to my knowledge.
14          Q     To your knowledge, was one found in the area
15    around Mr. Barnhill's person during the use of force
16    event?  And -- and by that, I mean after he was taken
17    into custody.
18          A     To my knowledge, I know that officers later had
19    conducted a search of the residence that we did not know
20    at the time was Mr. Barnhill's and a firearm -- I think
21    multiple firearms located within that residence.
22          Q     Okay.  This entire event happened outside the
23    residence; correct?
24          A     Yes.
25          Q     And the front door to the residence was closed

Deposition Of Joshua Bishop

1    at all times?

2         MS. KORNBLAU:  Objection.  Calls for

3    speculation.

4         But go ahead.

5         THE WITNESS:  Yes, the front door was closed.

6    However, as I had put in my report, it had appeared that

7    Mr. Barnhill was attempting to gain entry into that same

8    residence that the firearms were located.

9    BY MR. PACKER:

10        Q    Okay.  There were no firearms found on the

11   front porch of the residence; correct?

12        A    No.

13        Q    And there were no knives found on the front

14   porch of the residence; correct?

15        A    No.

16        Q    And aside from the metal chair that you

17   identified, there was no weapon of any kind found on the

18   front porch of the residence; correct?

19        A    No.

20        MR. PACKER:  Andrea, let me look at my notes.

21   I think I'm pretty close.

22        MS. KORNBLAU:  Okay.

23        MR. PACKER:  So if you want to just take five.

24        MS. KORNBLAU:  Yeah.

25             (A recess was taken.)

Deposition Of Joshua Bishop

1    BY MR. PACKER:
2        Q    So, Officer Bishop, I just want to confirm a
3    couple more things.
4            You told us about a knee strike from one of the
5    other officers by Mr. Barnhill; is that right?
6        A    Yes.
7        Q    Did Mr. Barnhill strike you at all during this
8    use of force event?
9            MS. KORNBLAU:  Objection.  Vague and ambiguous.
10            But go ahead.
11            THE WITNESS:  No.
12    BY MR. PACKER:
13        Q    Okay.  I'm going to share with you a couple of
14    photos and just ask if they accurately depict
15    Mr. Barnhill's appearance on that day.
16            Now I'm going to mark this as Exhibit E.
17                (Exhibit E was marked for
18                identification and is attached
19                hereto.)
20    BY MR. PACKER:
21        Q    Do you see the individual depicted in this
22    photo?
23            MS. KORNBLAU:  And I'll just object that it
24    lacks foundation.
25            But go ahead.

Deposition Of Joshua Bishop

```
 1              THE WITNESS:  If -- if you could zoom in a
 2   little bit like the -- from the reports --
 3              MR. PACKER:  Sure.
 4              THE WITNESS:  -- it would help out.  And if you
 5   could repeat the question.
 6   BY MR. PACKER:
 7       Q    Do you recognize the individual in this
 8   photograph?
 9       A    Yes.
10              MS. KORNBLAU:  Objection.
11   BY MR. PACKER:
12       Q    Is that Mr. --
13              MR. PACKER:  Sorry.
14              MS. KORNBLAU:  Okay.  Objection.  Lacks
15   foundation.
16              Go ahead.
17   BY MR. PACKER:
18       Q    Who do you recognize this to be?
19       A    Mr. Barnhill.
20       Q    Is this how he appeared after the use of force
21   incident on April 29, 2022?
22              MS. KORNBLAU:  Objection.  Calls for
23   speculation.
24              Go ahead.
25              THE WITNESS:  I personally did not really
```

Deposition Of Joshua Bishop

1  observe Mr. Barnhill following his apprehension and

2  arrest.

3  BY MR. PACKER:

4    Q    Okay.  Do you know if anybody accompanied him

5  to the hospital that day?

6    A    I do not recall who went with him to the

7  hospital.

8    Q    Okay.  I'll share with you another photo that

9  we'll mark as Exhibit F.

10                (Exhibit F was marked for

11                identification and is attached

12                hereto.)

13  BY MR. PACKER:

14    Q    Do you recognize the individual depicted in

15  Exhibit F to be Mr. Barnhill?

16        MS. KORNBLAU:  Again, objection.  Lacks

17  foundation.

18        Go ahead.

19        THE WITNESS:  Yes.

20  BY MR. PACKER:

21    Q    Okay.  And is this how he appeared to you on

22  April 29, 2022?

23        MS. KORNBLAU:  Again, lacks foundation and

24  lacks authentication.

25        Go ahead.

Deposition Of Joshua Bishop

```
1            THE WITNESS:  As I previously stated, after he
2  was taken into custody, I did not really have any
3  contact or visual of Mr. Barnhill after the fact.
4  BY MR. PACKER:
5     Q    Okay.  I'm going to share with you one more
6  exhibit.  I think we're on --
7            MR. PACKER:  Is this G?
8            THE REPORTER:  G.
9            MR. PACKER:  I'm sorry, what was that?
10           THE REPORTER:  It's G, yes.
11           MR. PACKER:  Okay.  Excellent.
12               (Exhibit G was marked for
13               identification and is attached
14               hereto.)
15  BY MR. PACKER:
16    Q    Does this appear to be Mr. Barnhill?  Just the
17  individual depicted, does it appear to be Mr. Barnhill
18  to you?
19           MS. KORNBLAU:  Again, objection.  Lacks
20  foundation.  Lacks authentication.
21           Go ahead.
22           THE WITNESS:  Yes.
23  BY MR. PACKER:
24    Q    I want to direct your attention to the -- to
25  his head -- this individual's head who you've identified
```

Deposition Of Joshua Bishop

1    as Mr. Barnhill.

2            Do you see that there is -- appears to be a

3    laceration of some sort in the -- on his head?

4            MS. KORNBLAU:  Objection.  Calls for medical

5    opinion.

6            But go ahead.

7            THE WITNESS:  It's hard to see.  I can't tell

8    if it's -- if it's hair or a laceration.

9    BY MR. PACKER:

10       Q    Okay.  Do you see the area of discoloration on

11   the left side of his head?

12       A    Yes.

13       Q    Is that, to your recollection, the area where

14   you struck him with the improvised weapon, the Taser

15   used as an improvised weapon?

16           MS. KORNBLAU:  Lacks foundation.

17           Go ahead.

18           THE WITNESS:  To my recollection, it was to the

19   left side of his head, so that could be a result of it.

20   But I'm not -- I don't want to say I'm 100 percent sure.

21           MR. PACKER:  Okay.  Okay.  Andrea, do you have

22   anything?

23           MS. KORNBLAU:  No, I don't.

24           MR. PACKER:  All right.  Do you want to just go

25   by code?

Deposition Of Joshua Bishop

```
 1    MS. KORNBLAU:  Sure.

 2    MR. PACKER:  Excellent.

 3    MS. KORNBLAU:  Yes.

 4    THE REPORTER:  Do you need a copy, Ms. --

 5    MR. PACKER:  Thank you, Officer.

 6    THE REPORTER:  Oops.  Sorry.

 7    Do you need a copy, Ms. Packer?

 8    MS. KORNBLAU:  Yes, please.

 9        (The proceedings were concluded

10                  at 3:49 p.m.)

11                  ---o0o---

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Deposition Of Joshua Bishop

```
1    STATE   OF   CALIFORNIA  )
                              ) ss.
2    COUNTY OF   _____  )

3

4

5            I, JOSHUA OFFICER , say I have read the

6    foregoing deposition and declare under penalty of perjury

7    that my answers as indicated are true and correct.

8

9

10

11   _____
           (Date)

12

13                            _____
                                      (Signature)

14

15

16

17

18

19

20

21

22

23

24

25
```

Deposition Of Joshua Bishop

```
1   STATE   OF  CALIFORNIA    )
                              ) ss.
2   COUNTY  OF  LOS ANGELES  )

3

4           I, Sandra Concialdi, Certified Shorthand Reporter,

5   License No. 12553, for the State of California, do hereby

6   certify:

7           That, prior to being examined, the witness

8   named in the foregoing deposition, to wit, OFFICER JOSHUA

9   BISHOP, was by me duly sworn to testify the truth, the whole

10  truth and nothing but the truth;

11          That said deposition was taken down by me

12  in shorthand at the time and place therein named and

13  thereafter reduced to computer-aided transcription

14  under my direction.

15          That the foregoing transcript, as typed, is a

16  true record of the said proceedings.

17          I further certify that I am not interested

18  in the event of the action.

19

20

21          Witness my hand this 11th day of February, 2025

22          Sandra Mitchell

23          _____

24          SANDRA CONCIALDI, C.S.R. No. 12553

25
```

Deposition Of Joshua Bishop

```
1   California Deposition Reporters, Inc.

2

3   NAME OF CASE: Henry Barnhill vs City of Hemet, et al.

4   DATE OF DEPOSITION: 01/30/2025

5   NAME OF WITNESS: Joshua Bishop

6   Reason Codes:

7        1. To clarify the record.

8        2. To conform to the facts.

9        3. To correct transcription errors.

10  Page _____ Line _____ Reason _____

11  From _____ to _____

12  Page _____ Line _____ Reason _____

13  From _____ to _____

14  Page _____ Line _____ Reason _____

15  From _____ to _____

16  Page _____ Line _____ Reason _____

17  From _____ to _____

18  Page _____ Line _____ Reason _____

19  From _____ to _____

20  Page _____ Line _____ Reason _____

21  From _____ to _____

22  Page _____ Line _____ Reason _____

23  From _____ to _____

24

25                   _____
```

Deposition Of Joshua Bishop

---

**Exhibits**

**Exhibit A** 4:9
12:14

**Exhibit B** 4:10
49:22,23 61:16

**Exhibit E** 4:13
78:16,17

**Exhibit F** 4:14
80:9,10,15

**Exhibit G** 4:15
81:12

---

**-**

**---o0o---** 83:11

---

**1**

**1** 12:12 50:10

**100** 82:20

**12525.2** 15:21

**18** 15:1

---

**2**

**2** 41:3

**20** 6:24

**2014** 7:3

**2018** 8:20 9:5,16

**2019** 8:11

**2020** 9:23

**2022** 24:15 25:3
26:13 27:12
29:21 30:4
31:10 50:3
64:22 76:8

79:21 80:22

**2022-02719-use**
24:23

**2025** 5:1

**29** 24:13 25:3
27:2,12 28:7,22
29:21 31:10
79:21 80:22

**29th** 26:13 30:3
49:19 50:3
62:11,14 63:11
64:22 76:8

**2:02** 5:2

**2:26** 70:15

**2:41** 65:19

**2:49** 66:23

**2:51** 66:25

**2:52** 67:11

**2:55** 67:21

**2:57** 71:17

**2:59** 74:22 75:9

---

**3**

**3** 41:7 61:18

**30** 5:1 64:10

**300.3** 17:19

**300.3.3** 17:23

**300.4** 13:8

**354** 33:4,5 34:2
37:25 38:4,12
42:15

**3:01** 73:22 74:13

**3:05** 68:1

**3:14** 68:6

**3:49** 83:10

**3:50** 69:2,13

---

**4**

**4** 50:17

---

**5**

**5** 41:3,7

---

**6**

**6** 50:10

**6:00** 27:15

---

**7**

**7:30** 27:20

---

**A**

**a.m.** 27:15

**ability** 18:8
19:19 21:9
47:10

**abrasion/
laceration** 51:4

**Absolutely**
48:13

**academy** 8:12,
15,19 9:13,15
10:2

**accompanied**
80:4

**accomplish**
55:2

**account** 18:10
22:18 23:3

**accurate** 50:6
69:23

**accurately**
62:15 78:14

**action** 55:21
56:19 73:3,9

**actions** 22:10
56:25 57:9,12,
15 63:5 72:20
73:17

**active** 56:24
57:8 62:4 72:23

**actively** 39:22
46:15 53:13
55:23 58:6,21
61:8,11 62:7,21
72:23

**actual** 24:19

**added** 20:9

**addition** 20:20
47:11

**additional** 9:24

**address** 33:6

**afternoon** 5:10,
11

**agency** 8:24

**agree** 68:23

**Aguila** 37:7
38:21 39:17
40:12,25 41:2,6
42:23 43:20
45:23 46:15
52:16 59:8,21
60:22 67:16

**Aguila's** 69:23

**ahead** 7:19 16:1
18:21 21:5,12
22:2,23 24:10
26:23 29:23
30:6,11,24 33:8
34:4,12 35:6,20
37:21 38:8
39:16 40:5 43:5,
23 46:9 52:8
53:7 54:11
55:15 56:7,23
57:22 58:12
59:19 62:18
67:5 69:8 70:19
71:7,19 72:8
73:12 74:2,9
75:2,12,25 77:4
78:10,25 79:16,
24 80:18,25
81:21 82:6,17

**allowed** 54:24
56:10

**allowing** 57:13
59:25

**altogether**
20:12

**ambiguous**
18:20 20:16
21:11 29:22
30:5,23 38:6
46:8 52:7 53:6
74:1 75:1 78:9

**Andrea** 77:20
82:21

**Andrew** 29:3,5

**anymore** 62:24

**apologize** 17:14

**appearance**
78:15

**appeared** 58:18

---

Deposition Of Joshua Bishop

59:21 77:6 79:20 80:21

**appears** 21:20 49:1 74:23 82:2

**apply** 5:24,25

**applying** 18:10

**apprehend** 23:14 45:24

**apprehending** 23:20 41:18

**apprehension** 23:5 80:1

**approximate** 11:18

**approximately** 6:22 27:20 32:25 41:3 66:25 68:1 69:2 73:3

**April** 24:13 25:3 26:13 27:2,12 28:7,22 29:21 30:3 31:10 49:19 50:3 62:11,14 63:11 64:22 76:8 79:21 80:22

**area** 23:4 25:15 31:20,22,24 32:1,2,4,16 33:3 34:16,23 41:10 45:2,12 51:2 76:14 82:10,13

**Argumentative** 38:7 55:14

**Arizona** 7:13

**arking** 47:12

**arm** 53:17

**arms** 39:22,23 58:17 61:10 62:23 74:16

**arrest** 11:6 22:19 23:5 80:2

**arrive** 37:16 38:14,22

**arrived** 37:9 38:11,17,20 40:12 60:4

**articulating** 75:5

**aspect** 55:21

**assaulting** 56:14

**assert** 17:8

**assessing** 22:15

**assignment** 9:6 25:5

**assist** 41:13,17, 18 53:21 72:11

**assistance** 41:20 44:3

**assisting** 39:18 72:12

**attached** 12:15 49:24 65:2 70:12 78:18 80:11 81:13

**attempt** 47:22 61:20

**attempted** 40:12 45:23

**attempting** 39:19 42:1 46:16 61:12

62:20 77:7

**attention** 13:8 18:3 21:15 50:25 61:17 81:24

**attorney** 5:25 6:18

**authentication** 80:24 81:20

---

**B**

**B-I-S-H-O-P** 5:16

**back** 8:16 25:14 34:23 41:14 57:24 58:5,15, 16 59:10,14 60:1,6,18,20 62:8 63:6 66:22 68:10 72:22,24 73:5,18

**bad** 31:6

**badge** 25:15

**Barnhill** 28:3 29:8,16 30:3 31:9 32:6 33:17, 25 34:5,14 37:2, 19 38:3,23 39:2, 5,19,22,24 40:10,13,17,20, 21,24 41:2,6,18, 25 42:23 43:21 45:3,5,9,14 46:6,16,18,19 47:17 50:4 51:24 52:15,21 53:2,4,13 54:1 55:3,9 56:14,19, 20,25 58:3,4,8, 21 61:7,14 62:6,

21 66:7 67:19 69:3 72:11 75:17 77:7 78:5, 7 79:19 80:1,15 81:3,16,17 82:1

**Barnhill's** 32:23 33:6,20,24 38:18 39:21 42:4 44:4,6,8,9 45:1 46:24 47:15 53:10,22 55:6 57:9,20 59:3,10,24 61:23 62:12 63:5 76:5,8,15, 20 78:15

**barrage** 22:8

**based** 36:1

**basis** 13:3

**bear** 12:12 16:22 17:13

**began** 34:6 39:18

**begin** 32:15

**beginning** 32:21 33:9 64:4

**believed** 32:6

**believes** 13:21

**belt** 25:17

**biographical** 50:22

**Bishop** 5:4,15 17:7 67:9 78:2

**bit** 36:1 79:2

**block** 25:13

**bodies** 47:18

**bodily** 13:22 14:1,6,11 15:7, 10,21 16:6,13, 17,24 17:2

**body** 42:4,7 45:1 46:24 47:18 53:13,23 55:6 57:20 60:8 61:4,5,13 62:5 63:10,17,19 64:18 72:10 73:16

**body-worn** 6:20 25:21

**boots** 25:17

**bottom** 50:9

**box** 51:13,16,19

**brain** 14:7

**break** 6:7 19:14 48:12 51:22

**breast** 25:15

**briefing** 11:12

**broad** 23:24

**broadcast** 28:10,12 31:18 41:16

**broadcasted** 41:23

**Browne** 25:16

**bulky** 61:2

**business** 32:1

---

**C**

**California** 5:1 15:11,20

**call** 15:12 17:25

Deposition Of Joshua Bishop

27:22 28:1,24
29:15 41:19
44:3 45:20
47:11

calls 14:20
15:24 16:10
21:25 22:21
26:20 29:14
34:3 39:14 43:3
62:17 70:2,18
71:5 75:11,23
77:2 79:22 82:4

cam 63:17,19

camera 6:20
25:21 63:11
64:19 67:16
70:16,21 72:10
73:22

capture 67:4

car 31:3 32:5,8,
11 34:1 37:2

case 11:8,13
24:3 56:13

cases 47:17

catch 69:10

caused 54:8
55:22 56:20
62:9 63:7 72:25

causing 14:8

cetera 28:15

chair 39:9,11,13
40:10,18,20
41:11 42:2,11,
14,20 43:1,11,
12,14,17,19
77:16

chairs 23:17,23
43:6,7,8

check 76:3

check-the-box-
type 51:11

checked 25:25
51:13

chest 40:1

choose 23:15

Circle 33:4,5
34:2 37:25 38:4,
12 42:16

circumstances
45:3 56:13

city 7:19 25:6,17

clarify 6:13 17:1
33:22 36:20
37:24 74:11

Class 25:11

classes 11:18

classroom 28:8,
14,19

clear 62:10 73:2

close 23:20 32:3
43:9,11,12,18,
20 53:25 77:21

closed 39:2
76:25 77:5

closer 67:15

closest 36:24

cloth 25:14

code 15:21
82:25

college 7:6,10
8:15

command 35:3,
8,22

commands
34:21 35:1,13
66:16

communication
8:6

completely
71:23

compliance
57:12 59:23
62:20

complied 34:22,
25 35:12,21
36:21

comply 35:2,8

complying
66:15

computer 29:12

conclude 21:1

concluded 83:9

conduct 21:19
22:7,8

conducted
76:19

conducting
23:4

confirm 65:8
68:21 78:2

confronted
21:20 55:1

connect 8:1

connection
47:20

consistent
66:14

constitute 18:19
20:13

constitutes
19:18

contact 37:18
38:5 45:22
46:17 47:15
66:22 81:3

contacts 31:10,
13,14

continue 13:2
64:24 66:18

continued 34:20
62:6

continues 61:22

continuing 63:6

control 11:6
39:19,21 40:13,
17 42:5 46:16
47:9 53:15,16,
21 58:17,20
59:22,23 60:23,
24 62:20,23

copy 83:4,7

corner 50:10
75:9

corporal 28:24
29:1,2 37:11,15
59:8 60:4

correct 16:4,25
20:9 36:13
40:14 43:2
44:13 48:24
50:14 51:24
52:22 55:7,10,
11 63:11 68:2
72:5 73:9 76:23
77:11,14,18

counsel 16:25
20:10

County 7:4

couple 11:23
17:7,9 20:2
41:14 78:3,13

court 5:20,23,24
6:1,4,23

creating 63:22

crime 23:7

cuffed 69:14

culmination
59:7

cumulatively
20:19

cursor 51:1

custody 33:17,
25 42:1,6 46:17
55:4 57:13
62:23 72:12
76:17 81:2

cut 14:25

cycle 47:1,3,24

**D**

dangerous 45:7

darts 47:23

date 24:4,6 25:3

David 25:12

day 11:25 25:5,
10,20 29:21
78:15 80:5

de-escalation
11:6

deadly 10:7
12:3,9 13:7,19,
24

Deposition Of Joshua Bishop

death 13:21

decent 59:21

defines 15:21

definition 13:6 14:5 15:5 16:12, 17 22:6

degree 18:6

department 8:21,25 9:2,7, 20,25 10:18 11:1 12:19,25 13:6 16:14 17:17 27:6,9

department-issued 25:11, 16,21 44:23

depict 78:14

depicted 78:21 80:14 81:17

depiction 69:24

deploy 46:5,13 47:2

deployed 46:25 47:16,25 67:24

deployment 47:4

deposition 5:17 6:16 12:12 65:21

describe 25:9 31:21

describes 16:14

describing 73:4

description 29:13

detail 45:17

detective 28:23 29:1 31:17

determine 17:23

determined 44:17

device 25:19 45:14

devices 11:8

difficult 68:22

direct 6:2 13:7 18:3 21:15 50:25 55:21,24 61:17 81:24

directive 36:21

directly 7:8 39:17 74:4,18

discoloration 82:10

discussed 12:23

discussing 42:8 48:20

disfigurement 51:6,9,20

dishonesty 26:21

disregard 45:6

distance 39:2

document 12:18,21 48:19 50:18

documented 24:11

domains 10:13

door 34:6 37:25 38:4,12,15,18,

20,22 39:3,6,8 76:25 77:5

drew 45:24 46:17

drill 35:25

driver's 34:6

driving 32:8 45:7

drop-off 31:25

dropped 34:14, 22

dropping 31:24

due 61:14 62:4

duly 5:5

duty 25:17 27:7

—————

**E**

earlier 12:24 42:8 48:23 50:13 53:20 66:15 71:24 72:10

effective 18:19, 25 19:18 20:13

effectively 18:7, 13,14 20:5 21:2

effectuating 22:19

efforts 40:17 41:13 53:14 62:22

electric 47:12

empty 36:7,8,9, 17

end 13:12 37:24 64:9 65:14

68:20

ended 53:24 54:17 57:16 62:8

enforcement 7:15 31:10 55:3

engaged 32:13 45:5 55:5

enter 8:19

entire 58:24 76:22

entitled 6:11

entry 77:7

equipment 25:16

equipped 25:12

essentially 39:11 47:9 50:22

establish 75:16

estimate 59:1

event 33:18,19 60:10 73:14 76:9,16,22 78:8

events 52:24 69:24

evidence 58:11

evolving 54:25 56:11

exact 24:5 41:16,24

EXAMINATION 5:8

examined 5:6

examples 23:22

Excellent 48:15 49:8 81:11 83:2

excessive 26:21

excuse 15:6 22:16 28:10 63:10

exhibit 12:12,14 49:22,23 61:16 64:25 65:1,20 66:18 70:10,11 71:17 73:22 74:24 75:9 78:16,17 80:9, 10,15 81:6,12

exited 34:5,14 37:8,13

expert 14:21 15:13

explained 72:9

extensive 14:8, 15,19

extent 26:20

—————

**F**

face 61:24 62:12

fact 20:24 55:12,22 57:15 72:15 81:3

factor 20:8

factors 17:23 18:10 19:18,23 20:3,12,19 22:24 23:2,8 54:17 55:17 56:9

facts 29:5 50:7

fair 8:3 10:9

Deposition Of Joshua Bishop

13:3 20:23 28:20 29:6 31:3, 5,7,15 35:11 37:25 55:13 65:11 71:14

**fairly** 23:24

**familiar** 12:5,8 14:1 15:20

**family** 8:2

**feature** 51:11

**feel** 6:7,12

**feet** 41:3,7

**figure** 66:3

**finally** 59:15

**find** 16:21

**findings** 26:21

**finished** 8:17,18 9:15

**fire** 46:13

**firearm** 26:4 28:5 30:15 36:2, 13 45:8 64:16 72:17 76:3,7,20

**firearms** 76:21 77:8,10

**five-second** 46:25 47:3,24

**flew** 54:4 55:7, 24 62:25

**flown** 60:25

**fly** 54:9 55:22 56:20

**flying** 53:24 54:18 55:18 57:16

**foot** 37:2,19,24

**force** 10:5,7,9, 16,25 11:5 12:1, 3,6,9 13:7,19,24 17:16,20,24 18:10 26:17,21 27:6 31:11 33:19 50:3 54:6 58:24 60:10 64:6 65:16 71:13 76:9,15 78:8 79:20

**force-1** 48:23

**force-one** 24:23

**formal** 5:23

**forward** 65:14

**found** 16:17 76:7,11,14 77:10,13,17

**foundation** 38:7 46:7 70:18 71:18 72:7 73:11,25 74:25 75:11 78:24 79:15 80:17,23 81:20 82:16

**four-page** 50:13

**frame** 67:19

**free** 6:8,13

**front** 23:16 24:22 25:14 28:16,22,25 29:10 33:4 34:15,23 37:25 38:3,12,15,18, 20,22 39:3,6,7 41:10 42:15 45:1,12 76:25 77:5,11,13,18

**frozen** 74:16

**fucking** 65:25

**full** 5:13,15

**function** 52:16

**G**

**gain** 39:19,21 40:13 42:3 46:16 53:14,16 58:17,20 59:23 60:24 62:20,23 77:7

**gaining** 53:21

**Gardenia** 33:4,5 34:2 37:25 38:4, 12 42:15

**gardening** 23:16,23

**Gate** 8:25 9:1,7, 10,16 27:6

**gave** 34:20 46:19

**general** 7:22 42:10

**generally** 10:25 12:7,10

**Gilbert** 32:16

**Gilbert-stetson** 33:3

**give** 17:7

**giving** 20:11

**goal** 55:3

**good** 5:10,11 13:14 47:15 49:16 54:14

**Government** 15:20

**grab** 55:9 60:20 61:1

**grabbed** 45:21

**grabbing** 60:18

**graduate** 6:25 7:10,12

**graduated** 8:8, 13

**grasp** 39:24 58:22 59:22

**grasped** 61:2,23 62:11 63:4

**grasps** 58:7

**great** 14:6 15:7 16:6,13,17,24 17:2

**grip** 54:14

**ground** 40:22, 24 41:2,6,9 42:23 43:21 47:17 52:15 53:25 58:9 59:11 61:4,6,8, 24 62:1,6,8,9,13 63:1,5,7 72:20, 21,22,25 73:5, 17,18

**groups** 47:10

**gun** 29:21 30:9 44:13

**H**

**hair** 61:3,23 62:12 63:3 72:14 82:8

**hand** 23:7 35:4, 9,13,16,18,23 36:2,5,7,8,9,12, 13,15,17 44:9, 10,18,23,24,25 45:11,18,20 53:10,11,12 54:4,9 55:10,13, 25 56:21 58:19, 21 59:21,22,24 60:6,23,24,25 74:22,24 75:7

**handcuff** 59:14

**handcuffed** 69:3 75:17

**handcuffs** 59:13,17 62:21

**hands** 18:18 34:9,15,17,21 35:1,3,9,14,22 36:22 38:18,20 39:22 43:15 44:7 53:5,15,24 54:18 55:7,18, 22 57:17,24 58:4,18 59:3,10, 14,16 61:1 62:23 63:1 65:25 66:10,12 69:14 71:4,10, 16,17,22 72:4

**hands-on** 61:14

**happened** 29:25 34:2 39:5,13 55:24 76:22

**happening** 55:19

**hard** 13:12 66:5 82:7

**head** 28:5 45:15

Deposition Of Joshua Bishop

46:2 51:24 52:2,
21 53:3,5 56:4
60:18,21 61:3,
10,24 62:5,7,13
63:6 68:15
72:21,24 73:5,
16,18 81:25
82:3,11,19

**hear** 23:10
47:12 63:13,15
64:9 71:3

**heard** 76:2

**hearing** 71:10,
13 72:3

**held** 63:4

**Hemet** 8:21
9:19,25 10:18
11:1 12:18,24
13:24 25:17
27:9

**Hemet's** 10:19
12:5,8

**hereto** 12:16
49:25 65:3
70:13 78:19
80:12 81:14

**hiding** 28:2,7
29:10

**high** 6:25 7:8

**hold** 7:14 45:20
57:4 61:3,5,12
62:5 63:1,22

**holding** 64:15
72:12,19 73:16

**home** 32:3

**hooded** 61:1
63:1 72:13

**hospital** 80:5,7

**hostage** 72:19

**hours** 27:11

**house** 32:24
72:17

**husband** 28:2

**hypothetical**
22:1,22

---

**I**

**identification**
12:15 49:24
65:2 70:12
78:18 80:11
81:13

**identified** 42:9
73:23 77:17
81:25

**identify** 74:6

**image** 71:21

**immediately**
34:14 39:1 53:4

**imminent** 13:21
21:21 22:17

**immobilize** 62:3

**immobilized**
19:3,9

**immobilizing**
72:11

**improvise** 54:24
55:20 56:10

**improvised**
45:14 46:1 48:7
51:23 52:12
54:15,21,23,24
55:1 68:7 82:14,
15

**improvision**
56:12

**incapacitation**
47:8

**incident** 24:3,6
27:12,16 50:3
58:25 59:4
65:16 71:13
79:21

**incidents** 26:17

**include** 10:7
11:16 14:15,25

**included** 10:15
22:12

**includes** 14:14
19:19

**including** 31:11

**incomplete**
19:21 20:11

**individual** 19:3
20:25 21:20
22:7 23:5 29:9
67:11,15 78:21
79:7 80:14
81:17

**individual's**
18:18 81:25

**individuals**
23:14

**ineffective** 47:6
62:25

**ineptitude** 70:6

**information**
28:13,21 29:20,
24 30:2,9,14
31:18 50:23

**initial** 9:6 27:22
35:2,8,12,22

37:13 46:17
47:4

**initially** 34:21
35:2,7 36:21
66:15

**injuries** 14:14,
24

**injury** 13:22
14:2,6,7,8,11
15:8,11,21 16:6,
7,13,17,24 17:2
51:2

**instruct** 7:18

**instruments**
11:15

**intended** 46:4

**intent** 62:2

**intention** 62:4

**interjected**
20:10

**interrupted** 57:5

**investigation**
26:17

**involved** 26:18

**involving** 31:11

**issued** 11:8,15

**items** 23:24
42:8,15

---

**J**

**JANUARY** 5:1

**job** 9:19

**join** 9:1

**joining** 9:25
10:18

**Joshua** 5:4,15

---

**K**

**kick** 43:14

**kicked** 43:12

**kids** 31:24

**kill** 28:4

**kind** 17:15 22:7
31:15 39:7,8,9
43:14 54:12
66:5 72:9 74:16
77:17

**Klinzing** 37:11,
15 59:8 60:4

**knee** 40:17 78:4

**knees** 39:25
40:1

**knew** 45:3 47:14

**knife** 36:5,15
44:15 76:11

**knives** 77:13

**knowledge**
31:13,14 66:7
76:7,10,11,13,
14,18

**KORNBLAU**
7:14,18,23 8:1
14:20 15:12,24
16:9 17:5 18:20
19:4,11,20
20:15 21:3,11,
25 22:21 26:19
29:22 30:5,10,
23 33:7 34:3,11
35:5,19 37:20
38:6 39:14 40:4
43:3,22 46:7
48:14 49:2,7

Deposition Of Joshua Bishop

52:7 53:6 54:10
55:14 56:6,22
57:4,7,21 58:10
59:18 60:14
62:16 64:10
67:3 69:6 70:1,
17 71:5,18 72:7
73:6,10,25 74:8,
25 75:10,23
77:2,22,24 78:9,
23 79:10,14,22
80:16,23 81:19
82:4,16,23 83:1,
3,8

**L**

**labeled**  12:18
24:23

**laceration**  82:3,
8

**lacks**  38:7 46:7
70:18 71:18
72:7 73:10,25
74:25 75:10
78:24 79:14
80:16,23,24
81:19,20 82:16

**language**  22:17

**large**  25:13 61:2

**lasted**  32:18

**law**  7:15 31:10
55:2

**laws**  11:8,13

**lawsuit**  26:14

**lawsuits**  27:3

**learn**  28:13,21
29:11 33:13

**learning**  10:13

**leave**  55:13

**left**  25:15 36:12,
13,15,17 44:8,
10,18,24 45:15
46:2 52:1,21
53:2,5,10 58:19
59:21,22 60:23
74:22 82:11,19

**left-hand**  66:3
67:12 74:23
75:8

**leg**  14:25

**legal**  15:24
16:10

**legitimate**  55:2

**legs**  61:10 74:16

**lettering**  25:14

**life**  14:24

**lifted**  62:7 72:21

**lifting**  73:18

**limit**  25:6

**list**  20:3,11

**listed**  41:15

**lives**  8:2

**load-bearing**
25:12

**located**  76:21
77:8

**location**  41:16,
24

**locations**  7:25

**long**  9:12 32:18
55:1 56:11
58:24

**longer**  18:15
20:6,7,25 21:20

**lose**  47:9

**lost**  34:16

**lot**  14:25 23:17
32:2 41:12
47:18 55:17
71:8 74:16

**lots**  31:23

**loud**  47:12

**lower**  42:7

**lucky**  47:21

**M**

**Mac**  17:15

**made**  29:9
41:19 50:2

**major**  47:10

**make**  6:1,5
24:25 37:18
38:5 47:14
48:20

**making**  44:2
47:11 66:21

**manner**  52:4

**manual**  10:19,
22 12:19,23
16:18

**mark**  70:9 74:13
78:16 80:9

**marked**  12:12,
14 49:22,23
65:1,20 70:11
78:17 80:10
81:12

**materials**  6:19

**Maynard**  37:9
38:9,24,25 39:1,

18,25 40:9,13,
25 41:1,5 42:24
43:20 45:22
46:15 52:15
53:11,16 58:19
59:8,22 60:23
66:23 67:13
73:23,24 74:4,
18 76:2

**Maynard's**
58:22

**MDT**  29:12

**meaning**  15:11

**means**  18:14
20:6 22:13 47:8

**meant**  23:19
61:25

**medical**  14:20
82:4

**memorializes**
65:11

**memory**  50:6
69:24

**mentioned**  23:9
29:16

**metal**  23:16
39:9,12 40:10,
18,20 42:11,14
77:16

**method**  54:15

**methods**  54:24
55:2

**Michael**  5:15

**mind**  20:13,24
22:3 23:8

**mine**  50:10
73:15

**minutes**  20:3
33:1 59:2 73:3,9

**misconduct**
26:22

**misquote**  26:9

**misstate**  16:9
17:6 19:4,11
21:3

**Misstates**  19:20
56:6 58:10

**mobile**  29:12
32:3

**mode**  47:1,4

**moment**  38:17
52:14 64:6 66:2,
9 70:25

**months**  9:14,15
11:23

**morning**  27:21

**mouth**  19:2

**move**  13:15
18:15 46:22
47:10 55:10
62:7 63:6 65:14

**moved**  42:2

**movement**
47:18 72:23

**movements**
62:3

**moving**  47:19
61:8,11 62:4

**multiple**  76:21

**muscle**  47:10

**muscles**  47:9

**N**

**named** 20:21 26:13 27:3

**narrative** 24:20, 21 34:3 39:15 50:14 62:17

**nature** 8:2 11:9 14:9 18:17 22:11 23:17 39:23 54:13 72:19

**neuromuscular** 47:8

**night** 28:5 29:18,25 30:15 45:4

**noise** 63:22

**non-deadly** 10:9

**nonnarrative** 50:22

**normal** 31:25

**notes** 77:20

**notified** 29:5

**number** 15:5 22:18 23:6

**numbers** 41:14

**O**

**oath** 5:22,23

**object** 7:15 26:19 67:3 70:1 78:23

**objection** 6:1 14:20 15:12,24 16:9 17:5,9

18:20 19:4,11, 20 20:15 21:3, 11,25 22:21 29:22 30:5,10, 23 33:7 34:3,11 35:5,19 36:1 37:20 38:6 39:14 40:4 43:3, 22 46:7 52:7 53:6 54:10 55:14 56:6,22 57:21 58:10 59:18 60:14 62:16 69:6 70:17 71:5,18 72:7 73:6,10,25 74:8,25 75:10, 23 77:2 78:9 79:10,14,22 80:16 81:19 82:4

**Objective** 20:15

**objectively** 56:12

**observation** 39:1

**observations** 39:20 45:11

**observe** 41:14 44:24 47:8 71:22 76:4 80:1

**observed** 31:23 34:16 39:24 47:6 59:14

**obvious** 51:6,8, 20

**occur** 40:3,18

**occurred** 32:16

**occurs** 73:3

**office** 28:2,17, 22,25 29:10

**officer** 5:4,10 9:8,16 12:25 13:17,19,22 17:7 21:21 22:17 25:6 31:12 36:24 37:1,7,9 38:4,9, 14,21,24,25 39:1,17,18,25 40:9,12,13 41:5 45:22,23 53:11, 15 58:19,22 59:21,22 60:5, 22,23 66:21,23 67:9,13,16 69:22 70:16 73:23,24 74:4, 18 76:2 78:2 83:5

**officers** 18:16 20:7,8 22:12,19 23:6 34:7 37:5 39:20 40:25 41:1,25 42:23 43:20 46:15 52:15 56:14 58:16 59:8,13 61:15 62:19 67:18 76:18 78:5

**officers'** 39:23 58:7 69:20

**ongoing** 11:25 13:2

**online** 8:18

**Oops** 83:6

**open** 14:25 36:8,9,17

**operative** 63:10

**opinion** 14:21 15:4,13,25 16:10 20:18 22:13 57:1,9,14 82:5

**order** 25:23 38:11

**outstanding** 30:16 45:8

**P**

**p.m.** 5:2 27:15 83:10

**Packer** 5:9 7:17, 21,24 8:3,4 12:17 15:2,17 16:2,15 17:11 18:24 19:6,14, 16 20:1,22 21:7, 14 22:4 23:1 27:1 30:1,8,13 31:1 33:12 34:8, 18 35:10,24 37:23 38:10 40:2,7 43:10 44:1 46:11 48:10,15,17 49:4,8,9,21 50:1 52:10 53:18 54:19 56:1,17 57:2,6,18 58:1, 23 60:2,16 63:8 64:12,14 65:4,7, 23 66:20 67:6,7 68:5,13,19 69:1, 9,12 70:4,5,14, 20 71:2,11 72:1 73:1,8,20 74:5, 10,12,21 75:6, 15 76:6 77:9,20,

23 78:1,12,20 79:3,6,11,13,17 80:3,13,20 81:4, 7,9,11,15,23 82:9,21,24 83:2, 5,7

**pages** 24:16 50:21

**pants** 25:17

**paragraph** 18:1 61:19

**paralegal** 70:7

**parents** 31:23

**park** 32:3

**part** 19:12 29:14 55:24 56:8

**participation** 32:21

**partners** 22:14 41:16 46:21

**partners'** 41:13

**patches** 25:17

**patio** 39:9 41:11 42:2

**patrol** 9:8,16 25:6 28:23

**patted** 45:13 72:16

**PC** 17:14

**PD** 9:17

**peculiar** 26:10

**pending** 6:9

**people** 22:14 32:4 47:19

**pepper** 26:2

Deposition Of Joshua Bishop

percent 82:20

period 32:24

person 13:22
23:20 30:19,22
39:21 46:24
47:15 53:22
72:23 76:5,8,15

personal 14:24

personally
14:23 15:4 71:8,
9 76:4 79:25

photo 78:22
80:8

photograph
79:8

photos 78:14

phrase 14:19
15:7,10 16:23
18:12 21:22,24
51:8

physical 22:10
24:19 55:19
56:24 57:8
72:24

physically 20:7,
25 41:12 42:18
46:22 51:13,15,
19 53:14 55:23
56:15 58:6
62:22

pick 23:14 31:25
74:23

place 17:15
27:17 59:13
62:20

play 64:3,24
65:19 66:18
68:10,20 70:24
73:4 74:19

played 64:1

playing 63:25
64:8 65:6,22
66:19 68:4,12,
18,25 71:1 73:7
74:20

point 6:7 8:16,
22 9:17 26:11
28:4 32:5,10
33:10,13 34:13,
17,25 35:21
36:20 37:13,15
38:19 39:20,24
40:3,16,19,21
41:5,8,13,23
42:2,17 44:6,8
45:2,9,19,21
46:1,12,18,25
47:14,16,21
52:25 53:8,10,
19,20 54:2
59:11 60:10,18,
20 61:11 62:2,
24 67:9 69:2,20
70:3 71:4,20,23,
25 72:15,20
73:15 74:17
75:16,19,22
76:12

pointed 28:4
29:17,21 46:18

pointer 47:6

pointing 51:1

police 8:21,25
9:1,7,19,25
10:3,18 11:1
12:18,25 25:13
27:6,9 66:22

policy 10:19,21
12:6,9,19,23
13:6,24 14:5,11

16:14 17:16
54:23 56:10

ponytail-style
61:3,23 62:12
63:3 72:13

porch 41:11
42:15 77:11,14,
18

portion 34:15
42:4,6,7 53:22
61:1,13 62:5
63:2 71:24 72:2,
10,13 73:16
74:23

pose 21:21
22:17

posing 22:11

position 39:10
44:4

positions 9:9

possession
30:17,18 45:10
57:11 72:17

possibly 45:9

POST 10:13

postponed 8:14

potential 57:10

potentially 42:9

preparation
69:17

prepare 6:15

present 22:16

pretty 45:21
74:4 77:21

prevent 72:22

previous 29:25

45:11

previously
30:16 46:14
55:16 81:1

prior 12:24 28:5
31:10,13,14
45:4 59:16

privacy 7:15

privilege 7:16

probe 47:1,4
52:16

probes 47:5,20,
25 67:24

procedures
11:7

proceeded 33:2

proceedings
83:9

process 5:22

prongs 46:5

protect 13:20

provide 7:19

proximity 23:6,
9,19,21 43:9,12,
18,20 53:25

public 45:6

pull 18:16 20:7
21:9 53:12

pulled 61:25

pulling 39:22
58:6,22 67:1

purpose 46:5

pursuing 37:1

pursuit 32:10,
13,15,22 33:9,

10 37:8,19,24
45:5 65:11,15

pushed 39:3,6,
7,9,10,12 40:9
42:19,22 63:4,6
72:21,24 73:18

pushing 62:8
73:5

put 19:1 57:23
59:25 77:6

Q

question 5:25
6:3,9,12 15:16
17:8,10 18:23
19:7 31:6 32:20
40:6 54:7 60:15
79:5

questions 7:22
69:11

R

radio 29:6

raise 39:24

raised 66:12

ran 37:3

rapidly 54:25
56:10

reach 43:2,8
55:9

reached 45:12

read 62:15

reads 18:6

reapproached
41:25 44:3,20,
22 45:17 52:20

Deposition Of Joshua Bishop

reason 45:7

reasonable 55:2
56:12

reasonableness
17:24

reasons 47:7
56:9

recall 12:4
27:11,16,22
32:18 38:11,19
46:12 57:19
58:2,8,25 59:3
60:1,9,12,17
71:9,12 72:3
73:24 80:6

recalled 50:14

recalling 58:14

received 11:24

recent 11:21

recess 48:16
77:25

recharge 68:2

recharged
47:24 48:3,6
52:17

recitation 50:6

recognize 12:21
17:17 49:18
63:18 64:4,18
70:21 79:7,18
80:14

recollection
25:2 69:15
73:14 74:3,17
82:13,18

record 5:14 24:8
49:21 64:25

recording 25:19

reenergized
47:21

reengaged 60:7

reengaging
57:20

refer 24:5,10

reference 69:10

referring 14:12
24:9

refers 16:6

refresh 25:2

remember 24:4
25:22 37:6,7,11
42:12 50:19
52:18 58:14

repeat 79:5

report 6:20
24:5,9,11,16,22,
23 31:19 48:18,
24 49:1,10,18
50:2 51:11,18
61:17,19 62:11
77:6

reported 28:3
31:20,22

reporter 6:4
81:8,10 83:4,6

reports 45:4
79:2

reprimanded
27:5

required 10:19

reread 22:3

residence
33:11,14,20,24

39:4,6,8 41:15
76:19,21,23,25
77:8,11,14,18

residential 32:2

resist 18:8,15
20:7,25

resistance
22:10 55:19
56:25 57:9
72:24

resisting 53:14
55:23 56:3,15
58:6,9 62:22

resources
41:17,24

respect 14:18
21:8 25:3 36:12

responded
28:24

responding
27:23

response 57:7

restrained 18:7,
8,13,14,19 20:6
21:2

restraining
18:19

restraint 19:1,
18 20:14

restroom 48:11

result 54:5,17
55:24 57:11,15
63:5 73:17
82:19

resulted 55:17
57:14

review 10:19

11:13 13:2
69:19

reviewed 6:19,
20 12:24 50:14
69:17

reviewing 50:19

Reynoso 29:2,3,
5 31:17

right-hand 50:9

Riverside 5:1
7:4

roaming 47:19

room 41:12 42:3

rules 5:24

ruling 6:2

running 34:6,
10,20

___

**S**

Sam 25:16

school 6:25 7:8,
20 28:2 31:18,
19,20,22 32:1

screaming
65:24

screen 12:13
16:20 17:12
49:3 63:18,24

scroll 49:17
50:16

search 16:22
75:19 76:4,19

searched 75:21
76:1

seated 39:10

seconds 17:8,
10 48:1,4,7
64:10

section 13:8
15:21 18:1

secured 58:18
59:4,6,9,15

selected 51:15,
19

senior 8:14,17

sense 6:5

sentence 61:22

sequence 52:24

series 23:24

set 47:23

severity 23:7

sexual 26:22

share 12:13
17:12 49:4
63:18 69:22
78:13 80:8 81:5

she'll 6:1

shield 25:14

shift 25:25
27:11

shoot 47:5,23

shot 46:24 67:4,
22 69:7 71:21
74:17

shoulder 25:18

shoulders 61:9

shouted 71:9

shoved 42:2
43:15

Deposition Of Joshua Bishop

**show** 12:11
34:21 35:1,8,22
36:21 48:19
61:16 65:24
66:9

**showed** 35:4
45:23

**showing** 35:3

**side** 45:15 46:2
52:1,21 53:3,5
56:4 59:25
62:25 66:3
67:12 68:14
82:11,19

**Similar** 5:22

**situation** 56:11

**situations** 54:25
56:11

**slam** 62:9 63:7
72:25

**slammed** 61:23
62:12

**slightly** 62:7
72:21

**slippery** 54:13

**sort** 11:3 25:20
39:10 82:3

**sounds** 47:12,
13

**South** 8:25 9:1,
6,10,16 27:6

**sparking** 47:12

**speaking** 6:18
22:7 28:24

**specific** 12:2
26:11 30:2
32:19 52:11

56:19 64:5
71:21 75:5

**specifically**
15:19 24:3
30:21,25 31:2,5
54:22 55:18
58:20 75:7

**speculation**
43:4 70:2,18
71:6 75:11,24
77:3 79:23

**spell** 5:12,13

**spelled** 5:16

**spend** 9:13

**spray** 26:2

**stand** 18:16
19:10,19 21:9

**standing** 20:8
41:3,6 67:8
74:14

**start** 24:2 35:16
64:10

**starting** 65:5

**starts** 13:16
61:20

**state** 5:12,13
7:13,20 54:23

**stated** 19:8,23
28:16 38:24
46:14 53:20
54:16 55:17
57:12 58:15
59:20 60:22
62:3 73:13 81:1

**stating** 58:4,15

**steps** 41:14

**Stetson** 32:17

**stitches** 15:1

**stop** 69:10

**stopped** 32:22
34:1 38:3

**straight** 8:12

**strike** 39:25
40:18 45:14
46:1 51:23 53:2,
4,23 54:4,6,8
55:20 56:4
57:12,14 68:6
78:4,7

**strikes** 53:9
68:8,9,14,21

**striking** 60:12

**struck** 52:20
56:15 60:9
82:14

**struggling**
39:21 53:12,16
58:17,20 59:23
60:24

**studied** 7:22 8:6

**study** 8:5

**Subdivision**
13:8,16

**subject** 18:7
20:6 26:16 51:2

**Subsequent**
27:2

**subsequently**
34:22

**successful**
47:22

**sufficient** 49:15

**suggested**
42:10

**supposed** 47:7

**surrounding**
41:11

**suspect** 22:20
42:10

**sustained** 26:20

**sutures** 15:5

**suturing** 14:8,
15,19,25

**sweater** 61:2
63:2

**sweatshirt**
72:13

**sweaty** 54:13

**sworn** 5:5

**system** 51:11

─────────

**T**

**table** 42:2,14,20
43:1,7,13

**tables** 41:12

**tactics** 10:3
11:6

**taking** 72:12

**talk** 6:3 13:5
48:18 63:9 64:5
65:15

**talked** 26:8
48:23

**talking** 24:2

**Taser** 26:6
44:23 45:14,18,
20,21,24,25
46:4,13,18,20,
25 47:2,5,6,7,
11,14,22,24

48:3,6 51:23
52:4,12,16 53:9,
23 54:4,8,14,20
55:6,10,13,18
56:16,20 57:11,
14,16 60:25
62:24 67:1,21
68:2,7,21 82:14

**Tasers** 11:16,19
26:11

**technological**
70:6

**term** 14:1,4,11

**termination**
33:10

**testified** 5:6,20
6:22

**testimony** 16:10
17:6 19:5,12,20
21:4 56:6

**thing** 25:1 58:13
63:2

**things** 8:2 11:5,
7,9 14:8 18:16
19:17 22:9,10
23:17,18 39:23
54:13 58:16
71:9 72:19 78:3

**thinking** 41:9

**thought** 42:16

**threat** 13:21
21:21 22:11,14,
17

**threatened** 28:4

**threatening**
28:14

**threats** 29:9

Deposition Of Joshua Bishop

THURSDAY 5:1

tied 11:4

time 10:12 22:5
27:12,16,19
32:24 33:7,18
34:11 35:5,12
37:2 38:3 40:4
41:1 43:19
45:17 47:16,23
48:1,12 50:2,7
52:17 53:8
54:16 55:6
71:13 74:8,19
75:14 76:9,20

times 6:22,24
47:2 77:1

today 69:17

today's 6:16
65:20

told 11:24 15:6
29:8 30:21 31:2,
6,17 40:9 42:19
44:2 45:25
51:22 60:7
66:15 78:4

tool 54:23

tools 11:7
23:16,23 54:25
55:1

totality 45:2
56:13

touching 47:19

trained 10:2,13
17:2,25 54:20,
22

training 9:24
10:12,24 11:3,
12,14,25

trainings 11:4,
10,25 12:2
26:10

tremendous
63:22

tucked 44:25

type 14:7 51:2

types 29:14

---

U

unconsciousne
ss 14:7

undergraduate
8:13

underneath
45:1 53:13 74:4

understand
6:12 15:10,15
16:5 18:12,22
19:2,7,14,17
30:19 31:9 32:8,
19 33:5,19 40:6,
16 54:5,7 56:2,
18 60:15 67:6,8,
12 73:21

understanding
13:23 14:4,10,
18 15:7 17:1
18:9 20:5 23:23
28:9 30:20
32:23 69:3,13

Understood
69:9

unholster 45:19

uniform 25:7,9,
12 73:23

University 7:13

Unlike 6:1

unpack 28:6

unrestricted
46:23

unshare 16:20

up-to-date
10:21

updated 11:13

upper 42:4,6
53:22 55:6
57:20 60:8 61:4,
12 62:5 66:3
73:16 74:23
75:8

utilized 45:13
61:1 63:1

---

V

vacation 70:7

vague 18:20
20:15 21:11
29:22 30:5,23
33:7 34:11 35:5,
19 37:20 38:6
40:4 46:8 52:7
53:6 54:10
57:21 59:18
60:14 73:11
74:1,8 75:1 78:9

vantage 70:2
71:23,25 73:15

variety 11:5
22:9

vehicle 29:13
34:5,14 37:8,9,
14 45:5 65:15

vehicles 31:24
32:2,3

verbally 76:2

vest 25:13,16

victim 28:1,25
29:18

victimized
72:18

video 63:19,24
64:15 65:6,8,20,
22 66:4,19 68:4,
12,18,25 69:16,
18,23 70:3 71:1,
21 73:2,7,11,14,
21 74:7,20 75:9

videos 69:20

view 46:23
67:16 70:16,22
73:22

violence 57:10

violent 45:4
56:14

virtually 11:25

visible 44:24,25

visual 34:17
81:3

visually 53:9

volume 64:8

---

W

waistband
34:16,23 45:2,
12 75:19,21

wait 17:9

walk 45:16

walls 41:11

wanted 24:25
46:21

wanton 45:6

warning 46:21

warnings 46:20

watch 74:24
75:8

watchband
75:14

watches 75:3

ways 41:9,10

weapon 23:21
29:17 30:3
44:18 46:1 48:8
51:23 52:12
54:21 57:11
68:7 77:17
82:14,15

weapons 23:6,
9,18,19,25 42:9,
16 44:11 45:13
72:16

wearing 25:9
64:21

weekly 11:11

word 46:24

words 19:1
22:10 46:5
62:13

working 24:25
25:22

worried 7:24

write 51:8,14

writing 51:11

written 24:11
25:13 51:12
62:11 66:22

wrong 16:25

Deposition Of Joshua Bishop

20:4

**wrote** 26:10

---

### Y

**yard** 23:16

**year** 7:2 8:7,10,
14,17,19 9:4,22
24:14

**years** 26:22

**yelling** 46:20
67:1

---

### Z

**zoom** 13:10
49:11,14 79:1