# "EXHIBIT 2"

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


HENRY BARNHILL,                          )
                                         )
                    PLAINTIFF,           )
                                         )
        VS.                              )        CASE NO.
                                         )        5:23-CV-00589-JGB-SB
                                         )
CITY OF HEMET; OFFICER BRETT             )
MAYNARD; OFFICER JOSHUA BISHOP;          )
OFFICER PEDRO AGUILA; CORPORAL           )
DOUGLAS KLINZING; JAMIE GONZALEZ;        )
CATHERINE TIPTON; AND DOES 1-10,         )
INCLUSIVE,                               )
                    DEFENDANTS.          )
_____)



DEPOSITION OF OFFICER JOSHUA BISHOP

TAKEN ON

THURSDAY, JANUARY 30, 2025



Sandra Concialdi
C.S.R. 12553
Job No. 241938

Deposition Of Joshua Bishop

```
 1        RIVERSIDE, CALIFORNIA, THURSDAY, JANUARY 30, 2025
 2                          AT 2:02 P.M.
 3
 4               OFFICER JOSHUA BISHOP,
 5                 having been duly sworn,
 6           was examined and testified as follows:
 7
 8                          EXAMINATION
 9  BY MR. PACKER:
10      Q    Good afternoon, Officer.
11      A    Good afternoon.
12      Q    Can you please state and spell your last
13  name -- so state your full name, spell your last name
14  for the record.
15      A    Full name is Joshua Michael Bishop, and my last
16  name is spelled B-I-S-H-O-P.
17      Q    Okay.  Have you ever had your deposition taken
18  before?
19      A    I have not.
20      Q    So have you testified in court before?
21      A    Yes.
22      Q    Similar process.  The oath you took is the same
23  oath you take in court, but it is a little less formal.
24  So I'll ask that the same rules that apply in court
25  apply here.  I'll ask the question, if your attorney has
```

Deposition Of Joshua Bishop

```
 1   the Hemet Police Department?

 2        A    Yes.

 3        Q    What sort of training have you had?

 4        A    Any trainings that were tied into the use of

 5   force can be a variety of things.  It could be

 6   de-escalation tactics.  It could be arrest and control

 7   procedures.  It could be the use of our tools and things

 8   that were issued, devices that were issued, case laws,

 9   things of that nature.

10        Q    Okay.  How often do you have those trainings?

11        A    I would say we go over them at least weekly,

12   whether it's briefing training, or I go over them myself

13   and review updated case laws.

14        Q    Okay.  You said there was training regarding

15   some of the instruments that you were issued.

16             Did that include Tasers?

17        A    Yes.

18        Q    Can you approximate for me how many classes you

19   have taken on the use of Tasers?

20        A    I would say at least six to seven.

21        Q    Okay.  When was the most recent course you

22   took?

23        A    I would say it's been about a couple of months.

24        Q    Okay.  Now, you told us that you received

25   training -- ongoing trainings virtually every day on use
```

Deposition Of Joshua Bishop

1      A    Yes.

2      Q    And you continue to review this on an ongoing

3 basis; is that fair to say?

4      A    Yes.

5      Q    So I want to talk to you about the

6 definition -- or, I'm sorry, the department policy when

7 it comes to the use of deadly force.  And I'll direct

8 your attention to Section 300.4, Subdivision A.

9           Do you see that?

10     A    If you'd be able to zoom in --

11     Q    Sure.

12     A    -- because it's a little hard to see on my end.

13     Q    Is that better?

14     A    Right there is good.

15     Q    Okay.  Let me see if I can move this over.

16          So you see Subdivision A, it starts with, "An

17 officer"?

18     A    Yes.

19     Q    It says, "An officer may use deadly force to

20 protect him or herself or others from what he or she

21 reasonably believes is an imminent threat of death or

22 serious bodily injury to the officer or another person."

23          Is that what your understanding of the use of

24 deadly force policy is with Hemet?

25     A    Yes.

Deposition Of Joshua Bishop

1       Q      Are you familiar with the term "serious bodily
2   injury"?
3       A      Yes.
4       Q      What is your understanding of that term?
5       A      Well, our policy also has a definition for
6   great bodily injury, and that could mean
7   unconsciousness, a certain type of brain injury, an
8   injury causing extensive suturing, things of that
9   nature.
10      Q      Okay.  And it's your understanding that when
11  this policy uses the term "serious bodily injury,"
12  that's what it's referring to?
13      A      Yes.
14      Q      I think you said that includes injuries that
15  include extensive suturing.
16             Is that what you said?
17      A      Yes.
18      Q      What is your understanding with respect to the
19  phrase "extensive suturing"?
20             MS. KORNBLAU:  Objection.  Calls for a medical
21  expert opinion.
22             But you can answer.
23             THE WITNESS:  So my -- me, personally, I've had
24  several personal injuries throughout my life that
25  include a lot of suturing.  I've had my leg cut open

Deposition Of Joshua Bishop

1  before, which was around, I think, 18 stitches.

2  BY MR. PACKER:

3      Q    Okay.

4      A    To -- to me, personally, my own opinion and my

5  own definition is around that number of -- of sutures.

6      Q    Okay.  So you told us that -- excuse me -- that

7  was your understanding of the phrase "great bodily

8  injury"; is that right?

9      A    Yes.

10     Q    Do you understand the phrase "serious bodily

11  injury" to have a particular meaning in California?

12          MS. KORNBLAU:  Objection.  May call for an

13  expert opinion.

14          But you can answer.

15          THE WITNESS:  I -- I don't understand the

16  question.

17  BY MR. PACKER:

18     Q    Okay.  Are you -- let me ask it more

19  specifically.

20          Are you familiar with the California Government

21  Code Section 12525.2 that defines serious bodily injury?

22     A    No.

23     Q    Okay.

24          MS. KORNBLAU:  Objection.  Calls for a legal

25  opinion.

Deposition Of Joshua Bishop

```
 1              But go ahead.
 2  BY MR. PACKER:
 3       Q    Okay.  I think your answer was no?
 4       A    Correct.
 5       Q    Okay.  So as far as you understand it, the use
 6  of serious bodily injury here refers to great bodily
 7  injury.
 8              Is that what you were saying?
 9              MS. KORNBLAU:  Objection.  May misstate
10  testimony and calls for legal opinion.
11              But you can answer.
12              THE WITNESS:  My -- my definition of serious
13  and great bodily injury, I go off from what my
14  department policy describes it as.
15  BY MR. PACKER:
16       Q    Okay.  And you said that you believe the
17  definition of great bodily injury is found within the
18  same manual?
19       A    Yes.
20       Q    Okay.  I'm going to unshare my screen right
21  now.  I have not been able to find that, but let me
22  see -- if you bear with me, if I can do a search.
23              Okay.  So I don't see the use of the phrase
24  "great bodily injury," but -- and obviously, your
25  counsel will correct me if I'm wrong.
```

Deposition Of Joshua Bishop

 1          Just to clarify, your understanding is that

 2   great bodily injury, and that's what you've been trained

 3   on?

 4       A    Yes.

 5          MS. KORNBLAU:  Objection.  And -- objection.

 6   May misstate testimony.

 7          Officer Bishop, just give me a couple of

 8   seconds after the question is asked to, you know, assert

 9   an objection if I need to.  So just wait a couple of

10   seconds after the question, please.  Thanks.

11   BY MR. PACKER:

12       Q    Okay.  I'm going to share my screen again.

13   Bear with me for a second.

14          I apologize.  I'm using a PC, and I usually use

15   Mac, so I'm kind of all over the place right now.

16          Okay.  So this is the use of force policy

17   within the department as you recognize it?

18       A    Yes.

19       Q    All right.  I'm going to go to 300.3, use of

20   force.

21          Do you see that?

22       A    Yes.

23       Q    Now, 300.3.3 says, "Factors used to determine

24   the reasonableness of force."

25          Are you trained on this, I'll call it,

Deposition Of Joshua Bishop

1    paragraph or section?

2        A    Yes.

3        Q    Now I want to direct your attention to sub I.

4             Do you see that?

5        A    Yes.

6        Q    And that reads, "The degree to which the

7    subject has been effectively restrained and his or her

8    ability to resist despite being restrained."

9             Is that your understanding of the -- one of the

10   factors to take into account when applying force?

11       A    Yes.

12       Q    And what do you understand the phrase

13   "effectively restrained" to mean?

14       A    To me, effectively restrained means that

15   somebody is no longer able to resist or move around or

16   pull away from officers any more or stand up, things of

17   that nature.

18       Q    Okay.  So if an individual's hands have been

19   restrained, would that constitute effective restraining?

20            MS. KORNBLAU:  Objection.  Vague and ambiguous.

21            But go ahead.

22            THE WITNESS:  I -- I don't understand that

23   question.

24   BY MR. PACKER:

25       Q    Okay.  So you said that an effective

Deposition Of Joshua Bishop

```
 1   restraint -- well, I don't want to put words in your
 2   mouth, but you understand it to mean that when, for
 3   example, an individual has been immobilized; right?
 4           MS. KORNBLAU:  Objection.  May misstate
 5   testimony.
 6   BY MR. PACKER:
 7       Q    You don't understand the question?
 8       A    Yes, but I don't believe I stated
 9   "immobilized."
10       Q    Okay.  So they can't stand up; right?
11           MS. KORNBLAU:  Objection.  May misstate
12   testimony.  There was more to it than one part of that
13   answer.
14           MR. PACKER:  I understand.  I'm trying to break
15   it down.
16   BY MR. PACKER:
17       Q    So you understand one of the things that
18   constitutes effective restraint, one of the factors
19   includes their ability to stand up; right?
20           MS. KORNBLAU:  Objection.  Misstates testimony.
21   Incomplete.
22           But you can answer.
23           THE WITNESS:  One of the factors that I stated,
24   yes.
25   ///
```

Deposition Of Joshua Bishop

```
 1   BY MR. PACKER:
 2       Q    Okay.  And since it's been about a couple of
 3   minutes now, can you list for me those factors again?
 4   I'm sorry, I don't want to get them wrong.
 5       A    So again, my -- my understanding of effectively
 6   restrained means that a subject is no longer able to
 7   physically resist officers, is no longer able to pull
 8   away from officers.  And standing up is another factor
 9   that I added in there.  Correct.
10       Q    Okay.  So your counsel interjected before that
11   I was giving an incomplete list.
12            Do you consider these factors altogether, or is
13   one alone enough in your mind to constitute effective
14   restraint?
15            MS. KORNBLAU:  Objective -- objection.  Vague
16   and ambiguous.
17            But you can answer.
18            THE WITNESS:  In my opinion, I think there's
19   even more factors than that.  So cumulatively, I think
20   all three of those in addition to more than what I
21   named, not just one.
22   BY MR. PACKER:
23       Q    Okay.  Fair enough.
24            So in your mind, the fact that, for example, an
25   individual can no longer physically resist is not enough
```

Deposition Of Joshua Bishop

1    on its own for you to conclude that they've been

2    effectively restrained?

3              MS. KORNBLAU:  Objection.  May misstate

4    testimony.

5              But go ahead.

6              THE WITNESS:  Yes.

7    BY MR. PACKER:

8        Q    Okay.  And the same answer with -- with respect

9    to their ability to pull away and their ability to stand

10   up?  Same answer?

11             MS. KORNBLAU:  Objection.  Vague and ambiguous.

12             Go ahead.

13             THE WITNESS:  Yes.

14   BY MR. PACKER:

15       Q    Okay.  I want to direct your attention to

16   sub Q.

17             Do you see that?

18       A    Yes.

19       Q    And it says, "Whether the conduct of the

20   individual being confronted no longer reasonably appears

21   to pose an imminent threat to the officer or others."

22             Do you see that phrase?

23       A    Yes.

24       Q    What does that phrase mean to you?

25             MS. KORNBLAU:  Objection.  Calls for

Deposition Of Joshua Bishop

1  hypothetical.

2          But go ahead.

3          THE WITNESS:  So do you mind if I reread it?

4  BY MR. PACKER:

5      Q    Of course.  Take your time.

6      A    So to me -- I mean, my -- my definition is the

7  conduct of the individual is what's kind of speaking out

8  to me.  So the conduct of somebody can mean a barrage

9  and a variety of things that could either be their

10  actions, their words, their physical resistance, things

11  of that nature.  And posing a threat to themselves,

12  others, I think that's included as well.  And officers.

13  In my opinion, what that means to me is, you know, are

14  they still a threat to me, my partners, or the people.

15      Q    Okay.  When you're assessing whether or not

16  they still present -- or, excuse me, I'm going to use

17  the language "pose an imminent threat to the officer or

18  others" -- do you take into account the number of

19  officers that are effectuating the arrest of the

20  suspect?

21          MS. KORNBLAU:  Objection.  Calls for a

22  hypothetical.

23          But go ahead.

24          THE WITNESS:  That could be one of the factors.

25  ///

Deposition Of Joshua Bishop

```
 1   BY MR. PACKER:
 2      Q     Okay.  What other factors do you take into
 3   account?
 4      A     The area that we're conducting this, you know,
 5   arrest or apprehension of an individual.  As you said,
 6   the number of officers, the proximity of weapons, the
 7   severity of the crime at hand.  There's -- there are
 8   several factors that come into mind.
 9      Q     Okay.  You mentioned the proximity of weapons.
10            Did I hear that right?
11      A     Yes.
12      Q     What do you mean by that?
13      A     What I mean by that is sometimes where we
14   apprehend individuals, obviously, we don't get to pick
15   and choose where that happens, and sometimes that can be
16   in a front yard with gardening tools, you know, metal
17   chairs, you know, things of that nature.  So a lot of
18   other things I've seen can be used as -- as weapons, and
19   that's what I meant by "proximity of weapons."  It's how
20   close is this person that we are apprehending and
21   proximity to something that they can use as a weapon.
22      Q     Okay.  And you -- I take it from your examples,
23   gardening tools, chairs, that your understanding is it's
24   a fairly broad series of items that can be used as
25   weapons?
```

Deposition Of Joshua Bishop

1      A      Yes.

2      Q      Okay.  Now, I want to start talking

3   specifically about the incident in this case.

4             Do you remember what the date is?

5      A      If I could refer to my report for the exact

6   date of the incident.

7      Q      Of course.

8             And then just for the record, I'm going to ask

9   you what report you're referring to, if that's okay.

10  But go ahead and refer to it.

11     A      It's -- it's my written, documented report.

12     Q      Okay.

13     A      And that would be April 29.

14     Q      Okay.  Of what year?

15     A      2022.

16     Q      Is the report you're looking at six pages?

17     A      This one is only four.

18     Q      Okay.

19     A      And it's just the -- the actual physical

20  narrative.

21     Q      And it's just the narrative.

22             Okay.  On the front page of that report, is it

23  labeled "DR No. 2022-02719-use of force-one report"?

24     A      Yes.

25     Q      Okay.  I just wanted to make sure we're working

Deposition Of Joshua Bishop

1   with the same thing.

2         So you were able to refresh your recollection

3   with respect to the date of April 29, 2022?

4     A    Yes.

5     Q    Okay.  What was your assignment that day?

6     A    A patrol officer in the city limit.

7     Q    Were you in uniform?

8     A    Yes.

9     Q    Can you describe the uniform you were wearing

10  that day?

11    A    Yes.  My department-issued Class D, as in

12  David, uniform.  I was equipped with a load-bearing

13  vest, which has "POLICE" written in large block

14  lettering on the back.  And on the front, a cloth shield

15  badge over my left breast area.  And also on my

16  department-issued equipment on my vest, my Sam Browne

17  duty belt, pants, boots, and the city of Hemet patches

18  on each shoulder.

19    Q    Okay.  Did you have a -- a recording device of

20  any sort on you that day?

21    A    Yes, a department-issued body-worn camera.

22    Q    And as far as you remember, was it in working

23  order?

24    A    Yes.

25    Q    You checked it before your shift?

Deposition Of Joshua Bishop

1    A    Yes.

2    Q    Did you have pepper spray in?

3    A    Yes.

4    Q    And a firearm?

5    A    Yes.

6    Q    What about a Taser?

7    A    Yes.

8    Q    All right.  And we talked about you having --

9    again, I don't want to misquote, but it was -- six to

10   seven is what I wrote down -- trainings peculiar to or

11   specific to Tasers at that point; is that right?

12   A    Yes.

13   Q    As of April 29th, 2022, had you been named in a

14   lawsuit before?

15   A    No.

16   Q    Had you been, as far as you know, the subject

17   of an investigation into any use of force incidents in

18   which you were involved?

19        MS. KORNBLAU:  And I'll just object to the

20   extent that it calls for anything other than sustained

21   findings of excessive use of force, dishonesty, or

22   sexual misconduct within the last five years.

23        But go ahead.

24        THE WITNESS:  No.

25   ///

Deposition Of Joshua Bishop

1    BY MR. PACKER:

2        Q    Okay.  Did you have any specific information

3    that Mr. Barnhill had a weapon on him on April 29th,

4    2022?

5            MS. KORNBLAU:  Objection.  Vague and ambiguous.

6            But go ahead.

7            THE WITNESS:  Yes.

8    BY MR. PACKER:

9        Q    So you had information he had a gun on him?

10            MS. KORNBLAU:  Objection.  Asked and answered.

11            Go ahead.

12            THE WITNESS:  Yes.

13    BY MR. PACKER:

14        Q    What was that information?

15        A    It was that the firearm that was used the night

16    previously was still outstanding and that he still was

17    in possession of it.

18        Q    Okay.  When you say "in possession of it," did

19    you understand that to mean it was on his person?

20        A    That is my understanding of it, yes.

21        Q    Okay.  But you were not specifically told it

22    was on his person?

23            MS. KORNBLAU:  Objection.  Vague and ambiguous.

24            But go ahead.

25            THE WITNESS:  Not specifically, no.

Deposition Of Joshua Bishop

```
 1    BY MR. PACKER:
 2        Q    Okay.  You were not specifically told it was in
 3    his car; is that fair to say?
 4        A    Yes.
 5        Q    That's fair to say, you were not specifically
 6    told that?  It was a bad question.
 7        A    That is fair to say.
 8        Q    Thank you.
 9             Did you understand that Mr. Barnhill, on
10    April 29, 2022, had any prior law enforcement contacts
11    in use -- including involving his use of force against
12    an officer?
13        A    I had no knowledge of any prior contacts.
14        Q    Okay.  So no knowledge of any prior contacts of
15    any kind; is that fair to say?
16        A    Yes.
17        Q    Okay.  So you told us that Detective Reynoso
18    broadcast information from the school itself.
19             Did you report to the school?
20        A    No, I reported to the area of the school.
21        Q    Okay.  Can you describe what you saw when you
22    reported to the area of the school?
23        A    What I observed were lots of parents and
24    vehicles in the area dropping off their kids and, you
25    know, pick up and drop-off just like any other normal
```

Deposition Of Joshua Bishop

```
 1   school area and school business.  The area is
 2   residential.  There's a lot of vehicles in the area.
 3   It's close to a mobile home park.  And several vehicles
 4   and people in the area, as I said.
 5       Q     Okay.  At some point, did you see a car that
 6   you believed was associated with Mr. Barnhill?
 7       A     Yes.
 8       Q     Did you understand he was driving that car?
 9       A     Yes.
10       Q     You know, at some point, there was a pursuit of
11   that car; is that right?
12       A     Yes.
13       Q     Were you engaged in that pursuit?
14       A     Yes.
15       Q     Where did that pursuit begin?
16       A     I believe it occurred in the area of Gilbert
17   and Stetson.
18       Q     Do you recall how long it lasted?
19       A     Could you be more specific?  I don't understand
20   that question.
21       Q     From the beginning of your participation in the
22   pursuit until the pursuit stopped -- and my
23   understanding is it was outside of Mr. Barnhill's
24   house -- what was that period of time?
25       A     I would say anywhere between approximately
```

Deposition Of Joshua Bishop

1    three to five minutes.

2        Q    Okay.  And it proceeded from the

3    Gilbert-Stetson area to where?

4        A    To in front of 354 Gardenia Circle.

5        Q    Okay.  Did you understand 354 Gardenia Circle

6    to be Mr. Barnhill's address?

7            MS. KORNBLAU:  Objection.  Vague as to time.

8            But go ahead.

9            THE WITNESS:  At the beginning of the pursuit,

10   at the termination point of the pursuit, we did not know

11   that that was his residence, no.

12   BY MR. PACKER:

13       Q    At some point, did you learn that was his

14   residence?

15       A    Yes.

16       Q    When was that?

17       A    Not until Mr. Barnhill was taken into custody.

18       Q    Okay.  So at the time of the event -- the use

19   of force event, you did not understand that to be

20   Mr. Barnhill's residence?

21       A    No, I did not.

22       Q    Okay.  And let me clarify.

23            You did not know one way or another whether it

24   was Mr. Barnhill's residence?

25       A    Not until Mr. Barnhill was taken into custody.

Deposition Of Joshua Bishop

1    Q    Okay.  Did you -- when the car stopped outside

2    354 Gardenia Circle, what happened?

3            MS. KORNBLAU:  Objection.  Calls for narrative.

4            But go ahead.

5            THE WITNESS:  Mr. Barnhill exited the vehicle

6    via the driver's door and began running away from

7    officers.

8    BY MR. PACKER:

9    Q    Okay.  You could see his hands when he was

10   running away?

11           MS. KORNBLAU:  Objection.  Vague as to time.

12           But go ahead.

13           THE WITNESS:  So at the point that he

14   immediately exited the vehicle, Mr. Barnhill dropped his

15   hands, both of them, toward the front portion of his

16   waistband area.  That's what I observed, then I lost

17   visual of his hands at that point.

18   BY MR. PACKER:

19   Q    Okay.

20   A    As he continued running away, I gave him

21   commands to show me his hands, to which he initially

22   complied, and then, however, subsequently dropped them

23   back down to his front waistband area to where I could

24   not see them.

25   Q    Okay.  So you said, at some point, he complied

Deposition Of Joshua Bishop

```
 1    with commands to show you his hands; is that right?
 2        A    Initially, he did comply with my initial
 3    command of showing his hands.
 4        Q    So he showed you his right hand?
 5             MS. KORNBLAU:  Objection.  Vague as to time.
 6             But go ahead.
 7             THE WITNESS:  So again, initially, he did
 8    comply with my initial command to show me both of his
 9    hands, not just his right hand.
10    BY MR. PACKER:
11        Q    Okay.  Fair enough.
12             At the time he complied with your initial
13    commands, did you see his right hand?
14        A    I saw both hands.
15        Q    Okay.  And there was nothing that you saw --
16    let's start with the right hand.
17             There was nothing that you saw in the right
18    hand; right?
19             MS. KORNBLAU:  Objection.  Vague.
20             But go ahead.
21             THE WITNESS:  At the point when he complied
22    with my initial command to show me his hands, I did not
23    see anything in his right hand.
24    BY MR. PACKER:
25        Q    Okay.  So then we'll drill down on that a
```

Deposition Of Joshua Bishop

```
1    little bit based on that objection.
2              You didn't see a firearm in that right hand;
3    right?
4        A    No.
5        Q    You didn't see a knife in that right hand?
6        A    No.
7        Q    You saw an empty hand; right?
8        A    I saw an open hand that was empty.
9        Q    Okay.  So you saw an open and empty right hand;
10   right?
11       A    Yes.
12       Q    With respect to the left hand, you didn't see
13   any firearm in the left hand; correct?
14       A    No.
15       Q    No knife in the left hand; right?
16       A    No.
17       Q    So you also saw an empty and open left hand; is
18   that right?
19       A    Yes.
20       Q    And again, to clarify, that was at the point
21   when he initially complied with your directive to show
22   you his hands; is that right?
23       A    Yes.
24       Q    Were you the closest officer -- let me ask it
25   this way.
```

Deposition Of Joshua Bishop

1           Were you the only officer that was pursuing him

2    on foot at the time that Mr. Barnhill got out of his car

3    and ran?

4       A    No.

5       Q    What other officers were there as far as you

6    remember?

7       A    As far as I remember, Officer Aguila was

8    actually in my vehicle during the pursuit, so he exited

9    my vehicle as well.  And then Officer Maynard arrived as

10   well and was also there.

11      Q    Okay.  Do you remember Corporal Klinzing being

12   there?

13      A    At the initial point to when he exited the

14   vehicle, no.

15      Q    Okay.  At any point, did Corporal Klinzing

16   arrive?

17      A    Yes.

18      Q    Were you the first to make contact with

19   Mr. Barnhill after the foot pursuit?

20           MS. KORNBLAU:  Objection.  Vague.

21           Go ahead.

22           THE WITNESS:  No.

23   BY MR. PACKER:

24      Q    Okay.  So to clarify, the foot pursuit did end

25   at the front door of 354 Gardenia Circle; is that fair

Deposition Of Joshua Bishop

1   to say?

2        A     Yes.

3        Q     At the time Mr. Barnhill stopped at the front

4   door of 354 Gardenia Circle, who was the first officer

5   to make contact?

6             MS. KORNBLAU:  Objection.  Vague and ambiguous.

7   Lacks foundation.  Argumentative.

8             Go ahead.

9             THE WITNESS:  I believe it was Officer Maynard.

10  BY MR. PACKER:

11       Q     Okay.  Do you recall in what order you arrived

12  at the front door of 354 Gardenia Circle?

13       A     I was second.

14       Q     Okay.  So you were the second officer to arrive

15  at that front door?

16       A     Yes.

17       Q     Could you see -- at the moment you arrived at

18  the front door, could you see Mr. Barnhill's hands?

19       A     I -- I don't recall exactly at the point when I

20  arrived at the front door where his hands were.

21       Q     What did you see Officer Aguila do as he was

22  the first one to arrive at the front door with

23  Mr. Barnhill?

24       A     I stated Officer Maynard was the first.

25       Q     I'm so sorry.  Officer Maynard.

Deposition Of Joshua Bishop

1      A      My observation was Officer Maynard immediately

2   closed the distance between himself and Mr. Barnhill and

3   pushed him away from the -- the front door of the

4   residence.

5      Q      Okay.  What happened to Mr. Barnhill when he

6   was pushed away from the front door of the residence?

7      A      So as he was kind of pushed away from the front

8   door of the residence, it seemed as if he was kind of

9   pushed into a metal patio chair, which he was kind of in

10  a sort of seated position, so he got pushed into

11  essentially that chair.

12     Q      Okay.  After he was pushed into that metal

13  chair, what happened next?

14          MS. KORNBLAU:  Objection.  Calls for a

15  narrative.

16          Go ahead.

17          THE WITNESS:  Officer Aguila was directly

18  behind me.  He also began assisting Officer Maynard with

19  attempting to gain control of Mr. Barnhill at that

20  point.  And my observations were both the officers were

21  struggling to gain control of Mr. Barnhill's person and

22  his arms and hands as Mr. Barnhill was actively pulling

23  his arms and things of that nature away from officers'

24  grasp.  And at one point, I observed Mr. Barnhill raise

25  up one of his knees and actually strike Officer Maynard

Deposition Of Joshua Bishop

```
 1   in the chest with one of his knees.
 2   BY MR. PACKER:
 3       Q    Okay.  What -- at what point did this occur?
 4            MS. KORNBLAU:  Objection.  Vague as to time.
 5            Go ahead.
 6            THE WITNESS:  I don't understand the question.
 7   BY MR. PACKER:
 8       Q    Sure.
 9            You told us that Officer Maynard pushed
10   Mr. Barnhill into a metal chair; right?
11       A    Yes.
12       Q    And then Officer Aguila arrived and attempted
13   to gain control of Mr. Barnhill with Officer Maynard;
14   correct?
15       A    Yes.
16       Q    What I want to understand is:  At what point
17   during the efforts to control Mr. Barnhill did the knee
18   strike occur?  Was he still on the metal chair, for
19   example, or was it after that point?
20       A    Mr. Barnhill was still on the metal chair.
21       Q    Okay.  At some point, was Mr. Barnhill taken to
22   the ground?
23       A    Yes.
24       Q    Who took Mr. Barnhill to the ground?
25       A    Officers Maynard and Aguila together.
```

Deposition Of Joshua Bishop

1    Q    Where were you at the time Officers Maynard and
2  Aguila took Mr. Barnhill to the ground?
3    A    I was standing approximately 2 to 5 feet away
4  or behind both of them.
5    Q    Okay.  At the point where Officer Maynard and
6  Aguila take Mr. Barnhill to the ground, you're standing
7  3 to -- 3 to 5 feet away, what are you doing?
8    A    At that point, when they took him down to the
9  ground, I'm thinking about different ways and different
10  ways that I can help.  The area that we were was a front
11  porch.  We had two walls surrounding us, a patio chair,
12  and tables, so I didn't have a lot of room to physically
13  assist with my partners' efforts.  So at that point, I
14  took a couple more steps back to observe the numbers
15  that were listed on the -- on the residence, so that
16  way, I could broadcast our exact location to my partners
17  to hopefully get more resources there to assist --
18  assist us with apprehending Mr. Barnhill.
19    Q    Okay.  After you made the call out for further
20  assistance, did you do anything?
21    A    Yes.
22    Q    What did you do?
23    A    At this point, after I broadcasted our -- our
24  location -- our exact location for more resources, I
25  then reapproached Mr. Barnhill and the two officers that

Deposition Of Joshua Bishop

1    were attempting to take him into custody.  And at that

2    point, I moved and shoved the patio chair and table out

3    of the way, so that way, I could gain some room and get

4    toward Mr. Barnhill's upper portion of his body, because

5    when we want to take control of somebody and get them

6    into custody, it's best to be toward the upper portion

7    of their body and not the lower portion.

8        Q    Okay.  Earlier, when we were discussing items

9    that you identified as potentially being weapons that a

10   suspect -- a general suspect could use, you suggested a

11   metal chair was one of them.

12            Do you remember that?

13       A    Yes.

14       Q    Aside from the metal chair and table, did you

15   see any other items on the front porch of 354 Gardenia

16   Circle that you thought could be used as weapons?

17       A    Well, at this point, I did not see any

18   physically.

19       Q    Okay.  And then you told us that you pushed the

20   chair and table out of the way; is that right?

21       A    Yes.

22       Q    When you pushed them out of the way,

23   Mr. Barnhill is on the ground with Officers Aguila and

24   Maynard; is that right?

25       A    Yes.

Deposition Of Joshua Bishop

1    Q    So the table and chair were now out of his

2    reach; correct?

3         MS. KORNBLAU:  Objection.  Calls for

4    speculation.

5         But go ahead.

6         THE WITNESS:  The -- so there was two chairs

7    and one table that one of the chairs and the table would

8    have been out of his reach; however, one of the chairs

9    was still within very close proximity.

10   BY MR. PACKER:

11   Q    Okay.  So there was one chair within close --

12   close proximity after you kicked another chair and a

13   table away; right?

14   A    I did not kick any chair.  I just kind of

15   shoved them with my hands.

16   Q    Okay.

17   A    But, yes, there was just one chair that was

18   still within close proximity.

19   Q    Okay.  And at the time when the chair was

20   within close proximity, Officers Maynard and Aguila have

21   Mr. Barnhill on the ground; is that right?

22        MS. KORNBLAU:  Objection.

23        Go ahead.

24        THE WITNESS:  Yes.

25   ///

Deposition Of Joshua Bishop

1    BY MR. PACKER:

2        Q    Now, you told us that you, after making the

3    call out for more assistance, reapproached

4    Mr. Barnhill's position; is that right?

5        A    Yes.

6        Q    At that point, can you see Mr. Barnhill's

7    hands?

8        A    At this point, I can see Mr. Barnhill's left

9    hand, but I cannot see Mr. Barnhill's right hand.

10       Q    Okay.  The left hand that you could see, did it

11   have any weapons in it?

12       A    No.

13       Q    So no gun; correct?

14       A    No.

15       Q    No knife; right?

16       A    No.

17       Q    Nothing else that you determined could be used

18   as a weapon in his left hand when you saw it; right?

19       A    No.

20       Q    When you reapproached, what, if anything, did

21   you do?

22       A    When I reapproached, I still had my

23   department-issued Taser in my right hand.  Again, I

24   could still observe one left hand was visible; however,

25   the right hand was not visible and was actually tucked

Deposition Of Joshua Bishop

```
 1    underneath Mr. Barnhill's body, toward his front
 2    waistband area.  And at this point, again, the totality
 3    of the circumstances were that we knew Mr. Barnhill to
 4    be violent from the night prior, the reports that we had
 5    given that Mr. Barnhill was engaged in a vehicle pursuit
 6    with us, and the wanton disregard for the public, the
 7    dangerous driving.  Again, we had every reason to
 8    believe that the firearm was still outstanding at this
 9    point and that Mr. Barnhill was still possibly in
10    possession of it.  And once I couldn't see that right
11    hand and I had my previous observations that he had
12    reached toward that front waistband area, he had not
13    been patted down for weapons yet, I then utilized my
14    Taser as an improvised device to strike Mr. Barnhill on
15    the left side of his head twice.
16         Q    Okay.  I want to walk through that now in more
17    detail.  You said at the time you reapproached, you
18    still had the Taser in your hand.
19              At what point did you first unholster, I'll
20    call it, the Taser and hold it in your hand?
21         A    The first point I grabbed my Taser was pretty
22    much when Officer Maynard was the first contact with him
23    and then Officer Aguila showed up and attempted to
24    apprehend him as well, is when I drew my Taser.
25         Q    Okay.  You told us that you used the Taser at
```

Deposition Of Joshua Bishop

```
 1    some point as an improvised weapon to strike him on the
 2    left side of the head; right?
 3         A    Yes.
 4         Q    Did you ever use the Taser for its intended
 5    purpose, in other words, to deploy prongs at
 6    Mr. Barnhill?
 7              MS. KORNBLAU:  Objection.  Lacks foundation.
 8    Vague and ambiguous.
 9              But go ahead.
10              THE WITNESS:  Yes.
11    BY MR. PACKER:
12         Q    As you recall it now, at what point did you,
13    I'm going to say, fire your Taser or deploy your Taser?
14         A    So again, as -- as I -- as I stated previously,
15    that Officers Maynard and Aguila were actively
16    attempting to gain control and take Mr. Barnhill into
17    custody, it was that initial contact when I drew my
18    Taser and pointed it at Mr. Barnhill.  At this point, I
19    gave Mr. Barnhill -- I believe it was four to five
20    warnings by yelling, "Taser out."  And it was also a
21    warning for my partners.  I wanted my partners to
22    actually move physically out of the way, so that way, I
23    could have a unrestricted view and -- I'll use the
24    word -- shot of Mr. Barnhill's body and person.  And at
25    this point, I deployed my Taser for its five-second
```

Deposition Of Joshua Bishop

1  cycle in probe mode.

2      Q    How many times did you deploy the Taser for

3  that five-second cycle?

4      A    So I had the initial deployment in probe mode

5  where the probes actually shoot out of the Taser.  And

6  then I observed the Taser pointer to be ineffective for

7  various reasons because our Taser were supposed to

8  observe a neuromuscular incapacitation, which means you

9  essentially lose control of your muscles and your

10 ability to move around your major muscle groups.  And in

11 addition to that, my Taser was making what we call a

12 loud arking sounds.  You hear loud electric sparking

13 sounds.

14         So at that point, I knew the Taser did not make

15 good contact with Mr. Barnhill's person.  And that was

16 the only time I deployed at that point.  And then once

17 Mr. Barnhill was on the ground, there are some cases to

18 where when there's a lot of body movement and bodies

19 touching and people roaming around and moving around,

20 the probes can have sometimes a better connection and --

21 when they get lucky.  So at one point, I reenergized the

22 Taser and attempt to see if it would be successful a

23 second time.  I did not shoot a second set of darts.  I

24 just recharged the Taser for another five-second cycle.

25      Q    Okay.  So you actually deployed the probes one

Deposition Of Joshua Bishop

```
1   time for five seconds; right?
2       A    Yes.
3       Q    And then recharged the Taser for another
4   five seconds; right?
5       A    Yes.
6       Q    Okay.  Is it after you recharged the Taser for
7   another five seconds that it was used as an improvised
8   weapon?
9       A    Yes.
10           MR. PACKER:  Okay.  I've got to use the
11  restroom.
12           Is now an okay time for us to take a break?
13           THE WITNESS:  Absolutely.
14           MS. KORNBLAU:  Yes.
15           MR. PACKER:  Excellent.  I appreciate it.
16           (A recess was taken.)
17  BY MR. PACKER:
18      Q    So I want to talk to you about your report and
19  show you what I believe is the document we've been
20  discussing, just to make sure we're on the same page;
21  okay?
22      A    Okay.
23      Q    So earlier we talked about the use of force-1
24  report; correct?
25      A    Yes.
```

Deposition Of Joshua Bishop

1      Q     And this appears to be that report?

2            MS. KORNBLAU:  I don't see anything on my

3    screen.

4            MR. PACKER:  Then I should probably share it

5    better.

6            Okay.  Can you see it now?

7            MS. KORNBLAU:  Yes.

8            MR. PACKER:  Excellent.

9    BY MR. PACKER:

10     Q     Okay.  Do you see that report?

11     A     Yeah.  If you could just zoom in again to

12    the --

13     Q     Okay.

14     A     -- same zoom that you had before.

15     Q     Is that sufficient?

16     A     That should be good.

17     Q     Okay.  So I'm going to scroll down and just ask

18    you if you recognize this to be your report from

19    April 29th?

20     A     Yes.

21           MR. PACKER:  Okay.  And for the record, I'm

22    going to ask this be marked as Exhibit B.

23                 (Exhibit B was marked for

24                  identification and is attached

25                  hereto.)

Deposition Of Joshua Bishop

1  BY MR. PACKER:

2      Q     And you made this report at or near the time of

3  the April 29th, 2022, use of force incident with

4  Mr. Barnhill?

5      A     Yes.

6      Q     And that was your accurate recitation or memory

7  of the facts at that time?

8      A     Yes.

9      Q     Okay.  You could see in the bottom right-hand

10 corner, mine says, "Page 1 of 6."

11         Do you see that?

12     A     Yes.

13     Q     And I think earlier you described a four-page

14 narrative that you reviewed and recalled; correct?

15     A     Yes.

16     Q     All right.  So I'm going to scroll down.  This

17 would be page 4.

18         This would be the last page of the document

19 that you remember reviewing?

20     A     Yes.

21     Q     Okay.  And so the following two pages are

22 essentially biographical and other nonnarrative

23 information; is that right?

24     A     Yes.

25     Q     All right.  I want to direct your attention to

Deposition Of Joshua Bishop

```
 1   where -- do you see where my cursor is pointing?  Do you
 2   see that area here under "subject injury type"?
 3        A    Yes.
 4        Q    And you see it says, "abrasion/laceration"?
 5        A    Yes.
 6        Q    And "obvious disfigurement"?
 7        A    Yes.
 8        Q    Did you write that phrase, "obvious
 9   disfigurement"?
10        A    No.  I believe it was a -- there's a
11   check-the-box-type feature on our report writing system,
12   so I believe that was already written in there.  And it
13   was just a box that was checked, so I didn't physically
14   write it in there, no.
15        Q    Okay.  Do you know who physically selected that
16   box?
17        A    It would have been me because this is my
18   report.
19        Q    Okay.  So you physically selected the box that
20   said "obvious disfigurement"?
21        A    Yes.
22        Q    Okay.  Now, before the break, you told us that
23   you used the Taser as an improvised weapon to strike
24   Mr. Barnhill twice on the head; correct?
25        A    Yes.
```

Deposition Of Joshua Bishop

1    Q    And again, that was on the left side of his

2  head?

3    A    Yes.

4    Q    Had you ever used a Taser in this manner

5  before?

6    A    No.

7         MS. KORNBLAU:  Objection.  Vague and ambiguous.

8         But go ahead.

9         THE WITNESS:  No.

10  BY MR. PACKER:

11    Q    So then to be more specific, you had never used

12  your Taser as an improvised weapon before; right?

13    A    No.

14    Q    Okay.  We got up to the moment where

15  Mr. Barnhill is on the ground with Officers Maynard and

16  Aguila, and you used the probe function on your Taser

17  once and recharged it a second time.

18         Do you remember that?

19    A    Yes.

20    Q    And then you reapproached and struck

21  Mr. Barnhill twice in the left side of his head;

22  correct?

23    A    Yes.

24    Q    Okay.  So that's the right sequence of events

25  to this point?

Deposition Of Joshua Bishop

```
 1      A    Yes.
 2      Q    After you strike Mr. Barnhill twice in the left
 3   side of his head -- let me ask it this way.
 4           Immediately after you strike Mr. Barnhill in
 5   the left side of his head, can you see his hands?
 6           MS. KORNBLAU:  Objection.  Vague and ambiguous.
 7           But go ahead.
 8           THE WITNESS:  At -- at this point in time,
 9   after the strikes of the Taser, I was able to visually
10   see Mr. Barnhill's left hand.  However, at this point, I
11   saw that his right hand was just -- Officer Maynard was
12   struggling to pull that right hand from out -- from
13   underneath his body.  Mr. Barnhill was still actively,
14   you know, physically resisting our efforts to gain
15   control of his hands.  So I could see that Officer
16   Maynard was still struggling to gain control of that
17   right arm.
18   BY MR. PACKER:
19      Q    Okay.  So what do you do at that point?
20      A    At that point, as I stated earlier, the best
21   way for me to assist with gaining control of
22   Mr. Barnhill's person was to be toward the upper portion
23   of his body after the second Taser strike.  The Taser
24   ended up actually flying out of my hands, you know, to
25   the ground, again, within close proximity to
```

Deposition Of Joshua Bishop

1    Mr. Barnhill as well.  And that's where we were at that
2    point.
3        Q    Okay.  So you said that after the second
4    strike, the Taser flew out of your hand.
5            Did you understand that to be a result of the
6    force of the strike?
7        A    I don't understand the question.
8        Q    Okay.  Was it the strike that caused the Taser
9    to fly out of your hand?
10           MS. KORNBLAU:  Objection.  Vague.
11           Go ahead.
12           THE WITNESS:  I think it was more of a kind of
13   being sweaty, slippery, you know, things of that nature,
14   not having a really good grip on the Taser.  Again,
15   that's -- you know, it was an improvised method at that
16   time that hadn't been done, as I already stated.  And I
17   think as a result of all those factors, it ended up
18   flying out of my hands.
19   BY MR. PACKER:
20       Q    Okay.  Were you trained to use the Taser as an
21   improvised weapon?
22       A    Specifically not trained to use it as an
23   improvised tool.  However, my policy does state that we
24   are allowed to improvise and use improvised methods and
25   tools given rapidly evolving situations.  And when we're

Deposition Of Joshua Bishop

1   confronted with those, as long as our improvised tools

2   or methods are reasonable to accomplish a legitimate law

3   enforcement goal, which was to take Mr. Barnhill into

4   custody.

5        Q    Okay.  The -- you -- so you engaged with

6   Mr. Barnhill's upper body at the time after the Taser

7   flew out of your hands; correct?

8        A    Yes.

9        Q    Mr. Barnhill didn't reach up and -- and grab

10  the Taser and move it out of your hand; is that correct?

11       A    That's correct.

12       Q    Okay.  In fact, he -- he didn't do anything to

13  cause the Taser to leave your hand; is that fair to say?

14            MS. KORNBLAU:  Objection.  Argumentative.

15            But go ahead.

16            THE WITNESS:  Well, as I -- as I previously

17  stated, I think there's a lot of factors that resulted

18  in the Taser flying out of my hands.  And specifically

19  his physical resistance.  If that wasn't happening, I

20  wouldn't have had to, you know, strike him or improvise

21  in this aspect.  So I would say a direct action of his

22  caused it to fly out of my hands.  But the fact that he

23  was actively, physically resisting is, you know, a

24  direct result of part of what happened and why it flew

25  out of my hand.

Deposition Of Joshua Bishop

1    BY MR. PACKER:

2        Q    Okay.  So let me see if I can understand that.

3            Had he not been resisting, you would not have

4    had to strike him in the side of the head.  That's what

5    you're saying; right?

6            MS. KORNBLAU:  Objection.  Misstates testimony.

7            Go ahead.

8            THE WITNESS:  So that's -- that's part of the

9    factors.  Again, there's different reasons.  Again, with

10   my policy, I'm allowed to improvise given the rapidly

11   evolving situations.  And as long as the situation and

12   the improvision is objectively reasonable.  And I think,

13   given the totality of the circumstances in this case and

14   Mr. Barnhill being violent, assaulting officers,

15   physically resisting, that's why he was struck with the

16   Taser.

17   BY MR. PACKER:

18       Q    Okay.  I understand all that.

19            But the -- Mr. Barnhill -- no specific action

20   by Mr. Barnhill caused the Taser to fly out of your

21   hand; right?

22            MS. KORNBLAU:  Objection.  Asked and answered.

23            Go ahead.

24            THE WITNESS:  Just the active physical

25   resistance from Mr. Barnhill, which are his actions, in

Deposition Of Joshua Bishop

1  my opinion --

2  BY MR. PACKER:

3       Q    Okay.  So aside from that, there was nothing --

4            MS. KORNBLAU:  Okay.  Hold on.  Hold on.  It --

5  you interrupted him.  He wasn't done --

6            MR. PACKER:  Sure.

7            MS. KORNBLAU:  -- with the response.

8            THE WITNESS:  So the -- the active physical

9  resistance, in my opinion, was Mr. Barnhill's actions,

10  and the violence and the potential to still be in

11  possession of a weapon was the result of the Taser

12  strike.  And as I stated, if his actions were compliance

13  and allowing us to take him into custody, it wouldn't

14  have resulted in that Taser strike.  So in my opinion,

15  his actions did result in the fact that -- that's why

16  the Taser ended up being used and flying out of my

17  hands.

18  BY MR. PACKER:

19       Q    Okay.  Do you recall what you were saying while

20  you were reengaging with Mr. Barnhill's upper body?

21            MS. KORNBLAU:  Objection.  Vague.

22            Go ahead.

23            THE WITNESS:  I believe I was saying, "Put your

24  hands behind your back."

25  ///

Deposition Of Joshua Bishop

```
 1   BY MR. PACKER:
 2      Q    Okay.  Do you recall what, if anything,
 3   Mr. Barnhill was saying?
 4      A    Mr. Barnhill was stating that his hands were
 5   behind his back; however, they were not, and he was
 6   still actively, physically resisting and pulling away
 7   from officers' grasps.
 8      Q    Okay.  Do you recall Mr. Barnhill, while he was
 9   on the ground, saying, "I'm not resisting"?
10          MS. KORNBLAU:  Objection.  Misstates the
11   evidence.
12          But go ahead.
13          THE WITNESS:  I believe the only thing I
14   remember -- recalling him saying is, "They're behind my
15   back."  And again, as I stated, he was stating these
16   things that "they're behind my back"; however, officers
17   were still struggling to gain control of his arms and
18   hands.  And one of his hands appeared to be secured,
19   which was the left hand.  However, Officer Maynard
20   specifically was still struggling to gain control of
21   that right hand.  And Mr. Barnhill was still actively
22   pulling away from Officer Maynard's grasp.
23   BY MR. PACKER:
24      Q    Okay.  How long did this entire use of force
25   incident last, as you recall?
```

Deposition Of Joshua Bishop

1      A    I would estimate to be anywhere between three
2  to six minutes.
3      Q    Okay.  Do you recall if Mr. Barnhill's hands
4  were ever secured during this incident?
5      A    Yes.
6      Q    Do you know who secured them?
7      A    I believe it was a culmination and -- you know,
8  of Officers Maynard, Aguila, and Corporal Klinzing.
9      Q    Okay.  When they were secured, could you --
10 could you see Mr. Barnhill's hands behind his back while
11 he was still on the ground at any point?
12     A    Once we were able to -- I mean, those three
13 officers were able to place him into handcuffs.  This
14 handcuff -- hands behind his back is when I observed him
15 to finally be secured.
16     Q    So you -- you did not see his hands prior to
17 them being in handcuffs?
18         MS. KORNBLAU:  Objection.  Vague.
19         Go ahead.
20         THE WITNESS:  So as I -- as I stated, I saw the
21 left hand.  Officer Aguila appeared to have a decent
22 control and grasp of that left hand, but Officer Maynard
23 was struggling to gain control.  And in compliance with
24 the right hand, which was almost down by Mr. Barnhill's
25 side, and he was not allowing it to be put behind his

Deposition Of Joshua Bishop

1  back, from what I recall.

2  BY MR. PACKER:

3      Q    Okay.

4      A    And it wasn't until Corporal Klinzing arrived

5  that we had a third officer that it took to get this

6  other hand behind his back.

7      Q    Okay.  So you told us you reengaged with his

8  upper body.

9          Do you recall if you struck him again at any

10  point during the use of force event?

11     A    No.

12     Q    So you don't recall one way or another striking

13  him again?

14         MS. KORNBLAU:  Objection.  Vague.

15         THE WITNESS:  I don't understand the question.

16  BY MR. PACKER:

17     Q    Okay.  Let me ask you this:  Do you recall

18  grabbing the back of his head at any point?

19     A    Yes.

20     Q    At what point did you grab the back of his

21  head?

22     A    As -- as I stated -- so as Officer Aguila had

23  control of that -- of that left hand and Officer Maynard

24  was still struggling to gain control of that right hand

25  and after the Taser had flown out of my hand is when I

Deposition Of Joshua Bishop

1    utilized my hands to grab the hooded portion of his

2    large bulky sweater, and then I grasped his

3    ponytail-style hair to hold his down -- hold his head

4    and upper body down toward the ground.

5         Q    Okay.  When you say hold his body down towards

6    the ground, what do you mean?

7         A    So as Mr. Barnhill was still -- yes, he was

8    down on the ground.  He was still actively moving

9    around, you know, whether that be his shoulders, his

10   arms, his -- his head.  I couldn't see his legs at that

11   point; however, he was still actively moving around.  So

12   I was attempting to hold him down via the very upper

13   portion of his body.  And that was the only portion that

14   I was able to go hands-on with Mr. Barnhill due to the

15   other officers being there.

16        Q    Okay.  I want to show you again Exhibit B, your

17   report.  And I'm going to direct your attention to

18   page 3.

19             And in this report, do you see the paragraph

20   that starts, "In an attempt"?

21        A    Yes.

22        Q    And as that sentence continues, it says, "I

23   grasped Barnhill's ponytail-style hair and slammed his

24   face and head into the ground."

25             Is that what you meant when you said you pulled

Deposition Of Joshua Bishop

1    him toward the ground?

2        A    So my intent at that point, again, was to, as I

3    stated, immobilize him and keep any further movements

4    due to his active moving around.  And my intention was

5    to hold his head and upper portion of his body down

6    toward the ground.  And as -- as Mr. Barnhill continued

7    to actively move around, his head had slightly lifted

8    off of the ground, and I ended up pushing it back to the

9    ground, which caused it to slam into the ground.

10       Q    Okay.  To be clear, though, you said in your

11   report that was written on April 29th that you grasped

12   Barnhill's ponytail-style hair and slammed his face and

13   head into the ground.  Those were your words on

14   April 29th.

15            Did I read that accurately?

16            MS. KORNBLAU:  Objection.  Asked and answered.

17   Calls for a narrative.

18            But go ahead.

19            THE WITNESS:  So again, as -- as officers were

20   attempting to gain control and gain compliance and place

21   him in handcuffs, Mr. Barnhill was still actively

22   physically resisting our efforts to take him into

23   custody and gain control of his arms and hands.  At that

24   point, I didn't have my Taser anymore, and it was

25   ineffective, and it flew to the side, and it was on the

Deposition Of Joshua Bishop

1    ground, so I utilized my hands to again hold his hooded

2    portion of his sweater.  And the only thing that was

3    available to me as well was his ponytail-style hair,

4    which I grasped, held on to, pushed him down into the

5    ground.  And as a result of Mr. Barnhill's actions of

6    continuing to move around, I pushed his head back down

7    toward the ground, which caused it to slam.

8    BY MR. PACKER:

9        Q    Okay.  I want to talk about -- you said --

10   excuse me.  Sorry.  You said you had a operative body

11   camera on April 29th; is that correct?

12       A    Yes.

13       Q    Can you hear me?  I'm sorry.

14       A    Yes.

15       Q    I'm sorry, can you hear me?

16       A    Yes, I can.

17       Q    I've got a body cam -- okay.  So I'm going to

18   share my screen with you and ask you if you recognize a

19   video as being from your body cam; okay?

20       A    Okay.

21       Q    All right.  And let me see if I can do this

22   without creating tremendous noise.  Hold on just a

23   second.

24            Okay.  Can you see the video on my screen?

25       A    Yes.  It's not playing, but...

Deposition Of Joshua Bishop

```
 1      Q    No, I haven't played it yet.

 2      A    Okay.

 3      Q    I'm going to play it.  I'm going to play it

 4  from the beginning to see if you recognize it is you.

 5  And then I want to talk to you about this specific use

 6  of force moment; okay?

 7      A    Okay.

 8      Q    And I don't know why the volume is not playing.

 9           Can you hear it on your end?

10           MS. KORNBLAU:  It should start 30 seconds, and

11  we're not there yet.

12           MR. PACKER:  Got it.

13           There we go.  Thank you.

14  BY MR. PACKER:

15      Q    So in this video, is that you holding the

16  firearm?

17      A    Yes.

18      Q    And this is, as you recognize it, your body

19  camera?

20      A    Yes.

21      Q    And this is the one you were wearing on

22  April 29th, 2022?

23      A    Yes.

24      Q    Okay.  I'm going to continue to let it play.

25  And then for the record, I believe we're on Exhibit C.
```

Deposition Of Joshua Bishop

```
1              (Exhibit C was marked for
2              identification and is attached
3              hereto.)
4    BY MR. PACKER:
5        Q    So I'm just starting up.  And I'm starting.
6              (Video playing.)
7    BY MR. PACKER:
8        Q    And so just to confirm, this is your video;
9    right?
10       A    Yes.
11       Q    And this memorializes the pursuit; is that fair
12   to say?
13       A    Yes.
14       Q    Okay.  I'm going to move forward to the end of
15   the vehicle pursuit and talk to you about the use of
16   force incident.
17            Is that okay with you?
18       A    Yes.
19       Q    All right.  So I'm going to play from 2:41 on
20   the video that has been marked as Exhibit C to today's
21   deposition.
22              (Video playing.)
23   BY MR. PACKER:
24       Q    So is that you that's screaming, "Show us your
25   fucking hands now"?
```

Deposition Of Joshua Bishop

1    A    Yes.

2    Q    And is this the moment -- well, let me ask you

3  this:  Do you see a figure in the upper left-hand side

4  of the video?

5    A    Yes.  It's kind of hard to see, but yes.

6    Q    Sure.

7         And is that, to your knowledge, Mr. Barnhill?

8    A    Yes.

9    Q    And this is the moment where you said, "Show us

10  your hands"?

11    A    Yes.

12    Q    And you see his hands are raised?

13    A    Yes.

14    Q    Okay.  So that was consistent with you -- what

15  you told us earlier about him initially complying with

16  your commands?

17    A    Yes.

18    Q    Okay.  I'm going to continue to play Exhibit C.

19         (Video playing.)

20  BY MR. PACKER:

21    Q    Okay.  So the officer that's making first

22  contact there, has "police" written across his back at

23  2:49 is Officer Maynard; is that right?

24    A    Yes.

25    Q    Okay.  Okay.  And at 2:51, approximately, is

Deposition Of Joshua Bishop

1  that you pulling off the Taser and yelling, "Taser"?

2      A    Yes.

3           MS. KORNBLAU:  I'll just object that a still

4  shot doesn't capture exactly what you're saying.

5           But go ahead.

6           MR. PACKER:  I understand that.

7  BY MR. PACKER:

8      Q    I'm just trying to understand who's standing

9  where at this point, okay, Officer Bishop?

10     A    Okay.

11     Q    All right.  So the individual on -- at 2:52 on

12 the far left-hand side, do you understand that to be

13 Officer Maynard?

14     A    Yes.

15     Q    And then the individual that's closer to you in

16 your view from the camera is Officer Aguila?

17     A    Yes.

18     Q    Okay.  And those are the only officers we see

19 in the frame along with Mr. Barnhill; is that right?

20     A    Yes.

21     Q    So -- okay.  So that at 2:55 is the first Taser

22 shot; is that right?

23     A    Yes.

24     Q    That's the one where you deployed the probes?

25     A    Yes.

Deposition Of Joshua Bishop

```
 1      Q    Okay.  And at approximately 3:05 is that second
 2   recharge of the Taser; is that correct?
 3      A    Yes.
 4           (Video playing.)
 5   BY MR. PACKER:
 6      Q    So at 3:14, is that the first strike using the
 7   Taser as an improvised weapon?
 8      A    I believe it's both strikes.
 9      Q    That was both strikes.  All right.
10           I'm going to play that back; okay?
11      A    Okay.
12           (Video playing.)
13   BY MR. PACKER:
14      Q    So that was the two strikes to the side of his
15   head?
16      A    Yes.
17      Q    Okay.
18           (Video playing.)
19   BY MR. PACKER:
20      Q    I'm going to let this play through the end just
21   to confirm that after we see the Taser strikes, it's
22   difficult to see anything beyond that, and ask you if
23   you agree with that.
24      A    Okay.
25           (Video playing.)
```

Deposition Of Joshua Bishop

1    BY MR. PACKER:

2        Q    So at this point, at approximately 3:50, it's

3    your understanding Mr. Barnhill has been handcuffed; is

4    that right?

5        A    Yes.

6            MS. KORNBLAU:  Objection.  I can't -- I can't

7    say that in the still shot.

8            But go ahead.

9            MR. PACKER:  Understood.  I'm just trying to

10   stop it for reference just so that he can catch up and I

11   can ask the questions.

12   BY MR. PACKER:

13       Q    But -- so your understanding is as of 3:50, the

14   hands have been cuffed; is that right?

15       A    From -- from my recollection, yes.

16       Q    Okay.  Is this the only video that you've

17   reviewed in preparation for today?

18       A    Yes, my own video.

19       Q    Okay.  Did you review any of the other

20   officers' videos at any point?

21       A    No.

22       Q    Okay.  I do want to share with you Officer

23   Aguila's video and just ask if it's an accurate

24   depiction of your memory of the events; okay?

25       A    Okay.

Deposition Of Joshua Bishop

1          MS. KORNBLAU:  And I'll just object that it
2    calls for speculation since this is not his vantage
3    point nor his video.
4          MR. PACKER:  Okay.
5    BY MR. PACKER:
6        Q    Sorry for the technological ineptitude.  My
7    paralegal is on vacation, so this is what you get.
8    Sorry.
9          Okay.  This is -- we're going to mark this as
10   Exhibit D.
11              (Exhibit D was marked for
12              identification and is attached
13              hereto.)
14   BY MR. PACKER:
15       Q    And I'm going to ask if you see at 2:26 an
16   officer in the camera view.
17          MS. KORNBLAU:  Again, objection to all of this
18   since it lacks foundation.  Calls for speculation.
19          But go ahead.
20   BY MR. PACKER:
21       Q    Do you recognize that to be you in the camera
22   view?
23       A    Yes.
24       Q    Okay.  I'm going to let it play through, and
25   then I want to ask you about one moment in particular.

Deposition Of Joshua Bishop

```
1                    (Video playing.)
2    BY MR. PACKER:
3        Q    Okay.  Did you hear somebody say, "I've got his
4    hands, I've got his hands" at that point?
5              MS. KORNBLAU:  Objection.  Calls for
6    speculation.
7              Go ahead.
8              THE WITNESS:  Personally, I -- there was a lot
9    of things being shouted.  I don't personally recall
10   hearing somebody say, "I got his hands."
11   BY MR. PACKER:
12       Q    Okay.  So you don't recall that at that --
13   hearing that at the time of the use of force incident;
14   is that fair to say?
15       A    Yes.
16       Q    Okay.  Do you see his hands -- both of his
17   hands in Exhibit D at 2:57?
18             MS. KORNBLAU:  Objection.  Lacks foundation.
19             Go ahead.
20             THE WITNESS:  I -- I just like to point out in
21   this specific video -- I mean, this still shot image, I
22   can -- yes, I can observe two hands.  But from my
23   vantage point, it's completely different as you could
24   see earlier, and I could not see that portion from my
25   vantage point.
```

Deposition Of Joshua Bishop

1   BY MR. PACKER:

2       Q     Okay.  So you couldn't see this portion.  And

3   then you said you don't recall hearing somebody say, "I

4   got his hands"?

5       A     Correct.

6       Q     Okay.

7             MS. KORNBLAU:  Objection.  Lacks foundation.

8             Go ahead.

9             THE WITNESS:  So kind of as I explained

10  earlier, that the only portion of the body camera is

11  able to assist with immobilizing Mr. Barnhill and

12  assisting with taking him into custody, was holding the

13  hooded portion of his sweatshirt and the ponytail-style

14  hair that he had.  Again, with everything that we had

15  up -- up to this point, the fact that we still hadn't

16  patted him down for weapons, we still didn't know if he

17  was in possession of a firearm or whose house we were

18  at, if anybody else was going to be victimized or taken

19  hostage, things of that nature.  I was holding him down

20  toward the ground.  And with his actions, at one point,

21  his head slightly lifted off the ground, and I pushed it

22  back down into the ground to prevent any further

23  movement of his person, which was actively -- is active

24  physical resistance.  And when I pushed his head back

25  toward the ground is what caused it to slam.

Deposition Of Joshua Bishop

1    Vague and ambiguous.

2          Go ahead.

3          THE WITNESS:  There's several watches, so I'm

4    not sure which one you're being -- which one you're

5    articulating or being specific to.

6    BY MR. PACKER:

7      Q      I'm specifically asking about the hand with the

8    watch on in the upper -- further most upper left-hand

9    corner of the video that's Exhibit D at 2:59.

10          MS. KORNBLAU:  Again, objection.  Lacks

11    foundation.  Calls for speculation.

12          Go ahead.

13          THE WITNESS:  Yes, I believe that was my

14    watchband at the time.

15    BY MR. PACKER:

16      Q      Okay.  So we did establish that at some point,

17    Mr. Barnhill was handcuffed; is that right?

18      A      Yes.

19      Q      Did you search his waistband at that point?

20      A      I did not.

21      Q      Do you know if anybody searched his waistband

22    at that point?

23          MS. KORNBLAU:  Objection.  Calls for

24    speculation.

25          But go ahead.

Deposition Of Joshua Bishop

```
1           THE WITNESS:  Yes, I believe he was searched.
2    And I believe I heard Officer Maynard verbally say that
3    I have to check -- he has to check him for a firearm,
4    but I personally did not observe the search of
5    Mr. Barnhill's person.
6    BY MR. PACKER:
7        Q    Okay.  To your knowledge, was any firearm found
8    on Mr. Barnhill's person on April 29th, 2022, at the
9    time of the use of force event?
10       A    Not to my knowledge.
11       Q    To your knowledge, was a knife found at that
12   point?
13       A    Not to my knowledge.
14       Q    To your knowledge, was one found in the area
15   around Mr. Barnhill's person during the use of force
16   event?  And -- and by that, I mean after he was taken
17   into custody.
18       A    To my knowledge, I know that officers later had
19   conducted a search of the residence that we did not know
20   at the time was Mr. Barnhill's and a firearm -- I think
21   multiple firearms located within that residence.
22       Q    Okay.  This entire event happened outside the
23   residence; correct?
24       A    Yes.
25       Q    And the front door to the residence was closed
```

Deposition Of Joshua Bishop

1    at all times?

2            MS. KORNBLAU:  Objection.  Calls for

3    speculation.

4            But go ahead.

5            THE WITNESS:  Yes, the front door was closed.

6    However, as I had put in my report, it had appeared that

7    Mr. Barnhill was attempting to gain entry into that same

8    residence that the firearms were located.

9    BY MR. PACKER:

10       Q    Okay.  There were no firearms found on the

11   front porch of the residence; correct?

12       A    No.

13       Q    And there were no knives found on the front

14   porch of the residence; correct?

15       A    No.

16       Q    And aside from the metal chair that you

17   identified, there was no weapon of any kind found on the

18   front porch of the residence; correct?

19       A    No.

20            MR. PACKER:  Andrea, let me look at my notes.

21   I think I'm pretty close.

22            MS. KORNBLAU:  Okay.

23            MR. PACKER:  So if you want to just take five.

24            MS. KORNBLAU:  Yeah.

25            (A recess was taken.)

Deposition Of Joshua Bishop

1   BY MR. PACKER:

2       Q     So, Officer Bishop, I just want to confirm a

3   couple more things.

4             You told us about a knee strike from one of the

5   other officers by Mr. Barnhill; is that right?

6       A     Yes.

7       Q     Did Mr. Barnhill strike you at all during this

8   use of force event?

9             MS. KORNBLAU:  Objection.  Vague and ambiguous.

10            But go ahead.

11            THE WITNESS:  No.

12  BY MR. PACKER:

13      Q     Okay.  I'm going to share with you a couple of

14  photos and just ask if they accurately depict

15  Mr. Barnhill's appearance on that day.

16            Now I'm going to mark this as Exhibit E.

17              (Exhibit E was marked for

18               identification and is attached

19               hereto.)

20  BY MR. PACKER:

21      Q     Do you see the individual depicted in this

22  photo?

23            MS. KORNBLAU:  And I'll just object that it

24  lacks foundation.

25            But go ahead.

Deposition Of Joshua Bishop

1    MS. KORNBLAU:  Sure.

2    MR. PACKER:  Excellent.

3    MS. KORNBLAU:  Yes.

4    THE REPORTER:  Do you need a copy, Ms. --

5    MR. PACKER:  Thank you, Officer.

6    THE REPORTER:  Oops.  Sorry.

7    Do you need a copy, Ms. Packer?

8    MS. KORNBLAU:  Yes, please.

9        (The proceedings were concluded

10               at 3:49 p.m.)

11               ---o0o---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Deposition Of Joshua Bishop

```
1   STATE   OF   CALIFORNIA  )
                             ) ss.
2   COUNTY OF   _____  )

3

4

5           I, JOSHUA OFFICER , say I have read the

6   foregoing deposition and declare under penalty of perjury

7   that my answers as indicated are true and correct.

8

9

10

11  _____
            (Date)
12

13                              _____
                                       (Signature)
14

15

16

17

18

19

20

21

22

23

24

25
```

Deposition Of Joshua Bishop

```
1   STATE   OF   CALIFORNIA    )
                               )  ss.
2   COUNTY  OF   LOS ANGELES   )

3

4          I, Sandra Concialdi, Certified Shorthand Reporter,

5   License No. 12553, for the State of California, do hereby

6   certify:

7          That, prior to being examined, the witness

8   named in the foregoing deposition, to wit, OFFICER JOSHUA

9   BISHOP, was by me duly sworn to testify the truth, the whole

10  truth and nothing but the truth;

11         That said deposition was taken down by me

12  in shorthand at the time and place therein named and

13  thereafter reduced to computer-aided transcription

14  under my direction.

15         That the foregoing transcript, as typed, is a

16  true record of the said proceedings.

17         I further certify that I am not interested

18  in the event of the action.

19

20

21         Witness my hand this 11th day of February, 2025

22                    Sandra Mitchell

23         _____

24              SANDRA CONCIALDI, C.S.R. No. 12553

25
```