# "EXHIBIT 4"

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3

4  HENRY BARNHILL,                    )
                                      )
5              Plaintiff,             )
                                      )
6      vs.                    )CASE NO.
                              )5:23-CV-00589-JGB-SP
7  CITY OF HEMET; OFFICER BRETT       )
   MAYNARD; OFFICER JOSHUA BISHOP;    )
8  OFFICER PEDRO AGUILA; CORPORAL     )
   DOUGLAS KLINZING; CATHERINE        )
9  TIPTON; AND DOES 1-10, INCLUSIVE,  )
                                      )
10                                    )
             Defendants.      )
11                                    )
                                      )
12

13

14  DEPOSITION OF : DOUGLAS KLINZING
    Taken By     : TRENTON C. PACKER, ESQ.
15  Commencing   : 1:07 p.m.
    Location     : Zoom Remote Proceeding
16  Day, Date    : FRIDAY, JANUARY 31, 2025
    Reported by  : Ora Kohn, CSR No. 11933
17  Pursuant to  : Notice
    Original to  : TRENTON C. PACKER, ESQ.

18

19

20

21

22

23

24  Pages 1-57

25  JOB NO. 238692

Deposition Of Douglas Klinzing

1                    REPORTED REMOTELY

2                 FRIDAY, JANUARY 31, 2025

3           COURT REPORTER: Good morning.  My name is Ora

4   Kohn.  I'm a certified Court Reporter with the State of

5   California.  My CSR number is 11933.

6                    DOUGLAS KLINZING,

7            Sworn as a witness by the Certified

8            Shorthand Reporter, testified as follows:

9                 EXAMINATION BY MR. PACKER

10          MR. PACKER:  Q.  Good morning.  I'm going to

11  say Mister right now because I understand you're

12  retired, but I'm happy to call you any name that you're

13  most comfortable with.  Is it Mister, Corporal?  What

14  are you comfortable with?

15     A.   Doug or Mr. Klinzing, whatever you're

16  comfortable with, sir, is fine.

17     Q.   I'm going to call you Mr. Klinzing.  I'm Trent

18  Packer.  I'm going to be taking the deposition today.

19  Have you had your deposition taken before?

20     A.   Not on this case, no, sir.

21     Q.   On any case.

22     A.   Once before, yes, sir.

23     Q.   And I assume you've testified in court before

24  as well?

25     A.   Yes, I have.

Deposition Of Douglas Klinzing

1  of Hemet, primarily detectives in Hemet -- there's

2  about six assigned to the unit, more or less, and those

3  detectives are handling essentially most of your

4  serious violent crimes; your homicides, attempted

5  homicides, sexual assaults, all your child crimes,

6  officer-involved shootings.  They -- at least when I

7  was there, they were still assisting in those

8  investigations as well.  So you really handle pretty

9  much everything as a detective with the Hemet Police

10  Department.

11     Q.   Okay.  And then you told us you became a field

12  supervisor for the last year that you spent at the HPD?

13     A.   Yes, sir.

14     Q.   You were a field supervisor that supervised

15  the patrol unit.  Is that fair to say?

16     A.   Yes.

17     Q.   And you were a Corporal at that point?

18     A.   Yes.

19     Q.   When you joined the Hemet Police Department,

20  were you again trained on use of force policies?

21     A.   Yes, to an extent.

22        MS. KORNBLAU:  Objection.  Vague and

23  ambiguous, but go ahead.

24        MR. PACKER:  Q.  Okay.  So let me ask you a

25  more specific question.  Did you familiarize yourself

Deposition Of Douglas Klinzing

1   with the Hemet manual on use of force?

2   A.   Yes.

3   Q.   Same question with respect to the use of

4   deadly force.

5   A.   Yes.

6   Q.   What -- as of -- well, during your time as a

7   supervisor of patrol at the Hemet Police Department,

8   what was your understanding of deadly force, the term

9   deadly force?

10   A.   I'm sorry, can you restate the question?  I

11   don't understand the question.

12   Q.   Sure.  Sure.  Did you have an understanding of

13   what was meant by the phrase deadly force during your

14   time as a supervisor at the Hemet Police Department?

15   A.   Yes.

16   Q.   And what was that understanding?

17   A.   Any force which is likely to produce serious

18   bodily injury or death.

19   Q.   Okay.  Did you understand that term to include

20   force that was likely to cause obvious disfigurement?

21   A.   No.

22   Q.   Okay.  That was something different in your

23   understanding?

24   A.   I don't understand the question.  I'm sorry.

25   Q.   Sure.  Were you trained in the definition of

Deposition Of Douglas Klinzing

1  serious bodily injury from the California Government

2  Code?

3      A.   Not that I'm aware of.

4      Q.   Okay.  So your understanding was just the

5  phrase serious bodily injury; is that right?

6          MS. KORNBLAU:  Objection.  May misstate

7  testimony, but go ahead.

8          THE WITNESS:  I'm sorry, can you ask that

9  question again?

10         MR. PACKER:  Q.  I can.  It was a poor

11  question.  When you were giving me your understanding

12  of the phrase deadly force, you used the separate

13  phrase serious bodily injury.  Do you remember that?

14     A.   Yes.

15     Q.   Okay.  So it was your understanding that force

16  that was likely to lead to serious bodily injury was

17  deadly force.  Is that fair to say?

18     A.   I believe that that is -- that phrase is

19  included in the definition of deadly force, yes.

20     Q.   Okay.  What was your understanding as to the

21  phrase serious bodily injury?

22     A.   I believe the -- I believe that the policy

23  identifies that as like broken bones, like permanent

24  disfigurement, things of that nature.

25     Q.   Okay.

Deposition Of Douglas Klinzing

1    A.   Or something that could lead to death

2   obviously.

3    Q.   Sure.  What were you trained in terms of when

4   an officer with the Hemet Police Department is

5   permitted to use deadly force?

6    A.   Well, we're all trained essentially to go back

7   to IDOL, the Immediate Defense of Life.

8    Q.   Okay.

9    A.   And then -- and then the policy very heavily

10  states that an officer can use that force which would

11  be objectively reasonable under the totality of the

12  circumstances.

13    Q.   Okay.  So can we talk about the acronym IDOL?

14  What did you say that stood for?

15    A.   Immediate Defense of Life.

16    Q.   So that was the primary focus of when deadly

17  force could be used.  Is that fair to say?

18        MS. KORNBLAU:  Objection.  Misstates

19  testimony, but go ahead.

20        THE WITNESS:  That is -- that's one acronym

21  that officers will generally apply that they are taught

22  related to shootings -- shooting incidents.

23        MR. PACKER:  Q.  Okay.  So that your

24  understanding is that acronym was specific to shooting

25  incidents.

Deposition Of Douglas Klinzing

1    A.   I believe it's April 22nd of 2022.

2    Q.   Does April 29th of 2022 ring a bell?

3    A.   Okay.  April 29th.  I'm sorry.

4    Q.   That's fine.  So April of 2022?

5    A.   Yes, sir.

6    Q.   Near the end of your time with Hemet Police

7  Department?

8    A.   Yes.

9    Q.   And you were a field supervisor at that point?

10    A.   Yes.

11    Q.   What shift were you on at that -- on

12  April 29th, 2022?

13    A.   I believe it was day shift.

14    Q.   Okay, and when did the day shift run?  From

15  what time to what time?

16    A.   I think 6:00 a.m. to 6:00 p.m.

17    Q.   Okay.  I'll tell you that's what everybody

18  else remembers and they are still there.  So applaud

19  your memory.  And -- and what was your specific

20  assignment on April 29th, 2022, if you recall?

21    A.   Field supervisor.

22    Q.   Okay, so that was supervisor of the patrol

23  units?

24    A.   Yes.

25    Q.   Were you in uniform that day?

Deposition Of Douglas Klinzing

1    A.   Yes.

2    Q.   Can you describe, if you recall, what that

3  uniform looked like?

4    A.   Black cargo pants, black uniform shirt, and

5  load bearing vest on top with shoulder -- identifying

6  police shoulder patches, a badge patch and

7  associated -- your standard, you know, police belt and

8  load bearing vest.

9    Q.   Did you have a body worn camera?  I'm sorry, I

10  didn't hear if you said that.

11    A.   Yes.

12    Q.   And was it in working order that day?

13    A.   Yes.

14    Q.   I'm not sure I asked you this.  Forgive me if

15  I already did.  Have you ever been named in a lawsuit

16  alleging that you used excessive force while with any

17  police agency?

18    A.   Yes.

19    Q.   And what agency was that?

20    A.   With the Hemet Police Department.

21    Q.   How many times?

22    A.   One prior occasion.

23    Q.   Do you recall approximately what year that

24  was?

25    A.   It was recent.  2021.  Maybe or 2020.  Or

Deposition Of Douglas Klinzing

1  2021.

2   Q.   And there were no lawsuits at the LAPD that

3  you can recall?

4   A.   Yes, there was a lawsuit with the Los Angeles

5  Police Department.

6   Q.   And was that for the use of force?

7   A.   I don't recall what the allegations were on

8  that one.

9   Q.   Okay.  So on April 29th, 2022 you understand

10  we are talking about an incident that ended at 354

11  Gardenia Court.  Do you understand that?

12   A.   Yes.

13   Q.   When did your involvement in that incident

14  start?

15   A.   When I heard the broadcast of the call, which

16  very quickly turned into a pursuit, I would say that I

17  was involved as a field supervisor, although I was

18  absent from the scene, if that makes sense.  I was

19  listening and monitoring on the radio and I was

20  responding at that point.

21   Q.   Okay.  So to be more specific, you didn't

22  actually take place -- take part in the car pursuit

23  portion of April 29th, 2022's event?

24   A.   I caught up to the pursuit, if memory serves

25  me correct, like right as they were -- as it was

Deposition Of Douglas Klinzing

1  place on April 29th, 2022.

2     A.   Yes.  The computer would have been able to

3  provide some information as well.

4     Q.   Do you have any specific recollection of what

5  information the computer provided you?

6     A.   I don't.

7     Q.   Do you recall if you were specifically told

8  that the individual in that car that was located

9  outside the school on April 29th had a firearm on them?

10    A.   Yes.

11    Q.   And what was that information?

12    A.   As the pursuit was taking place or under way,

13 I believe it was another supervisor who was with the

14 victim broadcast that the subject was or the suspect

15 was believed to be armed with a handgun.

16    Q.   Okay.  Was your understanding that the suspect

17 was believed to be armed with a handgun that day or the

18 day prior?

19    A.   That day.  That was my -- that was my

20 understanding of the situation.

21    Q.   Okay.  That was your understanding then or

22 that's your recollection now?

23    A.   That was my -- that was my understanding then.

24    Q.   Okay.  Did you ever see a firearm on the

25 suspect on April 29th, 2022?

Deposition Of Douglas Klinzing

1      A.   No.

2      Q.   Did you ever see a knife on the suspect at any

3  point on April 29th, 2022?

4      A.   No.

5      Q.   When the car pursuit terminated at that

6  address on Gardenia, what did you see?

7      A.   I saw the vehicle stopped.  I saw the officers

8  stop behind and begin to give chase toward -- around

9  toward the front of the house on that corner.

10     Q.   Okay.  When you say the officers, which

11  officers did you see begin to give chase?

12     A.   It was Officer Aguilera (sic) and I believe

13  Officer Bishop and Officer Maynard.  They were the

14  three officers involved.

15     Q.   Okay.  Could you see the suspect during the

16  time when the suspect began to run from their car

17  towards the front door of Gardenia?

18     A.   Very briefly.  I quickly went toward the alley

19  directly behind the residence, so I only saw when

20  everybody kind of jumped out of the cars and started

21  running, and then I turned my attention to where I felt

22  he might go to.

23     Q.   Okay.  Were you able to see the suspect's

24  hands during --

25     A.   No.

Deposition Of Douglas Klinzing

1    Q.   -- that brief -- I'm sorry.

2    A.   I'm sorry, I cut you off.

3    Q.   That's okay.  I was just going to be specific

4  as to that brief period of time when the foot

5  pursuit -- the brief period of time that you observed

6  the foot pursuit.

7    A.   No.  I would have to say I did not get a good

8  look at him or his hands specifically.

9    Q.   Okay.  Do you recall what the suspect was

10  wearing that day?

11    A.   Yes.

12    Q.   What was that?

13    A.   A large hooded sweatshirt and basketball

14  shorts, I believe, or some type of shorts.

15    Q.   Okay.  So you went around to the alley behind

16  the home.  Is that what you said?

17    A.   The mouth of the alley, yes.  The home is

18  located right on the corner and then there's an alley

19  directly behind it.

20    Q.   Okay.  At any point did you join Officers

21  Bishop, Aguila and Maynard who were with the suspect?

22    A.   Yes.

23    Q.   What did you observe when you saw those

24  officers after you briefly saw them during the foot

25  pursuit?

Deposition Of Douglas Klinzing

1    A.    Can you be more specific as to at what point?

2    Q.    Sure.  Let me ask you this question.  You were

3 at the mouth of the alley, right?

4    A.    Yes.

5    Q.    What do you do from there?

6    A.    When I -- when I heard that officers were

7 confronting the suspect on the front porch, I ran back

8 around to the front up the front walkway to join the

9 officers, and that's when I became more personally

10 involved.

11    Q.    Okay.  So we keep using suspect in our

12 questions and answers.  Did you understand that

13 suspect's name to be Henry Barnhill?

14    A.    I later learned that.  I don't know that I

15 knew that at the time.  But yes, that is who we are

16 discussing.

17    Q.    Okay.  Did you know the residence at 354

18 Gardenia to be his residence?

19    A.    At that time, no.

20    Q.    Now, we talked about how you came around from

21 the mouth of the alley and up the walkway and saw the

22 officers engaged with Mr. Barnhill.  Can you describe

23 specifically what you saw at that moment in time?

24    A.    The three officers were struggling with Mr.

25 Barnhill who was on the ground.  Officer Aguila

Deposition Of Douglas Klinzing

1  appeared to be holding or trying to keep control of I

2  believe it was Mr. Barnhill's left hand, and the other

3  two officers were struggling or trying to get Mr.

4  Barnhill's right hand out from underneath him and

5  behind his back.

6      Q.   During the time that you observed the officers

7  struggling with Mr. Barnhill, did you observe

8  anybody -- any of the officers strike Mr. Barnhill with

9  one of their body parts, in other words a fist, a foot,

10  a knee, something like that?

11      A.   Yes, I believe so.

12      Q.   What do you specifically recall?

13      A.   I believe I observed Officer Aguila strike Mr.

14  Barnhill in his -- it would be his right side with his

15  hand maybe two times.

16      Q.   Okay.  During the time that you observed the

17  three officers struggling with Mr. Barnhill, did you

18  see any of them strike Mr. Barnhill with an object

19  other than the body part?

20      A.   No, I did not observe.  I did not observe

21  that.

22      Q.   Okay.  Specifically you did not observe

23  anybody strike Mr. Barnhill with a Taser?

24      A.   I did not observe that, no.

25      Q.   Did you observe the deployment of a Taser?

Deposition Of Douglas Klinzing

1    A.   No.  I was not there to observe the Taser

2  deployment.

3    Q.   So you were describing how Officer Aguila is

4  struggling to gain control of Mr. Barnhill's left hand,

5  right?

6    A.   No.  At the time I came up I believe he was

7  still holding -- he had that grip on his left hand.  It

8  was the right hand they were trying to get control of.

9    Q.   Okay.  Is it fair to say it appeared Officer

10  Aguila had control of Mr. Barnhill's left hand at that

11  time?

12       MS. KORNBLAU:  Objection.  Calls for

13  speculation, but go ahead.

14       THE WITNESS:  I know he had a grip on it at

15  one point.  I can't say -- I can't say at what point --

16  like at what exact moment he, like, had firm control,

17  but I know that at one point he did get control of that

18  hand and appeared to be holding it pretty firmly from

19  what I could see.

20       MR. PACKER:  Q.  At the time that Officers

21  Bishop and Maynard were still struggling to gain

22  control of Mr. Barnhill's right hand, during that time

23  period, did it appear to you that Officer Aguila had

24  control of Mr. Barnhill's left hand, during that time?

25       MS. KORNBLAU:  Objection.  Calls for

Deposition Of Douglas Klinzing

1  speculation.  Vague and ambiguous, but go ahead.

2       THE WITNESS:  Yes.  I think it was my

3  impression that at that moment -- at the moment when I

4  became involved, he appeared to have a pretty good hold

5  on that left hand.

6       MR. PACKER:  Q.  Okay.  At some point were

7  Officers Bishop and Maynard able to gain control of Mr.

8  Barnhill's right hand?

9       MS. KORNBLAU:  Objection.  Calls for

10  speculation.  Vague and ambiguous.  Go ahead.

11       THE WITNESS:  Yes, at some point they were

12  able to get control.

13       MR. PACKER:  Q.  Did you --

14       A.  After I arrived.

15       Q.  Okay.  Did you participate in trying to gain

16  control of Mr. Barnhill's right hand?

17       A.  Yes.

18       Q.  Did you personally strike Mr. Barnhill at any

19  point?

20       A.  No.

21       Q.  So is it fair to say your entire involvement

22  in attempting to gain control of Mr. Barnhill had to do

23  with controlling his right hand?

24       A.  Yes, I think that's a fair statement.

25       Q.  Do you recall hearing the officers say

Deposition Of Douglas Klinzing

1  anything during this time period where they are

2  struggling to gain control of Mr. Barnhill's right

3  hand?

4     A.   Yes.

5     Q.   Do you specifically recall anything that was

6  said?

7     A.   Yes.  I could hear commands essentially from

8  the time that the pursuit terminated there.  You could

9  hear them yelling commands at him from around the back

10  of the house, yes.

11     Q.   Okay.  Do you recall Mr. Barnhill saying

12  anything during the time when now the four of you are

13  struggling to gain control of him?

14     A.   Yes.

15     Q.   What do you recall him saying?

16     A.   He was saying -- I don't remember his specific

17  words, but it was to the effect of my hands are behind

18  my back.  I'm not resisting.  Those types of phrases.

19     Q.   Okay.  Did you review any materials to prepare

20  for today's deposition?

21     A.   Yes, sir.

22     Q.   Can you tell me what you reviewed?  Without

23  disclosing any conversations you had with Counsel, can

24  you tell me what you reviewed?

25     A.   I reviewed policy.  I reviewed some reports

Deposition Of Douglas Klinzing

1    A.   Yes, sir.

2         MS. KORNBLAU:  Objection.  Lacks foundation.

3         MR. PACKER:  Sorry.  Sorry.  Hold on.  Go

4   ahead.

5         MS. KORNBLAU:  Mr. Klinzing, wait a couple of

6   seconds after the question to allow me to object if I

7   need to.  So again, objection.  Lacks foundation.

8   Calls for speculation, but go ahead.

9         MR. PACKER:  Q.  Okay, so I'm going to go

10  ahead and play it now with the understanding that

11  you're going to tell me to stop when you believe that

12  you arrived, okay?

13    A.   Okay.

14    Q.   (VIDEO PLAYED.)

15    A.   I'm there.  Yeah, that's me, I think.

16    Q.   So at roughly the 2:57 mark you believe that

17  you've arrived.  Is that right?

18         MS. KORNBLAU:  Once again, objection.  Lacks

19  foundation, but go ahead.

20         THE WITNESS:  Yes.  You can actually see my

21  uniform and my name right there in that actual still

22  frame.

23         MR. PACKER:  Q.  Okay.  In this still frame,

24  can you see two hands being held, one on the left side

25  of the screen -- do you see the one on the left-hand

Deposition Of Douglas Klinzing

1 ambiguous.  Go ahead.

2        THE WITNESS:  Yes.  To me when I -- when I was

3 able to place a -- my hand on his hand or arm, I could

4 feel resistance.  And I mean, you can see the

5 difficulty we were having in getting the handcuffs

6 placed on him.  So it was my -- it was my feeling that

7 there was resistance the whole time until after those

8 handcuffs were secured on him.

9        MR. PACKER:  Q.  Okay.  So it's your opinion

10 that he was resisting the entire time until the

11 handcuffs were on?

12    A.   Yes.

13    Q.   Did you see any weapons in Mr. Barnhill's

14 hands at that point when you arrived?

15        MS. KORNBLAU:  Objection.  Lacks foundation.

16 Vague and ambiguous.  Go ahead.

17        THE WITNESS:  No, I did not see a weapon in

18 his hands.

19        MR. PACKER:  Q.  Were you present for the

20 search of the area following Mr. Barnhill's arrest?

21    A.   Can you be more specific?

22    Q.   Sure.  Do you know if the area on that front

23 porch at 354 Gardenia was searched after Mr. Barnhill

24 was arrested?

25    A.   Yes.

Deposition Of Douglas Klinzing

1    Q.   And do you know if any weapons were found?

2        MS. KORNBLAU:  Objection.  Vague as to

3  "weapons,"  but go ahead.

4        THE WITNESS:  On the front porch there, no.

5  No weapons were found there on the front porch where

6  this -- where he was taken into custody.

7        MR. PACKER:  Q.  Okay, and then to clarify,

8  there were no firearms found, right?

9    A.   On his person or in that immediate area, no.

10  Correct.

11    Q.   No knives were found on his person or in that

12  immediate area?

13    A.   No, not to my knowledge.

14    Q.   And to your knowledge, nothing that could be

15  used as a weapon was found on his person or in that

16  general area?

17        MS. KORNBLAU:  Objection.  Vague and

18  ambiguous.  Go ahead.

19        THE WITNESS:  That I would have to say is not

20  true, only given that if he had become free, I mean

21  there's bricks in the -- you know, right in there in

22  the front patio.  There's the chair.  I mean, anything

23  could be used as a weapon if we were to have lost

24  control of him and a fight was to occur or something.

25  So that's a little bit different type of a question, I

Deposition Of Douglas Klinzing

1 anyone was on top of him. Certainly they were

2 attempting to hold him down and were like -- had their

3 bodies up against him or their legs up against him.

4          MR. PACKER: Q. Okay, so we saw the movements

5 on the video, and you've testified about your

6 recollection of the struggle with Mr. Barnhill and the

7 officers, right?

8     A. Yes.

9     Q. At the time you arrived, did you believe that

10 Mr. Barnhill presented an immediate threat to your

11 life?

12    A. Yes.

13    Q. And why?

14    A. It was my belief at that moment that he was

15 armed.

16    Q. Okay.

17    A. And he was not yet under control.

18    Q. Okay. Your belief that he was armed was based

19 solely on the broadcast that went out at the beginning

20 of the car pursuit. Is that right?

21          MS. KORNBLAU: Objection.

22          THE WITNESS: Yes.

23          MS. KORNBLAU: Objection. May misstate

24 testimony, but go ahead.

25          THE WITNESS: Yes. Based on broadcasts, yes.

Deposition Of Douglas Klinzing

1  were found in the car in which Mr. Barnhill was driving

2  on April 29th, 2022?

3    A.  I don't know.

4    Q.  Okay.  So your belief that he presented an

5  imminent threat to your life was based on the prior

6  broadcast; is that right?

7        MS. KORNBLAU:  Objection.  May misstate

8  testimony.  Vague and ambiguous, but go ahead.

9        THE WITNESS:  Well, based on the broadcast and

10  also his actions leading up to our contact with him,

11  specifically the -- the pursuit, the nature of the

12  pursuit, and the offense that he was suspected of

13  having been involved in.

14        MR. PACKER:  Q.  What offense was that, as you

15  understood on April 29th, 2022?

16    A.  That he had threatened his wife with a

17  firearm.

18    Q.  And when did you understand that threat with a

19  firearm had taken place?

20    A.  I don't -- I don't recall if -- the time of

21  that incident.  I don't recall the time of that

22  incident whether or not that was broadcast or not.  I

23  don't remember that as I -- as I sit here today.

24    Q.  Okay.  Now, as the field supervisor on duty

25  that day, what responsibilities did you have after the

Deposition Of Douglas Klinzing

1  use of force incident?

2      A.   To ensure that medical treatment is obtained

3  for the subject or for Mr. Barnhill.  And to gather

4  statements from the involved officers and -- and then

5  to obtain a recorded statement from Mr. Barnhill.

6      Q.   Okay.  Do you recall doing all those things?

7      A.   Yes.

8      Q.   But you didn't memorialize them in a report

9  that you wrote?

10      A.   Correct.  No, there was no written report.

11      Q.   Do you know who, if anyone, accompanied Mr.

12  Barnhill to the hospital that day?

13      A.   To his -- to the first -- because he went to

14  two hospitals that day, so I want to be clear.

15      Q.   Sure.

16      A.   Initially I believe he was transported by the

17  ambulance, if I'm not mistaken, to Hemet Valley

18  Hospital.  I do not recall if or -- if an officer or

19  which officer would have accompanied him there.  I know

20  I followed the ambulance and went there as well.

21      Q.   Okay.  Did you get a chance to see Mr.

22  Barnhill when he was in the hospital?

23      A.   Yes.

24      Q.   I want to show you some pictures and see if

25  you recognize them.  This is the first photo.  I'm

Deposition Of Douglas Klinzing

1  Barnhill's head?

2    A.   Yes.

3    Q.   It appears that the ear is detached in some

4  manner.  Is that fair to say?

5        MS. KORNBLAU:  Objection.  Calls for a medical

6  opinion, but go ahead.

7        THE WITNESS:  I think it's torn.  He has a

8  tear in his ear.  I wouldn't say it's detached.

9        MR. PACKER:  Q.  Okay, so he has a tear in his

10  ear is what you're saying.

11    A.   I believe so.

12    Q.   Did you ever talk to the doctors at Hemet

13  Valley regarding Mr. Barnhill's condition?

14    A.   I know I spoke to the doctors.  I think you

15  have to be more specific, though, what regarding.

16    Q.   Okay.  Did you -- did you ever speak to the

17  doctors about a diagnosis of any of Mr. Barnhill's

18  conditions?

19    A.   No.

20    Q.   Okay.  Did you understand that he had any

21  fractures after your conversations with the doctors?

22        MS. KORNBLAU:  Objection.

23        THE WITNESS:  No.

24        MS. KORNBLAU:  Calls for a medical opinion,

25  but go ahead.

Deposition Of Douglas Klinzing

1  close.  I don't have anything more.  Do you have

2  anything?

3          MS. KORNBLAU:  No.

4          MR. PACKER:  So we'll just ask this be handled

5  by Code as well.

6          MS. KORNBLAU:  Yes.

7          COURT REPORTER:  Ms. Kornblau, would you like

8  a copy of the transcript?

9          MS. KORNBLAU:  Yes, please.

10          (Whereupon, at the hour of 2:25 p.m. the

11  matter was adjourned.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Deposition Of Douglas Klinzing

1          PENALTY OF PERJURY CERTIFICATE

2

3

4

5

6       I, the undersigned, declare under penalty

7  Of perjury that I have read the foregoing

8  Transcript, and I have made an corrections,

9  Additions or deletions that I was desirous of

10  Making; that the foregoing is a true and correct

11  Transcript of my testimony contained therein.

12          EXECUTED this _____ day of _____,

13  2025, at _____, California.

14

15

16

17

18

19

20

21      _____

22          Douglas Klinzing

23

24

25

Deposition Of Douglas Klinzing

1             CERTIFICATE OF REPORTER

2

3       I, ORA KOHN, Certified Shorthand Reporter,

4 do hereby certify:

5      That prior to being examined, the witness in the

6 foregoing proceedings was by me duly sworn to testify

7 to the truth, the whole truth, and nothing but the

8 truth.

9       That said proceedings were taken remotely

10 before me at the time and place therein set forth and

11 were taken down by me in shorthand and thereafter

12 transcribed into typewriting under my direction and

13 supervision.

14       That a review of the transcript was requested.

15       I further certify that I am neither counsel

16 for, nor related to, any parties to said proceedings,

17 nor in any way interested in the outcome thereof.

18         In witness whereof, I have hereunto

19 subscribed my name.

20

21         Dated: February 7, 2025

22

23       _____

24       ORA KOHN, CSR 11933

25