# "EXHIBIT 6"

Phillip Sanchez

1     UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3       --oOo--

4

5 HENRY BARNHILL,

6    Plaintiff,

7 v.         Case No.
           5:23-cv-00589-JGB-SP

8

 CITY OF HEMET; OFFICER BRETT
9 MAYNARD; OFFICER JOSHUA
 BISHOP; OFFICER PEDRO AGUILA;
10 CORPORAL DOUGLAS KLINZING;
 JAMIE GONZALEZ; CATHERINE
11 TIPTON; and DOES 1-10, inclusive

12    Defendants.
 _____/

13

14

15

16   STENOGRAPHIC REPORTER'S TRANSCRIPT OF

17     REMOTE DEPOSITION OF

18      PHILLIP SANCHEZ

19    TUESDAY, NOVEMBER 11, 2025

20

21

22 Reported Stenographically by:

23 KIMBERLY D'URSO, CSR 11372, RPR

24 Job No. 21507

25

Phillip Sanchez

1                              --oOo--

2          BE IT REMEMBERED, that set on Tuesday, the

3     11th day of November, 2025, commencing at the hour of

4     9:03 a.m., thereof, PHILLIP SANCHEZ, appeared remotely in

5     Dana Point, California, before me, Kimberly E. D'Urso, an

6     RPR and Certified Shorthand Reporter of the State of

7     California, the following deposition was stenographically

8     reported by me:

9

10                          EXAMINATION

11    BY MR. PACKER:

12         Q.   Good morning, Chief.

13         A.   Good morning, sir.

14         Q.   I'm Trent Packer.  I represent the plaintiff,

15     and I will be taking your deposition today.

16          I know that you've been deposed a number of

17     times, so unless you have any specific questions about

18     today, I'll just dispense with the normal pre-deposition

19     niceties, if that's okay with you?

20         A.   Yes, sir.

21         Q.   I'll just do my best not to talk over you.  If

22     you can make the same promise to me, so we can make the

23     court reporter's life as easy as possible?

24         A.   Yes, sir.

25         Q.   Excellent.

1      A.    Yes.

2      Q.    Other than the materials specifically listed in

3   your Rule 26 Report, have you -- I'm going to say --

4   reviewed any other items in preparation for today's

5   testimony or in preparation of the report?

6      A.    No.

7      Q.    Okay.  Did you work with any employees to

8   prepare your report?

9      A.    By "employees," can you clarify?  I'm sorry.

10      Q.    Do you have any employees of your own?

11      A.    Oh, I'm sorry.  Thank you.

12            No, sir.

13      Q.    Now, you were retained here, is it fair to say,

14   to determine whether the use of force was objectively

15   reasonable; is that right?

16      A.    Yes.

17      Q.    Now, there are several standards for

18   determining whether the use of force or a use of force

19   is objectively reasonable; correct?

20      A.    Yes.

21      Q.    And some of those include POST standards; is

22   that right?

23      A.    Yes.

24      Q.    And did you review the applicable POST

25   standards here?

1    A.    Yes.

2    Q.    And the City of Hemet has its own use of force

3    policies; correct?

4    A.    Yes.

5    Q.    Okay.  When is it your understanding that

6    force -- any level of force can be used?

7    A.    Thank you.  Yeah, peace officers in the state

8    of California, of course, are compliant and responsible

9    to adhere to 835 of the Penal Code.  Eight-thirty-five

10   outlines the times that a peace officer can, in fact,

11   use force in defense of themselves, defense of others,

12   to effect an arrest, to overcome resistant --

13   resistance, and to prevent escape.

14        Eight -- I'm sorry -- 300.2 of the Hemet policy

15   parrots that requirement for its employees.  And then

16   later on in its use of force policy, it also outlines

17   factors pursuant to an arrest when force can be used.

18        The standard of law is objectively reasonable,

19   based on the totality of the circumstances, and, of

20   course, in a rapidly-evolving event.

21   Q.    Okay.  And you understand that there are

22   different levels of use of force?  Is that -- do you

23   understand that?

24   A.    Yes.

25   Q.    In other words, there's sort of what I would

Phillip Sanchez

```
 1   call an ordinary use of force.  There's intermediate

 2   uses of force.  And there's the use of deadly force.  Is

 3   that a fair articulation?

 4        A.   That's a general classification.  I think the

 5   more accurate term is low level, mid level, and, of

 6   course, lethal force -- immediate and lethal force.

 7        Q.   Okay.  Is it fair to say, in your opinion, that

 8   any level of force, whether it's low-level, mid-level,

 9   or lethal force, can cause injury?

10        A.   Depending on the circumstances, yes.

11        Q.   And that would include permanent injury?

12        A.   I'm not a physician.  But at the end of the

13   day, I think the subject can be injured.  When force is

14   applied objectively reasonably, and appropriate, and

15   based on probable cause, injury can still occur.

16        Q.   Okay.  What is your understanding of the

17   definition of deadly force?  What constitutes deadly

18   force?

19        A.   I think deadly force, in my estimation, is that

20   application of an event, a technique or a device that is

21   likely to cause death or serious bodily injury.

22        Q.   Okay.  And what does it mean for the force to

23   cause serious bodily injury?

24        A.   I think serious bodily injury is defined as

25   either unconsciousness or severe injury to the human
```

1    body.   For example, a fracture, a broken bone, something

2    along those lines.

3        Q.   Okay.  And you understand that that phrase

4    "serious bodily harm or injury" is defined at Penal Code

5    Section 243(f)(4)?

6        A.   Yes.  I don't recall the actual section, but it

7    is defined.

8        Q.   Okay.  And you indicated that it does include a

9    bone fracture?

10        A.   That's my recollection.

11        Q.   I want to talk to you specifically about

12    strikes to the head.  Okay?  Do you agree that any

13    strike to the head is a significant use of force?  Is

14    that fair to say?

15            MS. KORNBLAU:   Objection.  Calls for medical

16    expert opinion, and exceeds the scope.

17    BY MR. PACKER:

18        Q.   So you can answer.  Unless your attorney

19    instructs you not to answer, you can answer.

20        A.   Thank you.  I think the strikes to the head

21    should be considered with respect to injuries that --

22    that can occur.

23        Q.   Okay.  Now, we talked about some of the POST

24    Learning Domains, and one of those domains is POST

25    Learning Domain -- the applicable domains in this case

 1    is POST Learning Domain 33.  Would you agree with me on

 2    that?

 3         A.   Can you give me the classification of Domain

 4    33, please?

 5         Q.   Sure.  It's arrest and control.

 6         A.   Yes.

 7         Q.   Okay.  And that would be applicable in this

 8    case?

 9         A.   I believe so.

10         Q.   Okay.  Do you happen to have Learning Domain 33

11    on arrest and control in front of you?

12         A.   I do not.  I can pull that up, if you'd like?

13         Q.   You can do that, or I can share my screen with

14    you.  Whatever would be easiest for you.

15         A.   Maybe the latter.

16         Q.   Okay.  Let me do that.  Bear with me for just a

17    moment.

18              (Pause.)

19    BY MR. PACKER:

20         Q.   Can you see what's on my screen?

21         A.   I can, sir.  "Learning Domain 33, Arrest and

22    Control, Version 6.0.  Commission on Peace Officer

23    Standards and Training."

24         Q.   Okay.  And I'm going to scroll down to the

25    second page.

1          MR. PACKER:  And before I do that, I'm going to

2     ask the court reporter to mark this as Exhibit 1 to

3     today's deposition.

4          (Exhibit Number 1 was marked.)

5  BY MR. PACKER:

6     Q.   And it indicates that this is the 2005

7     copyrighted version, but it appears to have been revised

8     in July of 2025.

9          Do you see that?

10    A.   Yes.

11    Q.   Okay.  Now I'm going to scroll down, and I'm

12    actually going to search.

13         Now, I'm looking at -- at the bottom right-hand

14    corner of Exhibit 1, 1-11.  Do you see that?

15    A.   Yes.

16    Q.   And in the center of the page it says:

17    "Principles of arrest and control"?

18    A.   Yes.

19    Q.   Now, it says:  "During a confrontation, peace

20    officers need to be aware of those areas of the body

21    which require maximum protection during an attack."

22         Do you see that?

23    A.   I do.

24    Q.   And is the head identified as one of those

25    areas that requires maximum protection during an attack?

1          A.    Yes.    I think the introductory phrase is

2      consistent with my prior testimony, that officers should

3      be concerned about certain areas of the suspect's body

4      or the subject of the force.

5          Q.    And that includes the head; right?

6          A.    Yes, sir.

7          Q.    Now, you agree with me that under certain

8      circumstances blows to the head can constitute deadly

9      force, as we've discussed that definition?

10              MS. KORNBLAU:   Objection.   Calls for medical

11     expert opinion and exceeds the scope.

12              THE WITNESS:   I believe that's true, with the

13     caveat that it depends on what the officer is striking

14     with, to the degree of causing death or serious bodily

15     injury.

16     BY MR. PACKER:

17         Q.    Okay.   Can you clarify what you mean by "what

18      the officer is striking with"?

19         A.    Sure.

20              MS. KORNBLAU:   Objection.   Calls for a

21     hypothetical.

22              But go ahead.

23              THE WITNESS:   Based on the question, the way

24     it's framed, Mr. Packer, I would say that there is a

25     higher likelihood of death or serious bodily injury if I

1   have a device or a tool in my hand versus, say, an

2   open-hand strike, or a knee, or something like that,

3   which is commonly referred to as a "weaponless defense

4   strike."

5   BY MR. PACKER:

6        Q.   Okay.  So in your opinion, a weaponless defense

7    strike has less of a chance of inflicting serious bodily

8    injury than something used as a nonbody part, if

9    that's -- if my question is clear?

10       A.   Yes.

11           MS. KORNBLAU:  Objection.  Vague, and calls for

12   a hypothetical.

13           MR. PACKER:  Okay.

14   BY MR. PACKER:

15       Q.   So you indicated that there are instances in

16    which a weapon can be used to strike the head; is that

17    fair to say?

18       A.   Yes.

19       Q.   And that includes impact devices?

20           MS. KORNBLAU:  Objection.  Calls for a

21   hypothetical.  Vague.

22           THE WITNESS:  Impact devices or improvised

23   devices, as long as the force is objectively reasonable,

24   based on the totality of the circumstances and based on

25   probable cause.

1  BY MR. PACKER:

2        Q.    Okay.   I understand that.   The question,

3  though, was an impact device has more of a likelihood,

4  in your opinion, of causing serious bodily injury than

5  the use of a body part, such as an open-hand or a knee,

6  as you previously identified?

7              MS. KORNBLAU:   Objection.   Calls for medical

8  expert opinion.   Exceeds the scope.

9              This is a police practices expert.   He's not a

10  medical expert.   So I would caution this expert on giving

11  medical opinions.

12             THE WITNESS:   Although I'm not a doctor, I

13  think that there's a likelihood -- an increased

14  likelihood with a device in your hand.

15  BY MR. PACKER:

16        Q.    Okay.   And you told us earlier that included

17  improvised devices; is that right?

18             MS. KORNBLAU:   Objection.   Exceeds the scope.

19  Calls for a medical expert opinion.

20  BY MR. PACKER:

21        Q.    Okay.   Now, what is an improvised device?

22        A.    In my opinion, an improvised device is

23  something -- an objects or a tool, an accoutrement that

24  the officer has access to, that its primary design or

25  application is not intended as an impact device.

1    Q.    Okay.    Would that include, for example, the use

2    of a Taser to strike somebody on their body or their

3    head, as opposed to stun them as they're ordinary used?

4         MS. KORNBLAU:    Objection.    Incomplete

5    hypothetical.

6         THE WITNESS:    Based on the way that the

7    question is framed, Counselor, as I understand it, you're

8    asking me whether or not an improvised device could

9    include a Taser.

10   BY MR. PACKER:

11   Q.    That's correct.    Thank you.

12   A.    Thank you.    Yes.

13   Q.    Are there any POST Learning Domains that

14   address the use of a Taser, specifically as an impact

15   device?

16   A.    No.    Learning Domain 20 covers the use of force

17   and de-escalation, but it's a general domain, based on

18   the thought and expectation that force is used

19   objectively reasonable and, of course, based on probable

20   cause.

21   Q.    Are you aware of any specific Hemet Police

22   Department policies that address the use of a Taser as

23   an improvised impact device?

24   A.    Yes.

25   Q.    And what is that?

1     A.    I believe it's "Hemet Use of Force Policy

2     Section 300.3."

3     Q.    Okay.

4     A.    It doesn't speak to Taser, specifically.

5     However, it states, in part, that if an object as used

6     as an improvised tool, that the force still has to be

7     objectively reasonable and based on probable cause.

8     Q.    Okay.  Now, based on the definition of deadly

9     force that we discussed previously, that is force likely

10    to lead to serious bodily harm or injury, would you

11    agree with me that a Taser used as an improvised device

12    to strike someone in the head could qualify as a deadly

13    weapon?

14          MS. KORNBLAU:  Objection.  Incomplete

15    hypothetical.  Compound.

16          THE WITNESS:  Depending on the totality of

17    circumstances, yes.

18    BY MR. PACKER:

19    Q.    Does Hemet have a policy against targeting the

20    head with improvised devices?

21          MS. KORNBLAU:  Objection.  Vague.

22          THE WITNESS:  As I recall, the Hemet Police

23    Department policy mirrors Learning Domain 33, in that

24    there are certain areas an officer should try to avoid.

25          That said, however, based on the totality of

1    circumstances of a rapidly-evolving event, the dynamic of

2    the struggle, the veracity or the resolve of the subject,

3    there are times that -- there are times that a strike to

4    the head might be appropriate.

5    BY MR. PACKER:

6        Q.    Okay.  We discussed that there are no specific

7    Hemet policies with regard to the use of a Taser as an

8    improvised device.  There are policies with respect to

9    the use of other devices that are not improvised.

10   They're intended as impact devices.

11            Are you familiar with those?

12       A.    Yes.

13            Counselor, just a point of clarity, if I may.

14   The Hemet policy does not restrict the use of improvised

15   devices; however, it does reaffirm for the reader that

16   the force or the device has to be based on objectively

17   reasonable standard.

18       Q.    Okay.  I understand that.  So let me ask a more

19   pointed question.  Hemet does have a policy with the

20   respect to the use of batons as impact devices; is that

21   your understanding?

22       A.    Yes.

23       Q.    And with respect to the use of batons, their

24   policy is against targeting the head; is that correct?

25       A.    Yes.  That's a key word.  When you say

1    "targeting," that means to me that it's an intentional

2    act by -- by the peace officer.

3        Q.    Okay.  And that's based on the totality of the

4    circumstances; correct?

5        A.    And the objective reasonable use of force, yes.

6        Q.    Okay.  And you'd agree with me that that is a

7    factual determination to be made in each individual

8    case?

9        A.    Yes.

10        Q.    Now, I want to talk to you specifically about

11    the use of force against Plaintiff Henry Barnhill that

12    you looked at in this case.  Okay?

13        A.    Yes, sir.

14        Q.    And we talked about how you created a Rule 26

15    Report; right?

16        A.    Yes.

17        Q.    Do you have that report in front of you?

18        A.    I do.

19        Q.    Now, I just want to confirm that all of your

20    opinions are listed in that report.  Okay?

21        A.    Yes, based on the information that I've been

22    provided thus far.

23        Q.    Okay.  And your first opinion, Opinion 1 -- and

24    I'm going to summarize it, so please correct me if the

25    summary is incorrect -- is found at page 13.  And it's

1    Q.   Okay.  Remind me, under what circumstances can

2    an officer use deadly force as defined in the statutes

3    and policies that we discussed earlier?

4    A.   Deadly force is applicable based on the

5    totality of the circumstances, assuming that the threat

6    requires that type of response.  I think it, again, is

7    outlined in 835; and any of the prongs could be used to

8    support lethal force, whether it was defense of

9    yourself, defense of others, overcome resistance, to

10   effect an arrest, or to prevent escape.

11   Q.   Okay.  Is it your understanding that

12   Mr. Barnhill had a gun on him during the arrest in this

13   case?

14   A.   That he physically possessed a gun at the time

15   of arrest?

16   Q.   Correct.

17   A.   No, he did not.  It was ultimately determined

18   he was unarmed.

19   Q.   Okay.  And that included with a firearm; is

20   that right?

21   A.   He didn't have a firearm in his possession.

22   All the officers knew that the -- believed that the

23   firearm used in the threat, in the night before against

24   Ms. Warren, was outstanding, had not been located.

25   Q.   Okay.  To -- well, let me ask this.  He also --

```
 1    there was -- try again.
 2            There was no knife found on his person at the
 3    time of the arrest, either; correct?
 4        A.    No.
 5        Q.    In fact, your understanding is the only item
 6    that he had on his person at the time of arrest was a
 7    set of keys; is that correct?
 8        A.    Yes.
 9        Q.    Now, at page 16 of your report -- and I'll wait
10    until you can get there.
11        A.    Yes, sir.
12        Q.    Are you there?
13        A.    Yes, sir.
14        Q.    Okay.  You write that:  "Officer Bishop used
15    the bottom of the device as an improvised impact tool."
16            Do you see that?
17        A.    Can you direct me to the paragraph, please?
18        Q.    At the final -- it's not a complete paragraph,
19    but the final paragraph of the page, starting with the
20    word "After."
21        A.    "After the CED failed"?
22        Q.    Correct.
23        A.    Yes, sir.  I'm there.
24        Q.    You write:  "After the CED failed to
25    incapacitate Barnhill temporarily, Officer Bishop used
```

1        A.    And body-worn camera video, yes.

2        Q.    Okay.  Again, an issue of fact to be resolved

3    by the judge or jury; right?

4              MS. KORNBLAU:  Objection.  Argumentative.

5    Exceeds the scope.

6    BY MR. PACKER:

7        Q.    And I think you shook your head "yes"?

8        A.    Yes.

9        Q.    Now, I'm going to ask you to turn to page 17 of

10   your report.

11       A.    I'm on page 17, sir.

12       Q.    The final paragraph that starts:  "Officer

13   Maynard."

14       A.    Yes.

15       Q.    And you write that:  "Officer Maynard used his

16   right knee to deliver one strike to Barnhill's face,

17   which caused Barnhill to stop resisting."

18             Do you see that?

19       A.    Yes.

20       Q.    So to rephrase, it was, in your opinion, the

21   knee to Mr. Barnhill's face that led him to stop

22   resisting.  Is that fair to say?

23             MS. KORNBLAU:  Objection.  Vague.

24             THE WITNESS:  I think it's more accurate to say

25   that in the report at some place, I -- I talk about the

1    that you've provided this morning, I -- I have to say

2    that it depends on the totality of the circumstances.  I

3    am aware of and have experienced where subjects or

4    suspects have continued to resist, have continued to be a

5    threat, even though handcuffed.

6            So my response would be, based on the totality

7    of the circumstances, the level of resistance offered by

8    Mr. Barnhill -- or in your hypothetical, an unknown

9    individual -- to determine whether force needed to be

10   used to -- to continue the effort to control that

11   individual.

12   BY MR. PACKER:

13       Q.   Okay.  It is relevant to your analysis, though,

14   whether the suspect -- well, whether Mr. Barnhill

15   continued to the resist arrest at the moment force was

16   used; is that correct?

17       A.   Yes.

18       Q.   It would be unreasonable for an officer to use

19   deadly force after Mr. Barnhill had stopped resisting;

20   correct?

21       A.   If Mr. Barnhill was completely compliant and

22   not physically resisting, then the use of deadly force,

23   as you have characterized, would be objectively

24   unreasonable.

25           MR. PACKER:  Okay.  I want to pull up some

1    Q.   And does that include the photo that's

2   currently on my screen, that I will ask the court

3   reporter to mark as Exhibit 2 to today's deposition?

4              (Exhibit Number 2 was marked.)

5              THE WITNESS:   No.  It did not include this

6   photograph.

7   BY MR. PACKER:

8    Q.   Okay.  Do you see this photo on my screen?

9    A.   Yes.

10    Q.   And then, for identification, we have labeled

11   it as Exhibit 2.

12              Does this appear to be Mr. Barnhill?

13              MS. KORNBLAU:   Objection.  Calls for

14   speculation.  Calls for medical opinion.

15              THE WITNESS:   Based on the image in front of

16   me, I'm not 100 percent sure.  This is the first time I'm

17   seeing this photograph.  It was not used as part of my

18   assessment for my opinions in the Rule 26 Report.

19   BY MR. PACKER:

20    Q.   Okay.  You did, though, review the injuries

21   that were suffered by Mr. Barnhill after the use of

22   force incident; is that correct?

23    A.   Yes.

24    Q.   And that included a blowout fracture to his

25   orbital; is that right?

1    MS. KORNBLAU:  Objection.  Calls for medical

2  expert opinion.  Exceeds the scope.

3    THE WITNESS:  I'm not a doctor, of course,

4  Mr. Packer.  The term "blowout," I'm not sure if that's a

5  medical term or -- or your characterization of the

6  injury.

7  BY MR. PACKER:

8    Q.  Sure.  Let me ask it in lay terms.  It is your

9  understanding that Mr. Barnhill did suffer a broken bone

10  in his eye; correct?

11    MS. KORNBLAU:  Objection.  Calls for medical

12  expert opinion.

13    THE WITNESS:  Based on the documentation that I

14  reviewed, yes.

15  BY MR. PACKER:

16    Q.  Okay.  And again, that would constitute serious

17  bodily harm or injury as defined by the Penal Code?

18    MS. KORNBLAU:  Objection.  Calls for a medical

19  expert opinion.  Exceeds the scope.

20    THE WITNESS:  I think the statute speaks for

21  itself, so...

22    MR. PACKER:  Okay.  I don't have anything else.

23    Andrea, do you?

24    MS. KORNBLAU:  No, I don't.

25    THE CERTIFIED STENOGRAPHER:  Ms. Kornblau, are

1    you ordering a copy?

2            MR. KORNBLAU:  Yes, please.

3            (10:05 a.m., deposition concluded.)

4                    --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1  STATE OF CALIFORNIA)
                       ) ss:
 2  COUNTY OF BUTTE    )

 3          I, KIMBERLY E. D'URSO, do hereby certify:
 4
 5          That the witness named in the foregoing

 6  deposition was present remotely and duly sworn to testify

 7  to the truth in the within-entitled action on the day and

 8  date and at the time and place therein specified;

 9          That the testimony of said witness was reported

10  by me in shorthand and was thereafter transcribed through

11  computer-aided transcription;

12          That the foregoing constitutes a full, true and

13  correct transcript of said deposition and of the

14  proceedings which took place;

15          Further, that if the foregoing pertains to the

16  original transcript of a deposition in a federal case,

17  before completion of the proceedings, review of the

18  transcript [ ] was [ ] was not requested.

19          That I am a certified stenographic reporter and

20  a disinterested person to the said action;

21          IN WITNESS WHEREOF, I have hereunder subscribed

22  my hand this 25th day of November, 2025.

23  _____

24  KIMBERLY D'URSO, CSR NO. 11372, RPR

25
```