In the Matter of:

HENRY BARNHILL

vs

CITY OF HEMET, et al.

---

# RYAN O'CONNOR, M.D.

## November 13, 2025

---



Case 5:23-cv-00589-JGB-SP    Document 55-1    Filed 01/26/26    Page 2 of 36    Page ID #:2337

HENRY BARNHILL vs CITY OF HEMET, et al.
RYAN O'CONNOR, M.D.                          11/13/2025

1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4

5   HENRY BARNHILL,                     )
                                        )
6              Plaintiff,               )
                                        )
7   v.                                  )
                                        ) Case No.
8                                       ) 5:23-cv-00589 JGB(SPx)
                                        )
9   CITY OF HEMET, OFFICER BRETT        )
    MAYNARD; OFFICER JOSHUA BISHOP;     )
10  OFFICER PEDRO AGUILA; CORPORAL      )
    DOUGLAS KLINZING; JAMIE GONZALEZ;   )
11  CATHERINE TIPTON; and DOES 1-10,    )
    inclusive,                          )
12                                      )
                                        )
13             Defendants.              )
    _____ )

14

15                      CERTIFIED
                        TRANSCRIPT
16

17

18            DEPOSITION OF RYAN O'CONNOR, M.D.

19                   Taken via Zoom

20              Thursday, November 13, 2025

21

22

23

24  Reported by Jane Gallegos, CSR

25  Certificate No. 14676

HENRY BARNHILL vs CITY OF HEMET, et al.
RYAN O'CONNOR, M.D.                    11/13/2025                              Page 2

```
 1              UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4

 5   HENRY BARNHILL,                    )
                                        )
 6              Plaintiff,              )
                                        )
 7   v.                                 )
                                        ) Case No.
 8                                      ) 5:23-cv-00589 JGB(SPx)
                                        )
 9   CITY OF HEMET, OFFICER BRETT       )
     MAYNARD; OFFICER JOSHUA BISHOP;    )
10   OFFICER PEDRO AGUILA; CORPORAL     )
     DOUGLAS KLINZING; JAMIE GONZALEZ;  )
11   CATHERINE TIPTON; and DOES 1-10,   )
     inclusive,                         )
12                                      )
                                        )
13              Defendants.             )
     _____)

14

15

16

17

18        On Thursday, November 13, 2025, commencing at the

19   hour of 10:00 a.m., via Zoom, before me, Jane Gallegos,

20   Certified Shorthand Reporter in and for the State of

21   California, remotely appeared

22                      RYAN O'CONNOR, M.D.,

23   called by the Defendants, who, being by me first duly

24   sworn, was thereupon examined as a witness in said cause.

25
```

HENRY BARNHILL vs CITY OF HEMET, et al.
RYAN O'CONNOR, M.D.                                    11/13/2025                                    Page 3

```
 1                    A P P E A R A N C E S

 2    FOR THE DEFENDANTS:

 3         MANNING & KASS ELLROD, RAMIREZ, TRESTER LLP
           BY: KHOULOUD PEARSON , ESQ.
 4         801 South Figueroa Street
           15th Floor
 5         Los Angeles, California 90017
           (213) 624-6900
 6         (Appeared remotely)

 7

 8    FOR THE PLAINTIFF:

 9         LAW OFFICES OF GRECH & PACKER
           BY: TRENTON C. PACKER, ESQ.
10         7095 Indiana Avenue
           Suite 200
11         Riverside, California 92506
           (951) 682-9311
12         (Appeared remotely)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

HENRY BARNHILL vs CITY OF HEMET, et al.
RYAN O'CONNOR, M.D.                          11/13/2025                          Page 4

1                          I N D E X

2    Examination:                                        Page

3        By Ms. Pearson                                     5

4

5

6                        E X H I B I T S

7    Defendants'      Description                         Page

8                            (None.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HENRY BARNHILL vs CITY OF HEMET, et al.
RYAN O'CONNOR, M.D.                         11/13/2025                         Page 5

```
 1              Thursday, November 13, 2025, 10:00 a.m.

 2          Reported Remotely in Los Angeles, California

 3

 4              COURT REPORTER:  I'm the court reporter,

 5   Jane Gallegos, CSR 14676.

 6              Before swearing in the witness, may I have

 7   counsels state their appearances for the record, starting

 8   with the noticing attorney.

 9              MS. PEARSON:  Good morning.  Khouloud Pearson on

10   behalf of the defendants.

11              MR. PACKER:  Good morning.  Trenton Packer for

12   Plaintiff.

13              COURT REPORTER:  I will now swear in the witness.

14                      RYAN O'CONNOR, M.D.,

15   was called as a witness and, having been first duly sworn,

16   was examined and testified as follows:

17                          EXAMINATION

18   BY MS. PEARSON:

19       Q    Good morning, Doctor.

20            Can you state your full name for the record.

21       A    My name is Dr. Ryan O'Connor -- R-Y-A-N, O-,

22   apostrophe, C-O-N-N-O-R.

23       Q    And have you had your deposition taken before?

24       A    I have, yes.

25       Q    Are you comfortable waiving the admonitions
```

HENRY BARNHILL vs CITY OF HEMET, et al.
RYAN O'CONNOR, M.D.                    11/13/2025                           Page 6

1  today?

2      A     Yes, I am.

3      Q     Okay.  Can you please state your current

4  position.

5      A     I'm an emergency medical physician at Hollywood

6  Presbyterian Medical Center.

7      Q     And can you briefly summarize your professional

8  qualifications.

9      A     Yes.  After I finished attending Georgetown

10 University for undergraduate and premedical studies -- I

11 graduated in 1997.  I then did a -- four years of medical

12 school at New York Medical College, graduating with an

13 M.D. degree in 2002.  I then did a residency in emergency

14 medicine at Beth Israel Medical Center in Manhattan,

15 graduating in 2005.

16        Since then I've been board-certified, licensed,

17 and practicing as an emergency physician.  As I mentioned,

18 I'm currently employed at Hollywood Presbyterian Medical

19 Center in the emergency room.  I also have additional

20 education in the form of a master's degree in

21 criminalistics from California State University of

22 Los Angeles.  That was a degree that was awarded to me at

23 the end of 2021.

24     Q     And can you describe your role and

25 responsibilities as an emergency room doctor?

HENRY BARNHILL vs CITY OF HEMET, et al.
RYAN O'CONNOR, M.D.                    11/13/2025                              Page 7

1      A    Yeah.  Staffing the emergency room -- I'm the

2  head of a team of various workers, including nurses and

3  techs and phlebotomists that all work together to treat,

4  diagnose any and all patients that present to the

5  emergency room and disposition them accordingly.

6      Q    What does "disposition them accordingly" mean?

7      A    Oh, so no one stays in the emergency room.  You

8  either get admitted to the hospital or go home, basically.

9  Sometimes you get transferred to another hospital, so the

10 ER doctors -- one of the big decisions is what to do with

11 the patient.  That's called disposition.

12     Q    Okay.  Gotcha.

13          So is it fair to say that as an ER doctor, it's

14 more about acute stabilization and kind of triaging?

15     A    Yeah.  We certainly deal with chronic issues,

16 especially when there's exacerbations or complications;

17 but, largely, the focus of emergency medicine is

18 identifying and treating acute issues or acute

19 complications related to chronic problems and disposition

20 and treating accordingly.

21     Q    Okay.  And what experience, if any, do you have

22 in forensic medical?

23     A    I have a master's degree in criminalistics from

24 California State University Los Angeles.  It's a two-year

25 master's degree program that has an extensive coursework

HENRY BARNHILL vs CITY OF HEMET, et al.
RYAN O'CONNOR, M.D.                    11/13/2025                                    Page 8

1   involving various aspects of criminalistics, including
2   forensic pathology.
3           I also did an internship at the Los Angeles
4   County Coroner's office as part of that program.  It was a
5   200-hour internship at the coroner's office, and I have
6   research experience as part of that program and aspects of
7   forensic toxicology.  I take additional courses --
8   largely, NHTSA courses for forensic toxicology issues,
9   including a field sobriety test administration and ARIDE.
10      Q    In your course of studies or experience, did you
11  do anything in regards to biomechanics?
12      A    I took a short conference, a one-day conference,
13  on biomechanics issues many years ago, but nothing
14  recently.  I don't have extensive expertise on the -- on
15  the field, although I do have some limited expertise.
16      Q    And what about in regards to head trauma?
17      A    Head trauma is a very common complaint in the
18  emergency room.  I see head trauma patients pretty much
19  every time I'm working.  It's something that's pretty
20  extensively covered in emergency medicine training.  I've
21  taken courses in neurology, both in medical school and
22  residency, so it's something I'm pretty comfortable
23  discussing.
24      Q    What about a background in ophthalmology?
25      A    Ophthalmology, again, is addressed in medical

HENRY BARNHILL vs CITY OF HEMET, et al.
RYAN O'CONNOR, M.D.                    11/13/2025                    Page 9

1    school; and it was a rotation during my residency.  We

2    have to be aware of ophthalmologic issues in the emergency

3    room, specifically identifying emergency issues and making

4    the diagnosis to be able to refer a patient to an

5    ophthalmologist for treatment.

6         Q    So what -- what -- I guess, what is the extent,

7    then, to your -- of your knowledge of ophthalmology, then,

8    in regards to your role in the ER?

9              MR. PACKER:  Objection.  Vague.

10             Go ahead.  Unless I tell you not to answer, you

11   can go ahead and answer.  I'm just objecting for the

12   record.

13             THE WITNESS:  Sure.  I mean, it is a bit vague;

14   but, you know, largely, it's focused on identification and

15   emergent treatment of ophthalmologic emergencies and,

16   otherwise, determining if it's a stable condition that can

17   be treated and followed about -- outpatient.  We have to

18   know when to call the ophthalmologist for consultation to

19   the emergency room or when they can be referred to

20   outpatient, maybe several days later.

21             We're trained in some emergency ophthalmologic

22   procedures, like lateral canthotomy, for example, but --

23   for example, the patient in this case who got the orbital

24   floor repair -- that's a surgical procedure.  That's not

25   something I would be involved in, although, certainly, I

HENRY BARNHILL vs CITY OF HEMET, et al.
RYAN O'CONNOR, M.D.                          11/13/2025                          Page 10

1   could make the initial diagnosis and referral for

2   consultation and for follow-up.  That would certainly be

3   within the realm of my expertise.

4   BY MS. PEARSON:

5       Q    So what criteria do you look for when making that

6   judgment?

7       A    For an orbital --

8            MR. PACKER:  Hold on just a second.

9            Objection.  Vague.

10           Go ahead.

11  BY MS. PEARSON:

12      Q    And when you're -- when you're determining when

13  to reach out to a specialist in ophthalmology, when -- in

14  the ER what criteria do you...

15      A    We're speaking specifically about eye trauma and

16  orbital floor fractures?

17      Q    Yes.

18      A    I mean, the most significant indications for

19  emergency intervention would be, like, significant visual

20  changes; reduction in motion of the eye that can result

21  from something called "entrapment," where the muscle of

22  the eye gets stuck in the fractured orbital floor; if

23  there's any sign of rupture or perforation of the orbit or

24  deformity of the pupil or something called "Seidel's

25  sign," where you can see intraocular fluid streaming from

HENRY BARNHILL vs CITY OF HEMET, et al.
RYAN O'CONNOR, M.D.                 11/13/2025                      Page 11

1   the eye.

2           So anything that indicates a more complicated or

3   potentially emergent course, something that would need --

4   for example, entrapment needs emergency repair of the

5   fracture.  If no entrapment is present and visual acuity

6   and pressures in the eye are okay, they're probably okay

7   to follow up with the ophthalmologist for the procedure.

8       Q    And you referred to something called an

9   "emergency ophthalmology care."  What does that mean?

10  Like, what can you treat in the ER, as an emergency room

11  physician?

12      A    Well, a lot of the emergency ophthalmologic

13  issues are not entirely treated in the ER, but we can

14  initiate medical treatment.  So, for example, if there is

15  severe glaucoma, like acute angle closure glaucoma that's

16  causing visual deficit, we would initiate medical

17  treatment in the emergency room while the ophthalmologist

18  is coming in to provide definitive care.

19          For example, lateral canthotomy that I mentioned

20  is a procedure, where if you have bleeding behind the

21  eyeball, and it starts to press the eyeball forward out of

22  the face, it can stretch the nerve and lead to blindness

23  if that pressure isn't relieved; and so we, actually, in

24  the emergency room can cut the part of the support

25  structure of the eye to release that pressure, so it's a

HENRY BARNHILL vs CITY OF HEMET, et al.
RYAN O'CONNOR, M.D.                    11/13/2025                    Page 12

1    minor surgical procedure, for example; but a lot of it
2    would be sort of medical management until the
3    ophthalmologist can come in to definitively address the
4    emergency issue.
5        Q    And then kind of similar questioning here
6    regarding ear, nose, and throat specialty:  what
7    background do you have in ENT?
8        A    Something that's taught in medical school, as
9    well as residency -- we have a rotation through ENT.
10   Basically, you have to be able to take care of basic ENT
11   issues that don't require full specialty evaluation and,
12   also, be able to identify when there is an ENT emergency
13   where the ENT doctor needs to come in and take care of it.
14       Q    What is considered basic ENT?  And we can limit
15   it to the ear.
16       A    Oh, limited to the ear?
17       Q    Yeah.
18       A    Foreign body in the ear -- it's something we see
19   a lot in the emergency room -- removal of foreign bodies,
20   infections, otitis media, otitis externa -- perforation of
21   tympanic membrane is something that we could identify, but
22   not treat.  They'd have to go to the ENT doctor to get,
23   like, a surgical treatment, maybe, to repair a ruptured
24   tympanic membrane.  Those would be some typical examples.
25            Trauma to the ear itself -- more basic trauma can

HENRY BARNHILL vs CITY OF HEMET, et al.
RYAN O'CONNOR, M.D.                           11/13/2025                           Page 13

1   be handled by the emergency room doctor, as far as

2   stitches and things like that.  In this case the partial

3   avulsion was a lot more complicated and is better handled

4   by a plastic surgeon or an ENT doctor, but, technically,

5   is in the realm of emergency medicine, if you're in a

6   community hospital that doesn't have access to those

7   specialties, for example.

8        Q    And then you referenced medical school.  Is that

9   the New York Medical College --

10       A    Yes.

11       Q    -- that you -- that you referenced?

12            Okay.  And then you graduated in June of 2002; is

13  that correct?

14       A    That's correct.

15       Q    Okay.  And then your residency that you -- that

16  you referenced in regards to your experience -- was that

17  the Bethel Israel Medical Center?

18       A    Beth Israel, yes.

19       Q    Yeah.  Okay.

20            And that was in -- completed in July of 2005 --

21  2005 --

22       A    Yes.

23       Q    -- is that correct?

24            Okay.  Okay.  So kind of want to bring it to this

25  case -- what materials did you review in preparation of

HENRY BARNHILL vs CITY OF HEMET, et al.
RYAN O'CONNOR, M.D.                    11/13/2025                    Page 14

 1  drafting your opinion in this case?

 2      A    I summarized them at the beginning of my report,

 3  which I'll just refer to.  There were medical records from

 4  Riverside University Health System starting at 4/29, the

 5  date of the incident, through -- it looks like 6/13 is the

 6  latest -- '24 -- wait.  I'm sorry.  That's a different

 7  chart.  Anyway, it's Bates 67 to 199; Salinas Valley State

 8  Health Prison Care records Bates 901 to 1495, County of

 9  Riverside --

10      Q    Do you have a date for that one?  I'm sorry.  The

11  Salinas Valley State Prison -- what -- do you know the

12  dates that you reviewed?

13      A    Just have to refer to my notes.

14      Q    Sure.

15      A    I don't have the specific date range.  It looks

16  like it's largely 2024 --

17      Q    Okay.  And then -- I apologize.  I cut you off.

18  You were saying?

19      A    Bates 901 to 1495.

20      Q    Okay.  So all the records listed in your

21  report -- that's an accurate depiction of all material you

22  reviewed in this?

23      A    Yeah.  I noticed one minor error.  I said "Hemet

24  Police Department reports, Bates 7 to 66."  I believe it's

25  actually Bates 7 to 46.

HENRY BARNHILL vs CITY OF HEMET, et al.
RYAN O'CONNOR, M.D.                          11/13/2025                          Page 15

1    Q     Okay.

2    A     So that's one minor error that I identified.  I

3    apologize for that.

4          And then just prior to our deposition today, I

5    did receive a report from one of your experts, Rosabel

6    Young, which I skimmed through due to limitations on time,

7    because I just received it shortly prior; and I also

8    received a deposition of Mr. Barnhill from

9    September 10th, 2025, which is 171 pages.  I only had a

10   few minutes to sort of skim through it for keywords, so I

11   didn't review that entire document due to shortened time

12   limitations.

13   Q     In your review did you review any medical records

14   prior -- dated prior to the incident?

15   A     No.

16   Q     Can you describe your methodology for reviewing

17   the medical records and the evidence in this case?

18          MR. PACKER:  Objection.  Vague.

19          THE WITNESS:  Generally, I review the entirety of

20   the medical records, making notes on the way for anything

21   that stands out.  Medical records are often quite

22   disorganized chronologically, disorganized in other ways,

23   so I make notes to attempt to organize them; and after

24   getting an initial overview of the entirety of the medical

25   records, I'll generally go back and review certain key

HENRY BARNHILL vs CITY OF HEMET, et al.
RYAN O'CONNOR, M.D.                          11/13/2025                          Page 16

1  sections to reinforce my opinions and develop them from

2  there.

3  BY MS. PEARSON:

4      Q    And you say you take notes.  What type of notes

5  are you taking in your review?

6      A    I have an iPad; and I have a PDF reader; and I

7  take notes directly onto the document itself to help me

8  organize them, so my notes are on the files that I

9  receive.  I also have my report that I reviewed, and I

10 wrote some notes on my report for purposes of this

11 deposition.  That's the extent of my notes.

12     Q    And do you rely on those notes when you're

13 drafting your report?

14     A    Yes.

15     Q    So when you're reviewing the medical records,

16 what types of things are you looking for when you're

17 reviewing your medical records?

18         MR. PACKER:  Objection.  Vague.

19 BY MS. PEARSON:

20     Q    And we can limit it to what -- what were you

21 looking for in regards to this case when you reviewed the

22 medical records?

23     A    In this case the patient had a single incident

24 where he received multiple blunt force trauma to the head,

25 so I was reviewing, initially, the emergency room records

HENRY BARNHILL vs CITY OF HEMET, et al.
RYAN O'CONNOR, M.D.                    11/13/2025                    Page 17

1    for descriptions of the acute events related to that
2    physical assault and then follow-up records, looking for
3    lingering complications related to the initial diagnoses.
4    He's had persistent complaints of headaches and vision
5    issues, for example.
6        Q    Okay.  And then did you -- it looks like on your
7    report you may have reviewed some body-worn cameras and
8    photographs; is that correct?
9        A    Yeah.  There were three body-worn camera clips of
10   the arrest of Mr. Barnhill, and then there were some
11   photographs of the injuries that he received --
12       Q    And --
13               (Simultaneous speakers.)
14               THE WITNESS:  -- photographs, I believe.
15   BY MS. PEARSON:
16       Q    How was that review integrated into the medical
17   documentation in preparing your report?
18       A    Well, the photographs provide a visual reference
19   for the description of the injuries that were most
20   detailed in the emergency room records, to make sure that
21   the doctors are describing things in an accurate fashion
22   when compared to the photographs.  The video is helpful
23   for establishing mechanism of injury and circumstances
24   around the injury.
25       Q    So what specific evidence or observation led to

HENRY BARNHILL vs CITY OF HEMET, et al.
RYAN O'CONNOR, M.D.                11/13/2025                    Page 18

```
1    your conclusion that Mr. Barnhill's head abrasion and

2    scalp injury were caused by his head striking the ground?

3              MR. PACKER:  Objection.  Vague.

4              THE WITNESS:  I'm just going to refer to that

5    section of my report.  Yeah.  I mean, there's a

6    description in the medical records of a large hematoma to

7    the parietal occipital area, the back side of his head;

8    and there's a description in the Hemet Police Department's

9    use-of-force report.  Officer Joshua Bishop grasped

10   Barnhill's pony-hairstyle hair and slammed his face,

11   slash, head into the ground, which -- that mechanism is

12   very consistent with causing an area of swelling and

13   hematoma to someone's head, so it's consistent and

14   expected.

15   BY MS. PEARSON:

16      Q    You indicated that you watched some body-worn

17   camera where -- where in the body worn cameras --

18              MR. PACKER:  Objection --

19              MS. PEARSON:  -- support that conclusion?

20              MR. PACKER:  Objection.  Vague.  Objection.

21   Outside the scope of the designation.

22              Go ahead.

23              THE WITNESS:  I can't identify the specific

24   minute and second to that -- that event occurred.  I'm

25   referring to the officer's description of his own actions.
```

HENRY BARNHILL vs CITY OF HEMET, et al.
RYAN O'CONNOR, M.D.                11/13/2025                      Page 19

```
 1   BY MS. PEARSON:

 2       Q      But in your report and in our discussion today,

 3   you discussed the mechanisms of the injury; correct?

 4       A      Yeah.  Largely, the mechanism of injury that I

 5   discussed is based on the officer's own words.  The video

 6   is quite chaotic, I find; and, you know, it can be a bit

 7   objective when describing it, so -- the officer was there

 8   and involved in the situation, so it's easier and more

 9   specific, I find, to quote the officer specifically and

10   what he says that he did to Mr. Barnhill.

11       Q      So is there any objective evidence to support --

12              MR. PACKER:  Objection --

13              MS. PEARSON:  -- that analysis?

14              MR. PACKER:  Sorry.

15              MS. PEARSON:  Sorry.

16              MR. PACKER:  Objection.  Vague.  Objection.

17   Argumentative.  Objection.  Outside the scope of the

18   designation.

19              THE WITNESS:  Well, the videos themselves show a

20   very violent and aggressive takedown of Mr. Barnhill.

21   There's plenty of instances of head trauma going on, so I

22   would refer to the video itself.  It speaks for itself.

23   BY MS. PEARSON:

24       Q      But is that video referenced in your report?

25       A      It's referenced as being reviewed, as evidence
```

1  for causing the hematoma that we're discussing.  Again, I

2  refer to the officer's statement of his actions because I

3  think he describes it quite clearly.

4       Q    Okay.  And then what -- what led you to conclude

5  that the left ear injury and underlying scalp abrasion

6  were caused by blunt force trauma from a TASER or similar

7  object?

8       A    Well, again, the officer -- I believe the same --

9  Officer Bishop describes that he "struck him two times on

10  the left side of his head/face with my CEW," a conducted

11  energy weapon, which would be also known as TASER.  So he

12  does describe striking him in the area that the ear

13  avulsion occurred.

14           Forensically, it's very interesting and kind of

15  classic when you look at the photograph; and it's, you

16  know, well detailed.  You have the partial avulsion, which

17  is a very linear crush-type injury consistent with the

18  edge of an object, like a TASER, or, perhaps, like the

19  butt of a gun, would be another, you know, reasonable

20  possibility.  Although, I'm not saying that that's what

21  happened, but it's -- the injury itself is not specific.

22           And then directly underlaying the ear avulsion is

23  a linear abrasion about 2 centimeters that's directly

24  underneath the ear avulsion in the same orientation as the

25  ear avulsion and same location, so it's what we would call

1  a "paired injury."  So when the object crushed through the

2  ear, it continued and force was transmitted to the scalp

3  below the ear avulsion, leaving an impression of the shape

4  of the part of the object that caused the trauma.

5      Q    So are you able to state with medical certainty

6  that it was caused by a TASER?

7      A    A TASER --

8              (Simultaneous speakers.)

9              THE WITNESS:  Go ahead.

10             MR. PACKER:  Objection.  Outside the scope of the

11 designation.

12             Go ahead.

13             THE WITNESS:  As I say in my report, a TASER or

14 some similar object -- it could be the butt of a gun.  It

15 could be anything that has an edge to it.  So looking at

16 the wound itself, I wouldn't be able to say, "Yes.  That

17 is caused by a TASER and could not be caused by any other

18 object"; but given the statements of the officer striking

19 him in the area with the TASER and the findings -- are

20 certainly, consistent with that.  It's the most plausible

21 explanation that I have, and I don't have -- haven't been

22 presented with any plausible alternatives.

23 BY MS. PEARSON:

24     Q    And going back to the head abrasion and scalp

25 injury regarding his head striking to the ground, is

 1  that -- can you state that with medical certainty --

 2          MR. PACKER:  Object.

 3          MS. PEARSON:  -- that, in fact, caused the --

 4          Hold on a second.

 5          -- in fact caused the -- the injury alleged?

 6          MR. PACKER:  Objection.  Vague.  Objection.

 7  Outside the scope.

 8          Go ahead.  Sorry.

 9          THE WITNESS:  Yeah.  The ear avulsion and scalp

10  abrasion are very specific in appearance and -- and speak

11  a lot more to the specific mechanism.  The scalp hematoma

12  is not as specific a finding and could really be caused by

13  any sort of blunt force trauma.  It could have been the --

14  Mr. Barnhill falling and hitting his head on the ground.

15  It could be an officer grabbing his head and striking it

16  to the ground.  It could have been him being hit with some

17  other blunt object or kicked in the head, for example.

18  Looking at the injury itself, there's not a specific way

19  to differentiate.

20  BY MS. PEARSON:

21      Q    And in your studies in -- is it -- you said

22  criminal- -- criminalistics?

23      A    Yes, ma'am.

24      Q    Do you -- did you receive any training or

25  education regarding TASERs?

1      A      In criminalistics it was discussed a bit in

2  forensic pathology course that I took.  I got more

3  training in TASERs in my emergency medicine residency,

4  because it's not uncommon to have officers bring detained

5  suspects into the emergency room for the purposes of

6  removing TASER darts; and then there's also the potential

7  for, like, cardiac complications -- potentially fatal

8  cardiac complications related to TASER use, so we're

9  certainly trained in that aspect.

10     Q    So it's more to, I guess -- what -- what's the

11  scope, then, of your -- of your TASER education and

12  knowledge?

13          MR. PACKER:  Objection.  Vague.

14          THE WITNESS:  For TASERs, specifically, how they

15  function; some different types of TASERs, whether they're

16  contact or have projectile darts; how to identify the

17  darts and remove them safely; and then potential cardiac

18  conduction complications that can occur from TASER usage.

19  BY MS. PEARSON:

20     Q    What's your understanding of a post-concussion

21  syndrome?

22     A    A post-concussion syndrome is a syndrome that can

23  develop after someone suffers a concussion.  Typically, a

24  concussion will resolve in weeks to months.  There are

25  incidences where patients will have prolonged

HENRY BARNHILL vs CITY OF HEMET, et al.
RYAN O'CONNOR, M.D.                     11/13/2025                          Page 24

1   symptomatology.  There are differences in when that kind

2   of cutoff occurs, when it goes from concussion to

3   post-concussive syndrome.  A common cutoff would be around

4   three months, so, essentially, it's somebody that

5   continues to have concussive symptoms greater than

6   three months after the initial injury.

7       Q    As I understand you, there still needs to be an

8   underlying concussion; right?

9       A    Yes.  You can't have post-concussive syndrome

10  without an initial concussion.  Correct.

11      Q    And what -- what symptoms would be present in

12  a -- in a concussion at the time of the injury?  What do

13  you look for at the ER?

14          MR. PACKER:  Objection.  Speculation.  Vague.

15  Incomplete hypothetical.

16          Go ahead.

17          THE WITNESS:  Concussion symptoms are potentially

18  very diverse and not all patients suffer the same sorts of

19  symptoms or to the same extent, so the diagnosis can be a

20  little bit difficult because of that, especially in the

21  emergency department.

22          But common symptoms include:  headache;

23  dizziness; memory problems; light sensitivity; fatigue;

24  difficulty concentrating; emotional issues, like anxiety

25  or depression; difficulty sleeping; blurred vision; double

HENRY BARNHILL vs CITY OF HEMET, et al.
RYAN O'CONNOR, M.D.                          11/13/2025                          Page 25

 1   vision; decreased appetite; nausea; disequilibrium.
 2   There's other symptoms, I'm sure, but those are some of
 3   the more -- most common ones.
 4   BY MS. PEARSON:
 5       Q    And in your review of Mr. Barnhill's records the
 6   day of the injury, what symptoms, based on your review,
 7   were present in regards to a concussion?
 8       A    Largely, he was complaining of -- of pain --
 9   facial pain and then visual changes, blurred vision.  It's
10   a bit complicated; and, again, this is why concussion in
11   the emergency room is a little bit tricky because there's
12   often other injuries going on, and those injuries can be
13   distracting.
14          If you have a broken leg, for example, and you're
15   in excruciating pain, you might not notice that you are
16   feeling a little bit dizzy or feeling anxious or sensitive
17   to light, for example.  Sometimes concussion symptoms can
18   be more -- more subtle.  So in this case he's having pain
19   from the broken bones in his face.  The blurred vision
20   that he was complaining of -- it's unclear if it's because
21   of the eye trauma or from the concussion that he was
22   diagnosed with, for example, so there's confounding
23   factors.
24       Q    When you say diagnosed with those, based on
25   review, did that include any type of diagnostic testing?

HENRY BARNHILL vs CITY OF HEMET, et al.
RYAN O'CONNOR, M.D.                      11/13/2025                      Page 26

1      A     He was diagnosed with concussion by the emergency

2  room doctor, his treating physician.  There were no

3  radiologic images included as part of that medical record.

4      Q     And in your review of his medical records, did

5  you see any type of post-care regarding concussion?

6            MR. PACKER:  Objection.  Vague.

7            THE WITNESS:  Not specifically for concussion,

8  but he was treated for symptoms that could be

9  manifestations of a concussion.  Most traumatically was

10  persistent complaints of headache.

11  BY MS. PEARSON:

12      Q     But in your review of that medical record

13  regarding headaches, was there any reference to concussion

14  or post-concussion?

15      A     Not specifically concussion, no.

16      Q     And did you perform any type of physical

17  examination on the plaintiff?

18      A     No.  I've never met Mr. Barnhill.  He's not my

19  patient.  I'm not his doctor.  All of my statements and

20  opinions are based on my review of the discovery that was

21  provided to me.

22      Q     And I know we talked about the ER not necessarily

23  having any radiological reports; but did you review any

24  type of imaging in this analysis, like a CT or an MRI of

25  the -- of the head or the orbital or the ear?

HENRY BARNHILL vs CITY OF HEMET, et al.
RYAN O'CONNOR, M.D.                    11/13/2025                    Page 27

1        A    No.

2        Q    And in preparing this report, did you consult any

3   type of ophthalmologist or ENT?

4        A    I did not.

5        Q    So based on your report, is it fair to say that

6   your findings were relying on the police officer's reports

7   and the plaintiff's subjective complaints, as well as the

8   medical records that you reviewed?

9        A    Yes.

10       Q    Were there any -- as you prepared your report,

11  did you consider any type of preexisting conditions or

12  potential or rule out any preexisting conditions?

13       A    The medical records that were provided were

14  limited to the day of the incident and afterwards.

15  There's not much reference to anything prior, so I didn't

16  see any indication that any of these conditions were

17  preexisting in what was provided to me; and I believe in

18  the deposition of Mr. Barnhill -- again, I only skimmed it

19  due to lack of time complaints, but I believe he said he

20  didn't suffer from any of these conditions previously.

21       Q    So in your conclusion, you state "reasonable

22  medical probability" in support of your findings.  Can you

23  elaborate on that?  What -- what is your understanding of

24  "reasonable medical probability"?

25       A    Reasonable medical probability would encompass

HENRY BARNHILL vs CITY OF HEMET, et al.
RYAN O'CONNOR, M.D.                    11/13/2025                    Page 28

1   conclusions that are consistent with a reasonable

2   mechanism leading to an appropriate diagnosis.

3        Q    And how was that applied to -- to your report in

4   this case?

5             MR. PACKER:  Objection.  Vague.

6             THE WITNESS:  Well, I analyzed the mechanism of

7   injury as described by the police officers in their own

8   words, as well as the video of the arrest, the description

9   of the injuries that he sustained, most described in

10  detail in the emergency room records and substantiated by

11  the accompanying photographs to establish diagnoses.  So

12  we have a mechanism of injury leading to diagnoses.  There

13  is agreement and consistency between the injury mechanism

14  and the resulting diagnoses; and then the complaints that

15  persist the years after are consistent with the initial

16  injuries, which are consistent with the mechanism of

17  injury.

18  BY MS. PEARSON:

19       Q    When you state "mechanism of injury," what do

20  you -- what are you relying on to describe the mechanism

21  of injury in this -- and we're going to limit it to this

22  case.

23            MR. PACKER:  Objection.  Asked and answered.

24            Go ahead.

25            THE WITNESS:  Well, in my report I prefer to use

HENRY BARNHILL vs CITY OF HEMET, et al.
RYAN O'CONNOR, M.D.                    11/13/2025                              Page 29

1    the officer's own words because they're the ones

2    inflicted -- inflicting that injury.  It's -- I think the

3    officers describe what happened in the video well; but I

4    prefer to use their words because they're involved; and I

5    find if I try and describe what's in the video, it's more

6    open to, I guess, interpretation and objection, so I

7    choose to use the officer's own words, their involvement

8    in this incident.

9    BY MS. PEARSON:

10        Q    So when -- when analyzing the mechanism of

11   injury, do you account for positioning of the officer or

12   the plaintiff, kind of, the circumstances?

13             MR. PACKER:  Objection.  Vague.  Compound.

14             THE WITNESS:  It is a little vague.  I'm having

15   trouble understanding how to answer.  If you could

16   rephrase, please.

17   BY MS. PEARSON:

18        Q    So you've indicated that you rely on the

19   officer's reports primarily to -- to reach your

20   conclusions on mechanism of injury; correct?

21        A    Yes.  As -- in the video as well.  I mean, if

22   there was something that was clearly incompatible between

23   what the officer's describing, what's in the video, that's

24   something that I would bring up, for example; but I didn't

25   see any inconsistencies between what the officers were

HENRY BARNHILL vs CITY OF HEMET, et al.
RYAN O'CONNOR, M.D.                    11/13/2025                    Page 30

1   describing, at least as far as the mechanism of injury
2   goes, and what I saw in the video.
3        Q    Do you state that reliance on the videos in -- in
4   your conclusions?  I only see references of the officer's
5   reports.  Can you point me to where you indicated use of
6   the -- the body-worn cameras?
7        A    I list the body-worn cameras in the evidence that
8   I reviewed.  I don't specifically describe the videos
9   because I think the officers do a good job doing so, and
10  they were present, as opposed to me watching, you know,
11  video clips.  Different people can look at video clips and
12  focus on different aspects and describe them differently;
13  and it's more subject to interpretation; and I find that
14  the officers were present and are describing things, you
15  know, accurately from their recollection of being present.
16       Q    And are you being compensated for your work in
17  this case?
18       A    Yes.
19       Q    Okay.  And what's your rate?
20       A    My rate is $600 an hour.  I've received a $6,000
21  retainer, which covered my review of the discovery and
22  generation of this report, as well as preparation for this
23  deposition.  On April 10th, 2025, I received $6,000.  My
24  rate for the time during this deposition itself is $750 an
25  hour.

HENRY BARNHILL vs CITY OF HEMET, et al.
RYAN O'CONNOR, M.D.                    11/13/2025                    Page 31

```
 1              MS. PEARSON:  I have no further questions.

 2              MR. PACKER:  Okay.  I don't have anything,

 3    either.

 4              MS. PEARSON:  Okay.  Thank you, Doctor, for your

 5    time today.  I appreciate it.

 6              THE WITNESS:  Thank you.

 7              MR. PACKER:  Thank you, Doctor.

 8              Thank you, Madam Court Reporter.

 9                   (Reporter inquires for copy orders.)

10              MR. PACKER:  Yes, please.

11              MS. PEARSON:  All right.  Thank you, everybody.

12    Have a great rest of your day.

13              MR. PACKER:  Yeah.  Hold on just a second.

14    Before we go off the record, do we just want to stip

15    that'll be handled pursuant to code?

16              MS. PEARSON:  Yeah.  That's fine.

17                   (Whereupon, the proceeding was

18                   concluded at 10:42 a.m.)

19

20

21

22

23

24

25
```

HENRY BARNHILL vs CITY OF HEMET, et al.
RYAN O'CONNOR, M.D.                    11/13/2025                    Page 32

```
 1                    ERRATA PAGE

 2

 3   I,_____, make the following
            (Print Name)
 4

 5   changes to my testimony taken in the matter of

 6   _____,

 7   Taken on: _____:
                   (Date)
 8

 9

10   Page      Line      Change

11   _____     _____     _____

12   _____     _____     _____

13   _____     _____     _____

14   _____     _____     _____

15   _____     _____     _____

16   _____     _____     _____

17   _____     _____     _____

18   _____     _____     _____

19   _____     _____     _____

20   _____     _____     _____

21   _____     _____     _____

22   _____     _____     _____

23   _____     _____     _____

24   _____     _____     _____

25   _____     _____     _____
```

HENRY BARNHILL vs CITY OF HEMET, et al.
RYAN O'CONNOR, M.D.                      11/13/2025                      Page 33

1    _____    _____    _____

2    _____    _____    _____

3    _____    _____    _____

4    _____    _____    _____

5    _____    _____    _____

6    _____    _____    _____

7    _____    _____    _____

8    _____    _____    _____

9    _____    _____    _____

10   _____    _____    _____

11   _____    _____    _____

12   _____    _____    _____

13   _____    _____    _____

14   _____    _____    _____

15   _____    _____    _____

16   _____    _____    _____

17   _____    _____    _____

18   _____    _____    _____

19   _____    _____    _____

20   _____    _____    _____

21   _____    _____    _____

22

23                  _____
                              **(Witness Signature)**
24

25

HENRY BARNHILL vs CITY OF HEMET, et al.
RYAN O'CONNOR, M.D.                    11/13/2025                    Page 34

```
 1                    PENALTY OF PERJURY

 2

 3

 4      I, _____, do hereby declare under penalty

 5   of perjury that I have read the foregoing transcript; that

 6   I have made any corrections as appear noted, in ink,

 7   initialed by me, or attached hereto; that my testimony as

 8   contained herein, as corrected, is true and correct.

 9        EXECUTED this _____ day of _____, 20___,

10   at _____, _____.
              (City)              (State)
11

12

13

14

15   _____

16   RYAN O'CONNOR, M.D.

17

18

19

20

21

22

23

24

25
```

HENRY BARNHILL vs CITY OF HEMET, et al.
RYAN O'CONNOR, M.D.                    11/13/2025                    Page 35

1                    **CERTIFICATE**

2                         **OF**

3              **CERTIFIED SHORTHAND REPORTER**

4                    *    *    *    *

5

6

7        The undersigned Certified Shorthand Reporter of the

8    State of California does hereby certify:

9        That the foregoing Proceeding was taken before me at

10   the time and place therein set forth.

11       That the testimony and all objections made at the

12   time of the Proceeding were reported verbatim by me and

13   were thereafter transcribed, said transcript being a true

14   and correct copy of the proceedings thereof.

15       In witness whereof, I have subscribed my name, this

16   date:  November 26, 2025.

17

18

19

20   _____

         JANE GALLEGOS, CSR No. 14676
21

22

23

24

25