# Roger A. Clark

## Police Procedures Consultant, Inc.

10207 Molino Road.  Santee, CA 92071
Phone: (208) 351-2458,  rclark9314@aol.com

October 10, 2025

Trenton C. Packer, Esq.
Law offices of Grech & Packer
7095 Indiana Ave Ste 200
Riverside, CA 92506

**Regarding:    *Henry Barnhill, vs. City of Hemet; Officer Brett Maynard; Officer
Joshua Bishop; Officer Pedro Aguila; Corporal Douglas Klinzing; Jamie
Gonzalez; Catherine Tipton, et al., Case No.: 5:23-CV-00589-JGB-SB.***

Dear Mr. Packer:

Thank you for retaining me to analyze and render opinions regarding the April 29, 2022, use of force (including blows to the head and taser) inflicted on Mr. Henry Barnhill (Mr. Barnhill) during his apprehension by Hemet Police Department (HPD) Officers Brett Maynard (Officer Maynard), Joshua Bishop (Officer Bishop), Pedro Aguila (Officer Aguila), Douglas Klinzing (Corporal Klinzing), Jamie Gonzalez (Officer Gonzalez), and Catherine Tipton (Officer Tipton).  Pursuant to the requirement of Rule 26, I have reviewed the HPD reports, video/audio recordings, HPD policies, POST training, deposition transcripts, and other materials (as listed below) regarding this case provided to me thus far.  Please be advised that if/when any additional information is submitted, additional opinions may be required.

It is also necessary to state at the beginning of this report that I do not make credibility determinations in expressing my opinions.  That is, where there are differences in the events proffered by Mr. Barnhill, and others, versus those proffered by the Defendants, and/or others, I do not opine for the trier of fact regarding who are the more believable witnesses.  I consider that the resolution of any such conflicts is within the purview of a jury to decide. Relevant to my analysis in this matter is what was known to the Defendant Officers at the time they used force.

Additionally, it is necessary to state that I am not a lawyer nor a public official who hears and decides cases brought in court.  My opinions rest on the training given to every POST certified California Law Enforcement Officer and the reasonable professional standard of care as expressed and required pursuant to the training provided to every California certified Law Enforcement Officer.

Page 1 of 33

**Materials Provided and Reviewed Thus Far:**

1.  Pleadings:
    a.  Plaintiff's Complaint for Damages.
    b.  Protective Order Re Confidential Documents.

2.  Criminal Case Documents:
    a.  Criminal Compliant, the People of the State of California, V. Henry
        Michael Barnhill Aka: Henry Michael Barnhill Dob: 06/09/1978
        Booking#: 202216744.
    b.  Hemet Police Department Booking Record (Incident Report(s)).
    c.  DR # 2022-2719 -Supplement-1 Report Hemet Police Department.

3.  Body Worn Camera Recordings and screenshots:
    a.  Officer Maynard.
    b.  Officer Bishop.
    c.  Officer Aguila.

4.  Deposition Transcripts and Exhibits:
    a.  Defendant Officer Joshua Bishop, January 30, 2025.
    b.  Defendant Officer Pedro Aguila, January 31, 2025.
    c.  Defendant Corporal Douglas Klinzing, January 31, 2025.
    d.  Defendant Officer Brett Maynard, April 15, 2025.
    e.  Plaintiff Henry Barnhill, September 10, 2025.

5.  Photographs of Mr. Barnhill's Head Injuries–taken at the Hospital.

6.  2011 Electronic Control Weapon Guidelines.  U.S. Department of Justice
    Office of Community Oriented Policing Services and Police Executive
    Research Forum (PERF), Washington, D.C., March, 2011.

7.  TASER International Training Materials and Product Warnings.

8.  City of Hemet Police Department Policy Manual.

9.  POST Basic Learning Domains:
    a.  #00: "Becoming an Exemplary Peace Officer." Version 1.2
    b.  #01. "Leadership, Professionalism and Ethics." Version 5.6
    c.  #02: "Criminal Justice System." Version 6.4
    d.  #03: "Principled Policing in the Community." Version 5.1
    e.  #05: "Introduction to Criminal Law." Version 5.6
    f.  #15: "Laws of Arrest." Version 4.16
    g.  #16: "Search and Seizure." Version 4.8

      h.    #20: "Use of Force/Deescalation." Version 5.4
      i.    #21: "Patrol Techniques." Version 5.0
      j.    #23: "Crimes in Progress." Version 4.1
      k.    #30: "Crime Scene, Evidence, and Forensics." Version 5.0
      l.    #33: "Arrest and Control." Version 5.1
      m.    #34: "First Aid, CPR and AED." Version 6.1

10.    Overview of the incident scene via the internet.

## Apparent Uncontested Facts:

It is important to note at the outset of this report that there are a number of apparent uncontested facts relating to the reasonableness of the force inflicted on Mr. Barnhill by the Defendants based on my review of the video evidence in conjunction with my training, and experience reviewing use of force matters.  They include:

1.    Mr. Barnhill never had a weapon in his hands, or on his person during this apprehension.

2.    Based on video evidence, Officers Bishop, Aguila and Maynard could, or should have been able to, see that Mr. Barnhill had no weapon in hand.

3.    Mr. Barnhill never attempted to reach for a weapon or improvised weapon during the encounter.

4.    Mr. Barnhill never produced a weapon during the encounter.

5.    Based on video evidence, Mr. Barnhill's clothing showed no bulge, weight distribution, or indication that he was armed with a firearm during the physical encounter.

6.    During the use of force inflicted, Mr. Barnhill expressed that he was not a threat, a willingness to surrender and follow instructions – for example, "I am on the ground!," and "I am not refusing (resisting)!"

7.    The Defendant Officers did not give a warning prior to using force.

8.    Officer Maynard appeared to deliberately tackle Mr. Barnhill causing him to fall into a seated position on a patio chair.

9.    Officer Maynard struck Mr. Barnhill to the face twice with his fist.

10.    Officer Maynard struck Mr. Barnhill to the body with his knee.

11.    Officer Maynard pushed Mr. Barnhill's head and face up against the wall.

12.    Officer Bishop Tased Mr. Barnhill in probe mode twice.

13.    Officer Bishop struck Mr. Barnhill to the head with his Taser with such force that the Taser broke off and/or flew out of his hand.

14.    Officer Bishop struck Mr. Barnhill to the face by slamming his head on the ground with such force that blood immediately spattered over the ground.

15.    Officer Aguila struck Mr. Barnhill eight times with his closed fist on Mr. Barnhill's right lower-back.

16.    Mr. Barnhill did not verbally threaten any Officer during the encounter.

17.    Mr. Barnhill did not appear to attempt to strike (i.e., punch or kick) any officer during the encounter.

18.    Mr. Barnhill did not appear to attempt to grab any officer during the encounter.

19.    Mr. Barnhill did not appear to be assaultive throughout the encounter.

20.    Mr. Barnhill did not physically harm any officer.

21.    Mr. Barnhill did not appear to attempt to get up after being taken down during the encounter.

22.    Mr. Barnhill did not appear to flee immediately prior to and during the physical encounter.

23.    Mr. Barnhill did not appear to be resisting throughout the physical encounter.

24.    Mr. Barnhill conveyed pain several times throughout the encounter.

25.    Mr. Barnhill conveyed compliance several times, stating that he is not refusing commands, that he is on the ground, and that his hands

are behind his back as well as stating that he was not doing anything
wrong.

26.    Mr. Barnhill showed several acts of compliance including raising his
hands when first exiting the vehicle, putting his hands up on the
patio chair, going to the ground, going to his stomach, immediately
allowing his left arm to be placed behind his back, and allowing his
right arm to be placed behind his back once there was room to do so.

27.    Mr. Barnhill did not appear to be an immediate threat of death or
serious bodily injury at any time throughout the physical
engagement.

28.    The Defendant Officers were trained that an impact weapon to the
face/head can cause serious injury.

29.    Mr. Barnhill suffered serious injury.

30.    Mr. Barnhill was alone and outnumbered by the Officers, 4 to 1.

31.    The Defendant Officers had superior training and experience.

32.    Mr. Barnhill's height and weight were to no advantage given the
number of officers and his position chest down on the ground.

33.    All the above force occurred within approximately 50 seconds.

34.    Force was applied on Mr. Barnhill by Officers while he was sitting
on a chair, while he was on the ground, and while both hands were
behind his back.

**Brief Overview of Events and Commentary**:

On April 28, 2022, Mr. Barnhill and Ms. Rachel Amanda Warren ("Ms. Warren") resided
together at 354 Gardenia Circle, Hemet, California.  During that evening, they became
involved in domestic dispute.  According to Ms. Warren, as their argument progressed,
and Mr. Barnhill produced a handgun and pointed it at her.  Ms. Warren did not sustain
any physical injuries and did not call 9-1-1.

At the outset, I want to be clear that I am not critical of the Defendant
Officer's duty to respond to domestic violence claims, nor do I minimize the
seriousness of such claims. Law enforcement officers must take these
allegations seriously. Additionally, due to the emotionally driven nature of

such claims, law enforcement officers must control their emotions when
responding to a domestic violence call, as trained. If peace officers allow
emotions to affect their judgment, as we see in this matter, they may lose
control and overreact resulting in unnecessary use of force. An overreaction
to the situation when using force is an unreasonable use of force, as trained.

The next morning, on April 29, 2022, Mr. Barnhill drove Ms. Warren, and her daughter,
to McSweeny Elementary School, located in Hemet, California. During the drive, Ms.
Warren and Mr. Barnhill were not engaged in any physical or verbal dispute and no
weapons were present.

Unbeknownst to Mr. Barnhill, after Ms. Warren walked her daughter to the entry of the
school, she entered the school and called 9-1-1. Ms. Warren's call was related to the prior
night, but she did not say that Mr. Barnhill was presently armed or had committed any
assault on her during the previous night's argument.

> Q.     Okay. But you were not specifically told it [handgun] was on his
>        person?
> MS. KORNBLAU:  Objection. Vague and ambiguous. But go ahead.
> A.     Not specifically, no. (Officer Bishop deposition, Page 30)

As Mr. Barnhill awaited Ms. Warren's return, Officers Aguila, Bishop and Maynard
arrived in response to Ms. Warren's call. They parked and exited their patrol cars; each
drew their firearms and pointed them at Mr. Barnhill as he sat in his vehicle. Mr. Barnhill
observed the obvious display of firearms and the risk they posed to his life. Mr. Barnhill
expressed fear several times as it relates to this incident. Officers Bishop, Aguila and
Maynard pursued in their police vehicles when he fled. In the record, the entire pursuit
was brief and only spanned approximately 1.4 miles in approximately 2 minutes and 5
seconds (42 mph average) as Mr. Barnhill drove to his residence. Then Mr. Barnhill
stopped his vehicle in front of his residence and made his way to the front door and
attempted to enter his house.

Mr. Barnhill's hands were visible and empty as he attempted to open his front door and
had no apparent weapons of any kind in his hands or within his reach. For example,
Officer Bishop (the Officer who would thereafter fire his Taser into Mr. Barnhill), has
testified that he observed that Mr. Barnhill's hands were empty.

> Q.     Okay. So then we'll drill down on that a little bit based on that
>        objection. You didn't see a firearm in that right hand; right?
> A.     No.
> Q.     You didn't see a knife in that right hand?

A.    No.
Q.    You saw an empty hand; right?
A.    I saw an open hand that was empty.
Q.    Okay. So you saw an open and empty right hand; right?
A.    Yes.
Q.    With respect to the left hand, you didn't see any firearm in the left
      hand; correct?
A.    No.
Q.    No knife in the left hand; right?
A.    No.
Q.    So you also saw an empty and open left hand; is that right?
A.    Yes.
Q.    And again, to clarify, that was at the point when he initially complied
      with your directive to show you his hands; is that right?
A.    Yes. (Officer Bishop deposition, Pages 35-36)

As Mr. Barnhill ran from his car to his front door, the Officers followed close behind.  At
the front door Mr. Barnhill was immediately tackled and pushed into the wall and into a
seated position on the patio chair on the front porch by Officer Maynard and then
pummeled/piled upon by the other officers. During the encounter, Mr. Barnhill is
recorded as shouting, "I'm on the ground!" and "I'm not refusing (resisting)!".  (A clear
expression of surrender).

A significant collective infliction of force occurred before Mr. Barnhill was handcuffed.
It included a use of a Taser (and resultant apparent incapacitation) in dart mode, closed-
fist punches to his head, knee and punches to the body, blows to his head by the Taser,
and blows to his head into the cement structure of the house and ground.

During the encounter, Mr. Barnhill was unarmed, was not attempting to resist detention
or arrest, was not assaultive, had stopped his flight from apprehension, and did not
verbally threaten any Officer. Mr. Barnhill was mostly chest-down on the ground during
the group assault by Officers, including with one hand behind his back and with both
hands behind his back. Accordingly, while at the door and thereafter, Mr. Barnhill was
not a credible threat to the Officers, or any other person, worthy of the extreme force
inflicted.

Mr. Barnhill was subjected to unreasonable and excessive force (as defined by basic
officer training), inflicted when he was tackled, punched, kneed, Tased, had his face
slammed into the ground while subdued, struck in the head with the Taser as an
improvised weapon twice, and repeatedly punched in the lower back.

As a result of the excessive and unreasonable force, Mr. Barnhill suffered serious bodily injury to his head and face resulting from the force inflicted - a blowout fracture to his orbital floor, an ear avulsion, and a large parieto-occipital hematoma (from the record). Mr. Barnhill's injuries required emergency surgical intervention. Mr. Barnhill continues to suffer pain to this day.

In investigations, physical evidence looms large.  Physical evidence is considered as naturel (taking no side), does not lose its memory, and tells the truth.  The use of force by the Defendant Officers was recorded by the individual officer's BWC's (as listed above). I consider them to be accurate and apparent uncontested physical evidence of the incident, and in harmony with Mr. Barnhill's allegations. Accordingly, the BWC videos are the primary source of evidence in my evaluation of this matter.

Nevertheless, the Defendant Officers' statements provide useful context in this regard:

**Officer Maynard Crime Incident Report Narrative:**

"Origin:"

"On 04/29/2022, at approximately 0735 hours, I responded to the McSweeny Elementary School located at 451 W. Chambers Ave. (City of Hemet, County of Riverside) reference an assault with a deadly weapon. The victim, who will be identified in this report as V1, told Hemet Police Dispatch that her boyfriend, Henry Barnhill, had pointed a firearm at her face the evening prior, and said Barnhill was waiting for her outside the school in a vehicle. The victim told Police dispatch she had been able to distance herself from Barnhill after they drove her child to school."

"At approximately 0742 hours, Cpl. Reynoso (#10550) arrived in the area and located the victim inside the school. The victim told Cpl. Reynoso that Barnhill was in a black Dodge Challenger outside the school and Cpl. Reynoso broadcasted that information over the radio."

"I arrived in the area at approximately 0745 hours in a marked Hemet Police vehicle, and l was wearing a full Hemet Police Officer uniform (Class D) which included a black outer vest with clothe badge, and "POLICE" patches on front and back. Additionally, I had Hemet Police Department patches on both shoulders and a duty belt with attached equipment around my waist."

"Within seconds of my arrival on scene I saw a black 2019 Dodge

Challenger bearing a plate of 8RUU690 parked on the north side of Chambers Avenue near the intersection with South Gilbert St. I saw that was the only black Dodge Challenger on the street, and I broadcasted the vehicle's license plate information. Assisting uniformed Hemet Police officers Aguila (#10832) and Bishop(#10803) arrived on scene within seconds and parked behind it."

"The two officers attempted a felony traffic stop using marked Hemet Police Department vehicles and forward facing solid red lamps. I parked behind the other officers and exited my vehicle to assist in the stop after activating my own forward facing solid red lamp. I watched as the vehicle started and fled from the stop at a high rate of speed. I broadcasted over my police radio that the vehicle was "taking off"."

"Based on the available information at that time, Barnhill was suspected to be in a vehicle matching the color, make, and model of the one fleeing from the traffic stop. Barnhill was suspected of assaulting his girlfriend by pointing a firearm at her face, which would be a violation of California Penal codes 273.5(a), 245(a)(2), and 417. In the moment, Barnhill was believed to be a violent fleeing felon. Hemet Police officers Bishop and Aguila gave chase in the same marked police vehicle, and I gave chase behind them in my marked police vehicle."

"Barnhill evaded both marked Hemet Police vehicles using forward facing red lamps and audible sirens for a total of approximately 1.4 miles throughout the City of Hemet. Barnhill's driving actions were reckless and he drove with wanton disregard for the safety of the public. During the pursuit, Cpl. Reynoso broadcast over the radio that Barnhill was believed to have access to a semi-automatic firearm and was a violent felon. Please see Officer Aguila's and officer Bishop's supplemental reports regarding Barnhill's driving actions and actions taken at the termination point of the pursuit."

"Barnhill stopped the vehicle in the area of Gardenia Circle and Magnolia Circle (City of Hemet, County of Riverside) and fled from the vehicle on foot as officers stopped their vehicles close behind him. I could see Barnhill was wearing an oversized, dark hooded sweatshirt which concealed his waistband. I exited my vehicle and watched as Barnhill turned away from officers as he ran and reached both of his hands towards the front of his waistband. Based on my training and experience, I know it is common for persons to conceal deadly weapons such as firearms in or near their

waistband. As I watched Barnhill reach for his waistband I was fearful that he was attempting to produce a firearm."

"I chased Barnhill on foot and gave commands to Barnhill to "show us your hands! Do it now, show us your fucking hands !" as he ran onto the property of the residence located at 354 Gardenia Circle. (City of Hemet, County of Riverside). Barnhill complied by lifting his hands up to his chest height, but was still running away from me and towards the front door of the residence.

At that moment, I did not know whom the residence belonged to, and was unaware the residence was actually the registered address of the victim."

"As I ran towards him, l saw Barnhill had a bunch of keys in his right hand, and was reaching for the front door handle. Based on my training and experience, I know it is common for violent fleeing felons to store deadly weapons including firearms inside residences. I also know it is common for fleeing felons to barricade themselves inside residences to prolong or attempt to prevent capture, or possibly take another person as a hostage. Based on those reasons, I was intent on preventing Barnhill from entering the residence and I tackled him away from the front door before he could open it. As I tackled him, I ordered him to, "get the fuck on the ground" multiple times."

"I tried to grab Barnhill's right wrist with my left hand, but he pulled it away from me and towards his body. At the same time, Barnhill struck me in the chest with his left knee, in violation of 69 PC. I then regarded Barnhill not only as a violent fleeing felon, but also an assaultive and resisting violent fleeing felon. Again, I believed Barnhill was trying to retrieve a firearm from within his clothing, so I punched him in the front of his face with a closed right fist in an effort to distract him from reaching towards his clothing. This was effective, as Barnhill brought his hands up near his face as I said, "get on the ground" an additional time. Barnhill continued to resist my efforts to grab his right arm by flailing his arms around in the air, and I saw him pull his left arm away from Officer Aguila's grasp as well."

"I heard Officer Bishop shout a warning, "taser , taser!" and I heard the audible noise of the taser being deployed in probe mode. I saw the taser was ineffective, as Barnhill was still able to manipulate his limbs and push against my chest with his left hand. Officer Aguila and I pulled Barnhill towards the ground and had to forcefully shove him face down into a

semi-prone position. It should be noted, Barnhill was approximately 5'03"
tall and weighed in excess of 250lbs. At the time, I stood 5' 08" and
weighed just under 160lbs. I was using all of my body weight and
momentum to try to force Barnhill to the ground, and I saw Officer Aguila
was heavily involved in doing the same. Even with our efforts, Barnhill was
able to pull his hand underneath his body and place them approximately
shoulder width apart in a "push-up" position. I felt Barnhill was tensing the
muscles in his arms and shoulders as we continued to try to grab his arms
while telling him to put his hands behind his back. Barnhill was shouting,
"I'm on the ground, I'm not refusing" but even while saying that he was still
tensing his muscles and pulling his hand away from me. The actions by
Barnhill continued to show he was actively resisting my efforts to take him
into custody and was not trying to surrender to me."

"At one point, Barnhill shook my hands off of his right hand and I lost
control of that limb. Barnhill pulled his right hand close to his body and
reached towards the right front side of his waistband. ln fear Barnhill was
still trying to arm himself with a deadly weapon, I struck him in the right
side of his face with my right knee one (1) time. This was effective, as
Barnhill immediately brought his right hand up by his face in order to
prevent me from striking his face again. I was able to pull Barnhill's right
away from his face with both of my hands, and started to pull it behind his
back, but he flexed the arm straight down by his side and near the front of
his waistband again. Again, I feared Barnhill was reaching for a deadly
weapon, and the firearm said to have been used in the crime against the
victim was unaccounted for. It wis at this point I saw Officer Bishop grab
Barnhill by the hair as I used my full body weight to pry Barnhill's right arm
and hand away from his waistband using my right elbow as a fulcrum
against his right elbow. At that time, Cpl. Klinzing (#10345) ran up to the
front door and used his right hand to assist me in pulling Barnhill's hands
towards the center of his back. At that time I yelled, "got his hands!" and I
was able to secure Barnhill in handcuffs without further use of force. I did
not see any further use of force against Barnhill by any officer present after
I shouted that his hands were secured."

"Again, please see Officer Bishop's and Officer Aguila's supplemental
reports for additional information regarding the apprehension of Barnhill
and each officer's actions taken during the process." (Officer Maynard
Narrative, Pages 1 of 33 through 3 of 33).

Officer Maynard tackled Mr. Barnhill, forcing him into the wall and to fall into a seated

position on the nearby patio chair, then went hands on using force against Mr. Barnhill to take him into custody. Officer Maynard kneed Mr. Barhill to the body, fist-punched him to the face, hammer-fisted him to the face, pushed his head against the wall, and contributed to securing Mr. Barnhill's right arm.

**Summary of Officer Aguila's involvement:**

> "I immediately exited Officer Bishop's police vehicle and gave chase after Barnhill. I commanded Barnhill to place his hands in the air, where Officer's could see them. Barnhill attempted to open the front door of the location but was tackled into a patio chair by Officer Maynard. I arrived and grabbed Barnhill's left wrist. After Barnhill was taken to the ground, I placed his left arm behind his back … I punched Barnhill eight times to the right side of his rib cage." (Officer Aguilla Supplemental Report Narrative)

Officer Aguila had approximately five years of experience in law enforcement at the time of the incident. Officer Aguila went hands on with Mr. Barnhill and used force to secure his left hand and arm. Officer Aguila struck Mr. Barnhill with his fist eight times to Mr. Barnhill's right lower back area.

**Summary of Officer Bishop's involvement:**

> "As Barnhill ran, I gave him several commands to put his hands behind his back and for him to show officers his hands. Barnhill initially complied by placing both his hands/arms in the air, but continued running toward the front gate entrance … Barnhill attempted to unlock the front door of the residence, but was contacted by officers prior to Barnhill being able to unlock the front security door."

> "Officer Maynard was able to assist Barnhill onto a patio chair, which was located near the front security door. Officers gave Barnhill commands to get down on the ground as he was in a seated position on the patio chair … Officer Aguila was able to gain control of Barnhill's left arm/hand ..."

> "…I told officers to move out of my way. I drew my Conducted Electrical Weapon (CEW) and pointed it at Barnhill. I deployed my CEW and both probes struck Barnhill. One of the probes struck him in the abdomen region and the other in the left thigh area."
> …

> "Barnhill was then placed onto his buttocks by officers and ordered to get down on the ground. Officers were able to roll Barnhill over onto his

stomach … I then re-energized my CEW for another 5 second cycle …"

"Officer Aguila was able to place Barnhill's left arm/hand behind his back …"

"… I struck him 2 times on left side of his face/head with my CEW …"

"ln an an attempt to immobilize Barnhill, so officers could place Barnhill into handcuffs, I grasped Barnhill's ponytail style hair and slammed his face/head into the ground …"  (Officer Bishop Use of Force Report Narrative).

Officer Bishop was equipped with his body-worn camera, pepper spray, a Taser, and his firearm. Officer Bishop had approximately four years of law enforcement experience at the time. Officer Bishop did not have any specific information that Mr. Barnhill was armed with a firearm during the incident. Officer Bishop had no knowledge of Mr. Barnhill from prior contacts.

According to Officer Bishop, as Mr. Barnhill was running away from officers, Officer Bishop commanded Mr. Barnhill to show his hands, to which Officer Bishop admits that Mr. Barnhill initially complied. Officer Bishop saw both of Mr. Barnhill's hands and saw that he was unarmed. The foot pursuit ended at the front door of the house where Officer Maynard pushed Mr. Barnhill away from the front door and into a patio chair. Multiple Officers went hands-on with Mr. Barnhill and took him to the ground. During the process, Officer Bishop deployed his Taser in probe move for a 5-second cycle on Mr. Barnhill. Officer Bishop broadcasted their location and requested assistance (more resources). Officer Bishop never saw any weapons in Mr. Barnhill's hands or on his person.

Once on the ground, Officer Bishop recharged the Taser and deployed second 5-second cycle on Mr. Barnhill. While Mr. Barnhill was chest down on the ground, which one officer controlling his left arm behind his back and with other officers working on moving his right arm behind his back, Officer Bishop struck the left side of Mr. Barnhill's head with his Taser two times. Officer Bishop used such force that the Taser broke off and/or flew out of his hand after the second head strike. Officer Bishop was not specifically trained to use the Taser as an improvised weapon. After the Taser flew out of his hands, Officer Bishop engaged hands-on with Mr. Barnhill.

Officer Bishop grabbed the back of Mr. Barnhill's hood/head including his ponytail and slammed his face and head to the ground then pushed Mr. Barnhill's head to the ground.

The door to the house was closed throughout the entire incident. Officer Bishop

recognized that as a result of the force used against Mr. Barnhill, he suffered "abrasion/laceration" and "obvious disfigurement."

As noted above, Officer Bishop used his Taser on Mr. Barnhill despite having not seen any weapon in Mr. Barnhill's hands and seeing at the time that Mr. Barnhill was not standing or aggressing.  As recorded, he pointed his Taser at Mr. Barnhill, announced, "taser, taser, taser" and fired his Taser into Mr. Barnhill.  Officer Bishop allowed the Taser to run one cycle (five seconds) and held his finger on the trigger, so the Taser would cycle for another five seconds.

> Q.    Okay. So you actually deployed the probes one time for five seconds; right?
> A.    Yes.
> Q.    And then recharged the Taser for another five seconds; right?
> A.    Yes. (Bishop, Pages 47 - 48)

Officer Bishop deployed his Taser on Mr. Barnhill in probe-mode twice, each a five-second cycle designed to cause neuromuscular incapacitation. Officer Bishop went hands on and use force to take Mr. Barnhill into custody, including by pulling on his hood, using the Taser twice as an improvised weapon to strike Mr. Barnhill's head, and slamming Mr. Barnhill's head on the ground.

**Summary of Corporal Klinzing's involvement:**

Corporal Klinzing was a field supervisor with HPD and had over 20 years of experience in law enforcement at the time. Corporal Klinzing saw the vehicle stop and saw Officers Aguila, Bishop and Maynard foot-chase the subject toward the front of the house. Corporal Klinzing joined the officers' engagement with Mr. Barnhill. According to Corporal Klinzing, Officer Aguila was controlling Mr. Barnhill's left hand while the other two officers were in the process of getting Mr. Barnhill's right hand behind his back. Corporal Klinzing joined in that effort. During that time, officers were striking Mr. Barnhill. During this encounter, Corporal Klinzing heard Mr. Barnhill say something to the effect of, "My hands are behind by back" and "I'm not resisting." Additionally, Corporal Klinzing did not see a firearm or knife on Mr. Barnhill.

**POST Training Regarding Force Options**

Law Enforcement Officers are trained by POST and department policy that a subjects' resistance/actions to an arrest will determine the type of force used by peace officers.  The following chart illustrates how a subject's resistance/actions can correlate to the force applied by an officer:

| Subject's Actions | Description | Possible Force Option |
|---|---|---|
| Compliant | Subject offers no resistance | - Mere professional appearance<br>- Nonverbal actions<br>- Verbal requests and commands<br>- Handcuffing and control holds |
| Passive non-compliant | Does not respond to verbal commands but also offers no physical form of resistance | - Officer's strength to take physical control, including lifting/carrying<br>- Pain compliance control holds, takedowns and techniques to direct movement or immobilize a subject |
| Actively resistant | Physically evasive movements to defeat an officer's attempt at control, including bracing, tensing, running away, or verbally or physically signaling an intention to avoid or prevent being taken into or retained in custody | - Control holds and techniques to control the subject and situation<br>- Use of personal body weapons to gain advantage over the subject |
| Assaultive | Aggressive or combative; attempting to assault the officer or another person, verbally or physically displays an intention to assault the officer or another person | - Use of devices and/or techniques to secure compliance and ultimately gain control of the situation<br>- Use of personal body weapons in self-defense and to gain advantage over the subject |
| Life-threatening | Any action likely to result in serious bodily injury or death of the officer or others | - Utilizing firearms or any other available weapon or action in defense of self and others to stop the threat |

NOTE:     Officers must consider the *totality of the circumstances* when selecting a force option. It is not the intent of this chart to imply that an officer's force options are limited based on any single factor. A key principle in maintaining public trust and respect is ensuring that any use of force is reasonable.

(LD 20: Chapter 3 – Force Options, pages 3-6 & 3-7)

Additionally, an entire chapter in POST Learning Domain #20 is devoted to the consequences of using unreasonable force "Peace Officer and Agency Liability." Cruelty and malicious assaults are absolutely forbidden:

| | |
|---|---|
| **Unreasonable force** | An officer will be found to have used unreasonable force when the type, degree, or duration of the force which was used is found to have been greater than that which was objectively reasonable under the totality of the circumstances confronting the officer at the time that the force was used. The objective reasonableness analytical process was explained in previous chapters. |
| **Consequences of unreasonable force** | An officer who uses more force than is objectively reasonable faces the possibility of criminal prosecution, civil liability, and/or agency administrative sanctions. |

(LD 20: Chapter 7 – Peace Officer and Agency Liability, page 7-5)

Officers are also trained that although Penal Code Section 834a states that the person being arrested must submit to an arrest, if unlawful or unreasonable force is used to effect the arrest, the person being arrested may lawfully resist to overcome that force. The penal code sections include: Section 692 (Lawful resistance to the commission of a public offense may be made by the party about to be injured or by other parties); Section 693 (Resistance sufficient to prevent the offense may be made by the party about to be injured to prevent an offense against his person, or his family or some member thereof. To prevent an illegal attempt by force to take or injure property in his lawful possession; and Section 694 (Any other person, in aid or defense of the person about to be injured, may make resistance sufficient to prevent the offense)." As stated above, the necessity for a direct intervention by officers occurs in the context of the "totality of circumstances."

Under the facts cited above, once Mr. Barnhill sat down and gave up, he was nothing more than "compliant" (had not been issued any warnings or orders) and thereafter did not display "assaultive," "combative," or "life-threatening" behavior. Accordingly, considering the totality of this incident, nothing more than officer presence, verbal skills, firm grip, and/or grappling to handcuff would be justified, as trained.

## Consequences of Blows/Kicks/Punches to the Vulnerable Parts of the Body:

It is also important to note that Mr. Barnhill sustained injuries that appear consistent blows to his head (blowout fracture to his orbital floor, an ear avulsion, and a large parieto-occipital hematoma). Officers are trained that blows to the head can result in

serious injury and death, and are not to use blows to the head absent the protection of life. In my opinion, no Officer's life was in danger; therefore, any blows to Mr. Barnhill's head violate basic officer training.

> "Punches to the head or face can cause severe injuries to the individual, and additionally carry a high risk of injury to the deputy using such force. Deputies should only use this extremely dangerous level of force where lower force levels are not available or are ineffective, especially when the individual is already handcuffed and less severe use of force alternatives are available. See Graham, 490 U.S. at 396. LASD's Deputy Field Operations Manual and Defensive Tactics Manual state that "personnel are discouraged from striking an attacker's head with a fist," and encourages deputies "to use an open hand palm heel strike to lessen the potential of cutting injuries." LASD policy prescribing situational uses of force essentially ranks head strikes as akin to deadly force, stating they are appropriate only when a subject's behavior is "likely to result in serious injury or possibly in the death of a person." Punches to the face, as opposed to the head, are not considered deadly force, but this poor tactic can result in more injury to a subject and a deputy. The pattern of head and face strikes against handcuffed individuals we observed in LASD appears unreasonable under the Fourth Amendment." (DOJ Correspondence: "Investigation of Los Angeles County Sheriffs Department Stations in Antelope Valley," June 28, 2013, Page 32.)

Accordingly, I am very concerned at the significant number of injurious blows inflected on Mr. Barnhill (blowout fracture to his orbital floor, an ear avulsion, and a large parieto-occipital hematoma). As stated above, any use of force must be considered by the "objectively reasonable" standard (as taught by POST). In this regard, it is necessary to include the POST training given to all officers to consider the very serious consequences - including death – violent blows to specific parts of the body and that any intentional strikes to these areas (such as occurred here) must be "objectively reasonable." They are listed as (LD #33: "Arrest and Control," Use of Impact Weapons, page 6-7.):

- Face,
- Throat,
- Heart,
- Groin,
- Head,
- Neck,
- Spine and
- Kidneys.

**<u>Professional Standards and Considerations Regarding the Use of Deadly Force</u>:**

Law enforcement officers in California are trained that:

- The use of deadly force is the most serious decision a peace officer may ever have to make. Such a decision should be guided by the reverence for all human life (including the officer's life and others that may be in imminent danger) and, used only when other means of control are unreasonable or have been exhausted. (POST Learning Domain #20: "Use of Force.")
- Deadly force applied by a peace officer is force that creates a substantial risk of causing death or serious bodily injury. (POST Learning Domain #20: "Use of Force.")
- Reverence for all life is the foundation on which the use of deadly force rests. The authority to use deadly force is a tremendous responsibility given to peace officers by the people who expect them to exercise that authority judiciously. In the law enforcement/community partnership, peace officers are expected to be self-disciplined and accountable, which helps build community trust and respect. (POST Learning Domain #20: "Use of Force.")
- An officer may use deadly force to protect oneself or others when the officer has the objective and reasonable belief that his/her life, or the life of another, is in imminent danger of death or serious physical injury based upon the totality of the facts known to the officer at the time. (POST Learning Domain #20: "Use of Force.")

The decision of whether or not to use deadly force may be influenced by, but not limited to, the officer's:

- training and experience
- judgment
- mental alertness
- existing facts and circumstances
- understanding of state law, case law, and agency policy
- (emotional maturity)

(POST Learning Domain # 20: "Use of Force.")

A peace officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the

circumstances, that such force is necessary… to defend against an imminent threat of death or serious bodily injury to the officer or to another person. *(Penal Code Section 835a(c)(1)(A))* (POST Learning Domain # 20, page 4-4.)

**Serious bodily harm or injury** means a serious impairment of physical condition, including, but not limited to, the following: loss of consciousness, concussion, bone fracture, protracted loss or impairment of function of any bodily member or organ, a wound requiring extensive suturing, and serious disfigurement. (*Penal Code Section 243(f)(4)*)

**Deadly force** means any use of force that creates a substantial risk of causing death or serious bodily injury, including, but not limited to, the discharge of a firearm. (*Penal Code Section 835a(e)(1)*)

**Imminent** means: a threat of death or serious injury is "imminent" when, based upon the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed. *(Penal Code Section 835a(e)(2))*

**Totality of the Circumstances** means all facts known to the peace officer at the time, including the conduct of the officer and the subject leading up to the use of deadly force. *(Penal Code Section 835a(e)(3))*

NOTE:      *Penal Code Section 835a* prescribes the circumstances under which a peace officer is authorized to use deadly force to effect an arrest, to precent escape, or to overcome resistance. In determining whether deadly force is necessary, officers shall evaluate each situation in light of the particular circumstances of each case and shall use other available resources and techniques if reasonably safe and feasible to an objectively reasonable officer. *(Penal Code Section 835a(a)(2)).* (POST Learning Domain # 20, page 4-7.)

According to *Penal Code Section 835a*, **fear** alone does not justify the use of deadly force. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that from appearances, must be instantly confronted and addressed.

Tactical repositioning or other de-escalation tactics is not "retreat."
(POST Learning Domain # 20, page 4-8.)

**POST Re-evaluation of Force Requirement:**

"Peace officers must use the force option(s) appropriate for the situation as conditions may change rapidly. Officers must continually reevaluate the subject's actions and the practical considerations involved in the situation and must be prepared to transition as needed to the appropriate force options (deescalate or escalate), so as to always remain within the bounds of conduct which is objectively reasonable under the circumstances."
(POST Learning Domain 20, page 3-7.)

In my opinion, especially when considering the video evidence that is documented related to this group-assault on Mr. Barnhill, the Officers could not have reasonably believed that Mr. Barnhill was an imminent threat of death of serious bodily injury at the time of the force; Mr. Barnhill was not assaultive immediately prior to or during the force applied; and Mr. Barnhill was not actively resistant immediately prior to or during the force applied.

## Information and Training Regarding the Taser Weapon:

The Taser is classified as an Electronic Control Weapon (ECW) [originally called Conducted Energy Device - CED], and is a unique use-of-force tool typically used by law enforcement officers to overcome a suspect's assaultive/combative behavior. The most common ECWs in use throughout the nation are manufactured by Taser International, now called Axon Enterprise.

The Taser is designed to discharge electrical charges into a subject to create involuntary muscle contractions that override the suspect's voluntary motor responses. The weapon has three modes of use: "probe," "touch-stun," and "elongated stun" modes. Projectiles with wires are contained in an ECW cartridge. When fired in the probe mode, a cartridge projects, through a set of wires, a pair of barbs (or darts with hooks) that attach to clothing or penetrate the skin after the Taser is fired, delivering an electrical charge. As the barbs penetrate, the electrical current is sent down the wires and through the body between the two barb points. The application of the electrical energy painfully influences and incapacitates the subjects' muscles and nerves.

The effect of the Taser on a suspect through the application of an electrical pulse is called "neuromuscular incapacitation" (NMI). The NMI pulse provides electrical energy that provides the officer the ability to dominate a suspect's motor nervous system by interfering with electrical signals sent to the skeletal muscles by the central nervous

system.  Since the incapacitation is proportional to the muscle mass captured by the NMI, the amount of distance between the two probes when they embed is directly proportional to the effectiveness of the NMI.  It must be also noted that the infliction of pain occurs regardless of the distance between the two probes.  Thus, despite the distance between the embedded probes (and NMI result), significant pain is inflicted regardless of the existence or absence of NMI.

**Standards Regarding the Use of the Taser Weapon:**

The U.S. Department of Justice (DOJ), the International Association of Chiefs of Police (IACP), the Office of Community Oriented Policing Services (COPS), the Bureau of Justice Assistance (BJA), the National Institute of Justice (NIJ), and other policing organizations and associations developed and published in 2006 and 2011 defining documents regarding the use of the Taser weapon (listed as item 16 on page 3 of this report.)  Among other issues, 53 specific and necessary guidelines governing the use of the Taser weapon are listed in the 2011 publication.  These guidelines include limiting taser use to no more than 3 cycles (15 seconds) and to avoid firing the weapon into the chest.  As such, the 2006 and 2011 publications expresses the accepted professional standard of care and as endorsed by the U.S. Department of Justice.  They have not been revised since 2011.

*TASER Training/Warnings Sent To All User Agencies Regarding Chest Shots:*

Following the original 2006 DOJ publication, in 2009 TASER International published *Training Bulletin 15.0* which acknowledged and endorsed the DOJ 2006 published guidelines (including the 15 second limit), and added to their training to avoid firing the darts into the chest.  This product warning was acknowledged in the 2011 DOJ publication as follows:

"In October 2009, TASER International released "Training Bulletin 15.0 Regarding Medical Research Update and Revised Warnings," which offered a new preferred target zone for ECWs.  It lowered the recommended target area from "center of mass" to "lower center of mass" for front shots.  By avoiding the chest whenever possible, TASER International indicated that law enforcement agencies may avoid the "controversy about whether [ECWs] do or do not affect the human heart." (DOJ 2011 Publication, page 37.)

Since 2009, the TASER International Training/Certification lesson plans and their Product Warnings have included the 15 second limit and the increased risks to the heart when taser darts are fired into the chest.

"Experts have identified dart-to-heart distances and transcardiac (across the

heart) vectors as being key determining factors in whether an ECD can
affect the heart. *The further an ECD dart is away from the heart the lower
the risk of affecting the heart*." (Taser Version 18 User Update (2012),
page 44. Emphasis added.)

When the DOJ updated the 2006 publication in 2011, they included even more specific
cautions regarding the medical risks connected to a Taser's use on a subject are quoted
as follows:

*"Medical Considerations: Repeated or multiple applications may increase risk of
death:"*

"It is important to recognize that ECWs have been cited by medical
authorities as a cause of, or contributing factor in, some deaths. A number
of factors appear to be associated with fatal and other serious outcomes.
These factors include how the ECW was used and the physical or medical
condition of the subject who received an ECW application. Indeed, in July
2010 the American Academy of Emergency Medicine issued a Clinical
Practice Statement advising physicians that they should consider additional
evaluation and treatment for individuals who experienced an ECW
application longer than 15 seconds."

"Although causation factors are not clear, the most common factors that
appear to be associated with fatal and other serious outcomes include 1)
repeated and multiple applications, 2) cycling time that exceeds 15 seconds
in duration, whether the time is consecutive or cumulative, and 3)
simultaneous applications by more than one ECW. Officers must be trained
to understand that repeated applications and continuous cycling of ECWs
may increase the risk of death or serious injury and should be avoided."
(Page 13.)

*"Medical Considerations: High-risk populations:"*

"Some populations currently believed to be at a heightened risk for serious
injury or death following an ECW application include pregnant women,
elderly persons, young children, visibly frail persons or persons with a
slight build, persons with known heart conditions, persons in
medical/*mental crisis*, and persons under the influence of drugs
(prescription and illegal) or alcohol. (Emphasis added.) Personnel should
be trained about the medical complications that may occur after ECW use
and should be made aware that certain individuals, such as those in a state

of excited delirium, may be at a heightened risk for serious injury or death when subjected to ECW application or other uses of force to subdue them." (Page 14.)

*"Drive Stun: Avoid use as a pain-compliance tactic:"*

"The most commonly used ECWs can be used in two modes: probe and drive stun. Many police managers and officers erroneously believe that applications of drive stun are as effective as applications with probes, but that is not correct. The drive stun mode can be used to complete the circuit in the event that one of the probes is ineffective or becomes dislodged. The drive stun mode can also be used in close quarters for the purpose of protecting the officer or creating a safe distance between the officer and subject. Absent these circumstances, using the ECW in drive stun mode is of questionable value. The primary function of the drive stun mode, when not used to complete the circuit, is to gain subject compliance through the administration of pain. Using the ECW to achieve pain compliance may have limited effectiveness and, when used repeatedly, may even exacerbate the situation by inducing rage in the subject. For these reasons, agencies should carefully consider policy and training regarding when and how personnel use the drive stun mode, and should discourage its use as a pain compliance tactic. Drive stun has an applicable but limited purpose that should be taught, explained, and monitored during ECW training and field use." (Page 14.)

## Opinions Thus Far:

1.  From my review of the materials provided, the use of force inflicted on Mr. Barnhill by the Defendants was inconsistent with basic law enforcement training and violated basic POST standards and the standard of care pursuant to POST and officer training - in other words, was excessive and unreasonable as defined by POST. Across the nation, for decades, law enforcement agencies have been training their personnel in proper tactical responses, use of force options, and restraint techniques for individuals taken into custody. The aim of this training is to prevent injuries, such as the ones that occurred in this case (including blowout fracture to his orbital floor, an ear avulsion, and a large parieto-occipital hematoma). These methods are well-known and proven effective for the safety and welfare of both officers and the public. The Officers in this case utterly failed

to follow these standards and their training in this incident. Had they done so, Mr. Barnhill would not have sustained irreversible injuries to his head and face.

2.      The Defendant Officers used deadly force against Mr. Barnhill by violently striking him to the face and head several times. Mr. Barnhill was not an immediate threat of death or serious bodily injury to anyone at the time of the Officers' use of deadly force.

3.      In my opinion, there were fundamental tactical errors in this incident. Based on the nature of the call, and under these circumstances, in accordance with basic officer training, the Defendant Officers failed to attempt to de-escalate the situation, failed to employ proper control hold-techniques, failed to give Mr. Barnhill a warning prior to using such extreme force, and failed to control their emotions and fears, which resulted in their overreactions and unnecessary uses of force.

4.      After being apprehended at the door to his home and during the Officer assault thereafter, Mr. Barnhill did not attempt to flee, was not resistive, was not assaultive, was willing to communicate and conveyed compliance to the Defendant Officers. It is my opinion that no force beyond that which is trained and reasonable for a compliant subject was necessary or permitted (as trained).

5.      One of an Officer's overarching duties is to protect lives of those they come in contact with and protect and provide for their safety. Competent training for officers must include their duty to intervene if fellow Officer(s) apply excessive force, particularly if that excessive force could lead to extreme pain, serious injury or death. Officers Maynard, Bishop and Aguila and Corporal Klinzing failed to uphold their duty to intervene when they did not stop their partner Officers from continuing to violently assault the compliant Mr. Barnhill.

6.      In my opinion, the Officers exhibited a gross departure from nationally accepted required tactics to minimize the use of force including lethal force. Trained and experienced officers know that failure to follow them violates professional standards and training.

Based on my review of the record, the Officers violated POST standards, which reflects their lack of adequate training, and a direct reflection of HPD's inadequate supervision, and training policies. The Officers' use of force including deadly force against Mr. Barnhill, especially when Mr. Barnhill was chest down on the ground, unarmed, not resisting, not attempting to flee, and with at least one hand behind his back, have not harmed any officer nor verbally threatened any officer, but instead told Officers that he was not resisting, demonstrates the Defendant Officers complete lack of situational awareness, lack of control over their emotions and fears, and their inadequate training and understanding of basic use of force and de-escalation principles.

The HPD longstanding failure to adequately train their officers, also demonstrated by its officers' prior use of unreasonable force against the citizens of Hemet, has and will continue to place the community at risk of serious injury and/or death by other officers in the department, who have been or are now, similarly trained and/or supervised.

**My Qualifications To Review This Case:**

My opinions are based in part on my training, professional experience and education. I am a twenty seven year veteran of the Los Angeles County Sheriff's Department (LASD). I was hired on December 1, 1965, and I retired from active service on March 31, 1993. My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant. I retired holding a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5, 1988). The POST Command College was a Masters level two-year course of study requiring a thesis, in Police Administration, with the diploma awarded by the California Department of Justice (and not the California University system).

During the course of my service with the department, I had a wide range of duties. Those duties included an 18 month assignment as a staff jail deputy and two years as an Administrator/Lieutenant in the same jail facility (Men's Central Jail). I also served on the department as a patrol officer, field supervisor, jail watch commander and administrator, station watch commander, and commanding officer of investigative units. I was a field training officer while assigned as a patrol deputy, and I trained new officers in POST and department approved patrol procedures, field investigations, apprehension techniques, and emergency procedures.

I was a Station Detective and, as such, reviewed and assessed cases passed on to me by the patrol officers. Those cases included possible complaints relating to both misdemeanor and felony crimes. They frequently required follow up investigations and interviews before the exact nature of the case could be determined. As a field officer and detective, I was trained in interview and interrogation methods and subsequently trained other officers.

Among other assignments as a Sergeant, I supervised field officers and station detectives as they took complaints and conducted preliminary investigations regarding criminal and administrative matters.

As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriff's Department's Patrol School which taught the POST accepted patrol tactics, and investigation and apprehension methods.

As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer-involved shootings. I was also assigned by my Department to sit as a member of Departmental review committees regarding the reasonable or unreasonable use of force and tactics.

As stated above, during my career I was assigned to the Los Angeles County Men's Central Jail (MCJ) for a period of 18 months as a line officer. Upon my subsequent promotion to Lieutenant, I returned to the same facility approximately 10 years later. During that time, I was assigned as a Jail Watch Commander, and as the Facility Training and Logistics Administrator. At the time of my assignment, the MCJ held a daily population in excess of 7,000 inmates, including a hospital, which was serviced by a staff of more than 900 sworn and civilian personnel.

During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I worked closely with the State of California Peace Officer Standards and Training in revamping our Reserve Academy to bring it into state compliance. This process gave me an expertise in the POST Basic curriculum. I also supervised the training of cadets at our Reserve Training Academy. They were taught proper investigation, interview, and apprehension procedures. Among other topics, I lectured the Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and Firearms."

During the 1984 Olympics held in Los Angeles, I was assigned and served as the Department's Intelligence Officer at the Los Angeles Olympics Emergency Operations Center.

During the last five and one half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major (career) criminals. I held this position until my retirement from the Department on March 31, 1993.

Criminals investigated and arrested by N.O.R.S.A.T. included suspects involved with homicide, robbery, kidnaping, extortion, burglary, major narcotics violations and police corruption. The majority of our cases were homicide cases, including the murder of police officers. Arrests frequently occurred in dynamic circumstances including crimes in progress.

My unit also conducted major narcotics investigations including undercover narcotics buys, buy busts, and reverse stings. We frequently deployed at the request of investigative units, such as Narcotics, which provided the initial investigative leads for our operations. These narcotics cases usually involved multiple kilogram quantities of drugs and amounts of money ranging from one hundred thousand to more than one million dollars.

Approximately 80% of cases assigned to N.O.R.S.A.T. were active Homicide investigations. In that regard, the unit processed, under my command and supervision, various aspects (depending on the complexity of the cases involved) of approximately 1,000 Homicides ranging from deaths of police officers to serial homicide suspects.

Additionally, the majority of the over 2,300 cases for which I have been retained as a consultant (since 1993) have involved injuries or deaths connected with some aspect of force during either apprehension or while in police custody.

During the first three months of my command of N.O.R.S.A.T., the unit had three justifiable shooting incidents. From that time, and over the next five years of my command, N.O.R.S.A.T. established a remarkable record of more than two thousand arrests of career criminals without a single shot fired – either by my officers or by the suspects whom we arrested.

Many of these suspects were armed and considered to be very dangerous. Some were apprehended during the course of their crimes and were very prone to use firearms to escape apprehension. This record of excellence was accomplished through the use of proper tactics, management and supervision of personnel, training in correct apprehension methods, and adherence to the moral and ethical standards endorsed by California POST and my Department. These methods and principles are also embraced by every state training commission of which I am aware, as well as the national standards established by the U.S. Department of Justice.

As a result of my position and record as the commanding officer of N.O.R.S.A.T., I was assigned to author Field Operations Directive 89-3, "Tactical Operations Involving Detective Personnel." This order remained in force 20 years (until September 30, 2009), and included the basic standards and considerations with which investigative officers must comply in the event of a tactical deployment such as the dynamic entry into a building for the purpose of an arrest and/or seizure of evidence.

Since my retirement, I have testified as an expert on use of force, jail procedures and jail administration, investigations, police procedures, police tactics, investigative procedures, shooting scene reconstruction, and police administration in Arizona State Courts, California State Courts, Washington State Courts and Federal Courts in Arizona, California, Colorado, Florida, Illinois, Indiana, Louisiana, Missouri, Nevada, Ohio, Oregon, Pennsylvania, Texas, Utah, Washington, New Mexico, New York and Wisconsin. I have testified before the Los Angeles Police Department Board of Rights and the Los Angeles County Civil Service Commission. I have testified before the Harris County (Texas) Grand Jury and the Cleveland Grand Jury. I have also submitted written opinions in matters before Alaska, Delaware, Idaho, Montana, North Carolina, New York, Oregon, Kentucky, and Wyoming Federal and State Courts. I was selected (January 20, 2007) to present on the topic of: "Police Experts" at the National Police Accountability Project held at Loyola Law School, Los Angeles, California. I was selected (September 23, 2010) to present on the topic of: "Using POST Modules to Establish Police Officer' Standard of Care" at the National Police Accountability Project, National Lawyers Guild Convention, in New Orleans, Louisiana. I was selected (March 30, 2012) to present to the Kern County Public Defenders in Bakersfield, California, on the topics of "Ethics, Police Investigations, the California POST Curriculum, and the M26 and X26 Taser weapons." On August 7, 2013 I was invited and presented to the Texas Civil Rights Project (TCRP) 2013 Annual Legal Summit in Austin, Texas on the topic: "Ethically Working with Experts from the Prospective of a Police Expert." On October 15, 2015 I was the invited presenter at a Community Forum in Victorville, California on the topics of Police Procedures, Community Policing, Use of Force, and features of the M26, X26 and X2 Taser weapons. I was selected (January 24, 2020) to present on the topic of: "Use of force litigation under California's negligence standard and the impact of AB 392" at the National Police Accountability Project held at Loyola Law, Los Angeles, California. On February 18, 2020, and on March 10, 2021, I lectured (at request) at the University of California - Irvine, School of Law, Civil Rights Litigation Clinic.

I have worked on several projects with the Paso Del Norte (El Paso, Texas) Civil Rights Project and the Texas Civil Rights Project (Austin, Texas). As a result of my expert testimony in *Border Network, et al. v. Otero County, et al.*, Case No. 07-cv-01045

(D.N.M. 2008), a federal court issued a temporary injunction to stop the illegal and widespread immigration raids in Chaparral, New Mexico, implemented pursuant to Operation Stonegarden. The case resulted in the adoption of a model policy for inquiring into a person's immigration status, which has been adopted nationwide and has also been presented to the United States Senate, the Secretary of Homeland Security, and other government officials seeking to reform immigration enforcement.

I have been recognized, and my expert report was quoted by the USDC in *Burns v. City of Redwood City*, 737 F.Supp.2d.1047. I have been recognized, and my expert report was quoted by, the United States Court of Appeals for the Ninth Circuit as an expert in Police Administration and Use of Force in *Blankenhorn v. City of Orange, et al.*, 485 F.3d 463, 485 (9th Cir. 2007). The Ninth Circuit also drew from my expert report in a second published case involving Police Detective Investigations. *Torres, et al. v. City of Los Angeles, et al.*, 540 F.3d 1031, 1042-43 (9th Cir. 2008). The *Torres* case was appealed to the U.S. Supreme Court and returned for trial. I provided the expert opinion in *Chavies Hoskin v. City of Milwaukee, et al.* (E.D. Wis Case No. 13-cv-0920), regarding field strip and cavity searches, hiring, training, discipline and supervision, and which resulted in significant policy changes within the MPD. My opinions supported argument in the Ninth Circuit case: *A. D., a Minor; J. E., a Minor; Sue Casey, Plaintiffs-Appellees, v. State of California Highway Patrol, Defendant, and Stephen Markgraf.*, No. 09-16460, D.C. No. 3:07-cv-05483-SI (9th Circuit, Published Opinion). My opinions supported argument in the Ninth Circuit case: *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1102 (9th Cir. 2014). The Ninth Circuit also drew from my expert reports regarding credible threats justifying the use of force, *Hayes v. County of San Diego*, 658 F.3d 867 (9th Cir. 2011), and *(Baton use) Young v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011). The Ninth Circuit also drew from my expert reports regarding Jail Administration and Administrative Responsibilities, *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011). The Ninth Circuit also drew from my expert reports regarding an officer's violation of the 14th Amendment if an officer kills a suspect when acting with the purpose to harm, unrelated to a legitimate law enforcement objective, in *AD v. California Highway Patrol*, 712 F. 3d 446 (9th Cir. 2013). The Fifth Circuit drew from my expert report regarding search and seizure, investigations and no-knock requirements in *Bishop et al. v. Arcuri et al.*, 674 F.3d 456 (5th Cir. 2012). The Ninth Circuit also drew from my expert report regarding the use of impact weapons (PepperBall) on civilians in *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012). I was the expert in the Ninth Circuit opinion regarding the allegations proffered by police officers and their use/display of firearms against civilians in *Green v. City and County of San Francisco*, 751 F. 3d 1039 (9th Cir. 2014). Most recently, I was the expert in an important Ninth Circuit opinion regarding the allegations proffered by police officers and their use of lethal force against unarmed persons in *Jennifer Cruz, et al., v. City of Anaheim, et al.*, 765 F.3d 1076 (9th Cir. 2014). I was the expert at trial in the Ninth Circuit opinion regarding the order of evidence at trial in

*Estate of Manuel Diaz, v. City of Anaheim*, et al., No. 14-55644. My opinion is quoted in the Ninth Circuit opinion regarding the use of lethal force in *A.K.H. a minor, et al, v. City of Tustin, et al.*, No. 14-55184. My opinions supported argument in the Ninth Circuit case: *Estate of Angel Lopez, et al., v. Kristopher Michael Walb*, No. 14-57007 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court. My opinions supported argument in the Ninth Circuit case: *Estate of Shakina Ortega, et al., v. City of San Diego, et al.* No. 14-56824 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court. My opinions supported argument in the Ninth Circuit case: *Jerry Newmaker, et al., v. City of Fortuna, et al.* No. 14-15098 (for publication). My opinions supported argument in the Ninth Circuit Case: *Tonya E. Shirar, v. Miguel Guerrero, et al.* regarding use of lethal force and "suicide by cop," No. 15-55029 (not for publication). My opinions supported argument in the Ninth Circuit Case *Angel Mendez; Jennifer Lynn Garcia, v County of Los Angeles, et al.,* Nos. 13-56686, and 13-57072 (for publication) and which was settled before the Supreme Court, No. 16-369, regarding the use of lethal force and searches. My opinions supported argument in the Ninth Circuit case: *Chien Van Bui, et al, v City and County of San Francisco, et al*, No. 14-16585 (not for publication), regarding the use of lethal force. My opinions supported argument in the Sixth Circuit opinion, Case No. 16-5322*, Carey Woodcock v. City of Bowling Green, et al,* Originating Case No. 1:13-cv-00124 regarding the use of lethal force. My opinions supported argument in the Ninth Circuit opinion, Case No. No. 14-17388 (for publication), *Johnathan Jones, et al v. Las Vegas Metropolitan Police Department, et al,* Originating Case No. 2:12-cv-01636- regarding the use of lethal force and Taser weapons. My opinions supported argument in the Ninth Circuit opinion, Case No. 16-15606 (for publication), *Christian Longoria, et al v. Pinal County, et al,* Originating Case No. 2:15-cv-00043, PHX SRB, regarding the use of lethal force after a vehicle pursuit. My opinions supported argument in the Ninth Circuit case: *S. B. v. County of San Diego,* 864 F.3rd 1010 (9th Cir. 2017), (for publication) regarding issues of qualified immunity. My opinions supported argument in the Tenth Circuit case: *Russell Tenorio v. Brian Pitzer,* Case No. 2012-CV-01295 (U.S. Supreme Court No. 15-795) regarding issues of qualified immunity and use of deadly force. I participated as a retained expert in the USDC Fifth District case, *Stephen McCollum et al., v. Texas Department of Criminal Justice, et al.,* Case No.3:12-CV-02037 regarding in-custody hyperthermia deaths. My opinions supported argument (and I was cited by name) in the Ninth Circuit opinion, Case No. 17-55116 (for publication), *Susan Mellen, et al v. Marcella Winn, et al,* D.C. Case No. 2:15-cv-03006, GW AJW, regarding Detective Investigations and Qualified Immunity. My opinions supported argument in the Ninth Circuit Case *Richard Vos; Jenelle Bernacchi, v City of Newport Beach, et al.,* Nos. 16-56791 (for publication) and which was settled by the Supreme Court, No. 16-56791, regarding the use of lethal force and mental illness. My opinions (and quoted by name) supported argument in the Ninth Circuit Case *S.R. Nehad, et al. v. Browder, et al.*, No. 18-55035 (for publication)

regarding the use of lethal force and custom and practice. My opinions supported argument in the Ninth Circuit opinion, Case No. 17-55930 (not for publication), *Estate of Kevin Brown, et al. v. Michael Lambert, et al.*, D.C. No. 3:15-cv-01583-DMS-WVG, regarding Detective Investigations and Qualified Immunity. My opinions supported argument in the Ninth Circuit opinion, Case No. 15-56339 (for publication), *Shane Horton, by his Guardian Ad, Litem Yvonne Horton, v. City of Santa Maria; Santa Maria Police Department; Andrew Brice*, D.C. Case No. 2:14-cv-06135- SJO-PJW, and *Jonathan Michael Castro v. County of Los Angeles, et al,* D.C. Case No. CV 10-5425 DSF (JEMx), 833 F.3d 1060 (9th Cir. 2016) (en banc), regarding jail standards, in-custody suicidal prisoners and qualified immunity. My opinions supported argument in the Ninth Circuit opinion, Case No. 17-56270 (not for publication), *James Soler v. County of San Diego, et al.,* D.C. No. 3:14-cv-02470-MMA-RBB, regarding required verification of persons taken into custody pursuant to a warrant of arrest. My opinions supported argument in the Ninth Circuit opinion, Case No. 18-17404 (for publication) *Tan Lam, v. City of Los Banos, et al.* D.C. No. 2:15-cv-00531-MCE-KJN, regarding the use of lethal force. My opinions supported argument (and I was cited by name) in the Ninth Circuit opinion, Case No. 19-56035 (for publication), *Tiffany Tabares, et al v. City of Huntington Beach, et al*, D.C. Case No. 8:18-cv-00821, JLS-JDE, regarding use of force and subjects suffering mental illness. I was retained as consultant regarding the October 15, 2019 Law Enforcement Activity Related Death (including positional asphyxia) of Mr. Angel Zapata-Hernandez by San Diego Metropolitan Transit System (MTS) Code Compliance Officers. My consultations included recommendations and resulted in significant changes in policy and training by the MTS. I was a retained expert in the Temporary Restraining Order restricting the use of kinetic weapons during demonstrations issued April 19, 2021 in *Black Lives Matter v. City of Los Angeles, et al*, Case No.: CV 20-5027 CBM (Asx).. My opinions supported argument in the Ninth Circuit opinion, Case No. 20-16351 (not for publication), *Terrance Amons, et al., v. Dillon Tindall et al.* D.C. No. 4:19-cv-00301 KAW regarding use of lethal force. My opinions supported argument in the Ninth Circuit opinion, Case No. 20-56254, D.C. No.2:19-cv-05370-CAS-JC (for publication), *Paulette Smith, individually and as Successor in Interest to Albert Dorsey, deceased, v. Edward Agdeppa, and City of Los Angeles, et al.*, regarding the use of lethal force. My opinions supported argument in the Ninth Circuit opinion, Case No. 21-16709 (for publication), *Jose Murguia for himself and for the Estates of Mason and Maddox Murguia, v. Heather Langdon, et al.* D.C. No. 4:19-cv-00942 DAD-RAM regarding "State-created danger." My opinions supported argument in the Ninth Circuit opinion, Case No. 20-15651, D.C. No.2: 17-cv-02776 -JCM-NJK (for publication), *Rudy Rivera, v. Corrections Corporation of America*, regarding false imprisonment and callous disregard. My opinions supported argument in the Ninth Circuit opinion, Case No. 19-56462, D.C. No.5: 18-cv-00762 - DMG-SP (for publication - Declined Review by the Supreme Court), *Estate of Clemente Najera*

*Aguirre; J.S.;Y.S., v. County of Riverside; Dan Ponder* regarding the inflection of lethal force.

The California Court of Appeal (Second Appellate District) drew in part from my expert report regarding search warrant service, *Macias v. County of Los Angeles*, 144 Cal. App.4th 313, 50 Cal. Rptr.3d 364 (2006). The California Supreme Court drew in part from my expert opinion regarding police tactics and the use of deadly force, *Hayes et al. v. County of San Diego et al.*, 57 Cal.4th 622 (2013). I was quoted by the California Appellate Court (Second Appellate District, Division Three) and the California Supreme Court in *B.B., a Minor, etc., et al., v. County of Los Angeles, et al., Case No. B264946 Super. Ct. Nos. TC027341, TC027438, BC505918* regarding positional asphyxia issues.

On February 10, 1989, I was personally commended at the Los Angeles County Hall of Administration by United States Attorney General, the Honorable Edwin Meese III, for my work to establish California Penal Code Section 311.11 (forbidding the Possession of Child Pornography). On February 22, 1993 (at the time of my retirement), Mr. Meese presented a second personal commendation for the success of this critical five-year effort to bring this law into effect. California Penal Code Section 311.11 is required training for all Law Enforcement Officers in California and taught extensively in the POST Basic Learning Domain #9: "Crimes Against Children,"pages 1-18 to pages 1-21.

On December 7, 2015 I was requested by the Cleveland District Attorney to present my opinions to the Cleveland Grand Jury regarding the November 22, 2014 shooting death of Tamir Rice by City of Cleveland police officers. In March, 2016 I was requested by the Delaware Attorney General to review and provide my opinions regarding the shooting death of Jeremy McDole. The AG report was published May 12, 2016. I provided a written Opinion for New Mexico AG regarding the shooting Death of Teresa Anaya that included requested training opinions. I have also consulted with, and provided written opinions at the request of the U.S. Attorney (New York), the Santa Clara County District Attorney, and the San Francisco District Attorney. On June 16, 2021, I was selected by the Los Angeles County District Attorney as a member of FACCT - an independent team assigned to re-examine fatal use of force incidents by law enforcement officers and recommend further action when appropriate. On November 7, 2021, I was an Honoree of the 2021 National Lawyers Guild of Los Angeles at their annual Awards Gala as a recognized defender of Constitutional Rights. I was the retained Use of Force consultant regarding the May 28, 2010 homicide of Mr. Anastacio Rojas (USDC Case No. 11-CV-0522-L NLS) and which was taken under formal consideration by the Inter-American Commission on Human Rights (an international human rights tribunal) on November 2022.

I have been found competent by both Federal and State Courts to render opinions as to responsibilities as occurred in this case. A number of my cases have involved law enforcement officers as civil plaintiffs and as criminal defendants.

Since my retirement, I have become an expert in the features and the use of TASER International's products, including the Model M26, Model X26 and Model X2 ECDs. I own each, along with the download software. I have reviewed all the TASER training materials and am familiar with the risks and tactics associated with these potentially lethal devices. I have qualified as an expert on TASER products and testified both in deposition and before juries on their usage. Two published examples are *Lee v. Nashville*, 596 F. Supp. 2d 1101, 1121-22 (M.D. Tenn. 2009), and *Heston v. City of Salinas*, 2007 U.S. Dist. LEXIS 98433, *25-*26 (E.D. Cal. 2007). My most recent Federal acceptance/certifications as an expert in the general use and deployment of the TASER weapon (including Taser International product warnings/bulletins sent to every agency using the Taser weapon) occurred in Los Angles, California on November 7, 2017 in *William Mears, et al., v. City of Los Angeles, et al,* USDC Case No.: CV 15-08441 JAK (AJWx) and on February 22, 2018 in *Maria Hernandez; A.J., Jr., et al, v. City of Los Angeles, et al,* USDC Case No. 2:16-c-02689 AB (JEMx), and on May 3, 2018 in Heleine Tchayou, et al. v. City of Los Angeles, et al., Case No. 16-cv-06073-TJH-MRW, and on November 1, 2018 in *Alma Rosa Godinez, v. San Diego County, et al. Case No. 3:16-cv-00236 BAS-NLS.* There are many others.

Attached as Exhibit A is a statement listing my law enforcement qualifications and experience; Exhibit B is my fee schedule; Exhibit C is a listing of matters in which I have testified in the last four years as an expert; and Exhibit D are relevant screenshots of the provided Officer body-worn camera videos with commentary.

I reserve the right to modify my opinions to the extent additional information is provided.

I declare under penalty of perjury that the foregoing is true and correct. Executed October 10, 2025, at Santee, CA

Roger A. Clark