Eugene P. Ramirez (State Bar No. 134865)
 *eugene.ramirez@manningkass.com*
Andrea Kornblau (State Bar No. 291613)
 *andrea.kornblau@manningkass.com*
**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**
801 S. Figueroa St, 15th Floor
Los Angeles, California 90017-3012
Telephone: (213) 624-6900
Facsimile: (213) 624-6999

Attorneys for Defendants, , CITY OF HEMET, OFFICER BRETT MAYNARD, OFFICER JOSHUA BISHOP, OFFICER PEDRO AGUILA, CORPORAL DOUGLAS KLINZING; JAMIE GONZALEZ and CATHERINE TIPTON

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| HENRY BARNHILL,<br><br>  Plaintiff,<br><br>  v.<br><br>CITY OF HEMET, OFFICER BRETT MAYNARD; OFFICER JOSHUA BISHOP; OFFICER PEDRO AGUILA; CORPORAL DOUGLAS KLINZING; JAMIE GONZALEZ; CATHERINE TIPTON; and DOES 1-10, inclusive,<br><br>  Defendants. | Case No. 5:23-cv-00589 JGB(SPx)<br>District Judge: Jesus G. Bernal<br>Magistrate Judge: Sheri Pym<br><br>**DECLARATION OF ANDREA KORNBLAU IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 2 TO EXCLUDE CRIMES, WRONG, AND BAD ACTS**<br><br>Judge:  Hon. Jesus G. Bernal<br>Date:   3/16/2026<br>Time:   11:00 a.m.<br>Crtrm:  1 (2nd Floor)<br><br>Trial Date:        4/07/2026 |

///
///
///
///

---

**DECLARATION OF ANDREA KORNBLAU IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 2**

I, Andrea Kornblau, declare as follows:

1. I am an attorney duly admitted to practice before this Court. I am a Partner with Manning & Kass, Ellrod, Ramirez, Trester LLP, attorneys of record for Defendants CITY OF HEMET, OFFICER BRETT MAYNARD, OFFICER JOSHUA BISHOP, OFFICER PEDRO AGUILA, CORPORAL DOUGLAS KLINZING; JAMIE GONZALEZ and CATHERINE TIPTON. I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently testify thereto.

2. Attached hereto as **Exhibit A** is a true and correct copy of relevant excerpts of Defendant Brett Maynard's deposition testimony;

3. Attached hereto as **Exhibit B** is a true and correct copy of relevant excerpts of Defendant Joshua Bishop's deposition testimony;

4. Attached hereto as **Exhibit C** is a true and correct copy of relevant excerpts of Defendant Brett Maynard police incident report.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 23rd day of February, 2026, at Los Angeles, California.

/s/ Andrea Kornblau
Andrea Kornblau

2
**DECLARATION OF ANDREA KORNBLAU IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 2**

# EXHIBIT A

Case 5:23-cv-00589-JGB-SP Document 72-1 Filed 02/23/26 Page 3 of 18 Page ID #:2786

Deposition Of:

# Officer Brett Maynard

### April 15, 2025

Henry Barnhill

vs

City of Hemet, et al.

Job Number 247069



CALIFORNIA DEPOSITION REPORTERS

*When Every Word Counts...*

```
 1   April 29th.
 2           Okay?
 3           You told us you were on patrol in a single car
 4   that day, right?
 5       A   Yes, sir.
 6       Q   What was the first thing you did with respect
 7   to the case we are here to talk about, regarding
 8   Mr. Barnhill?
 9       A   First thing?  Well, I received a dispatch, so
10   the first thing I did was probably mark myself en route
11   on my computer.
12       Q   What was the dispatch you received?
13       A   It was a call for service, I believe, for
14   suspicious circumstances in regards to a female at a
15   children's school, an elementary school, in the area of
16   the district I worked.  She was stating that her
17   ex-boyfriend, who she named as Henry Barnhill, had
18   threatened her with a gun the night prior, had driven
19   her and her daughter to the school and was waiting
20   outside in a vehicle for her to come out and she was
21   inside the school when she called.
22       Q   Okay.  Did you have any information that
23   Mr. Barnhill had a gun on him, specifically on
24   April 29th, 2022?
25       A   That initial statement, that he was in
```

1  possession of a firearm.  Later on, during the incident,
2  there's multiple officers saying over the radio he has
3  access to a firearm.  The belief for me at the time,
4  was, he would still have it in his possession or he did
5  still have it in his possession.
6      Q    That was based on the broadcast that he had one
7  the night before; is that right?
8      MS. KORNBLAU:  Objection.  May misstate testimony.
9  BY MR. PACKER:
10     Q    Go ahead.  You can answer.
11     A    Could you say the question one more time for
12 me?
13     Q    Sure.
14          You told us there was a belief, or you had a
15 belief, he could have a gun on April 29th.
16          Do you recall that?
17     A    Yes.  I did believe he had a gun on him.
18     Q    And what I'm trying to understand is what the
19 source of that belief was.
20          Is it the fact that you were told on the
21 dispatch that he had a gun on him the night before?
22     A    I'm sure that played a factor.  Obviously,
23 going into this incident with no knowledge, other than
24 the first couple of sentences from this victim calling
25 in, saying she was threatened with a gun, and he drove

```
 1   her to the school, and the belief was it was still in
 2   his possession.
 3        Q    You were not specifically told, though,
 4   "Henry Barnhill is known to have a gun on him, today,
 5   April 29th, 2022"; is that fair to say?
 6        A    Actually, we were told that Henry Barnhill --
 7   or "Henry Barnhill," was stated earlier, so we knew that
 8   was alleged suspect.  And during the course of the
 9   investigation, later, as he was fleeing from us, yes,
10   there was a broadcast report saying he is known to carry
11   firearms, he is a violent fleeing felon.
12        Q    What specifically were you told about him being
13   a violent felon?  Were you told about any past
14   convictions?
15        A    At that time -- I would say -- ultimately, I
16   learned of past convictions.  However, in the very brief
17   response to the scene, I didn't know his background.  I
18   had never heard his name before.  The portion where I
19   learned about that, quote, unquote, "violent felon with
20   access to a firearm" -- "semiautomatic firearm," was
21   what was actually stated, that was broadcast during this
22   pursuit, that Mr. Barnhill led us on a chase through the
23   city, on.  I believe halfway through the pursuit, it was
24   reported he had access to a semiautomatic firearm, and
25   he was a violent felon.
```

```
 1      Q    Were you told what the basis for the conclusion
 2   that he was a violent felon was?  In other words, a
 3   prior conviction?  Anything of that sort?
 4      A    Not immediately at that time.  However, even
 5   just in the initial response, in those initial
 6   sentences, for the start of the call, the statement of,
 7   "My ex-boyfriend," whoever, "threatened me with a
 8   firearm the night before" as I'm en route there -- it's
 9   my zone.  I'm responsible.  I'm trying to understand
10   what kind of crime I'm investigating and what might be a
11   probable cause or a detainment or a contact, or anything
12   at all, I'm putting the pieces together that we possibly
13   have a felony domestic violence situation, we possibly
14   have a 245, a 422. 245 is assault with a deadly weapon,
15   422 is criminal threats, and 417, display or pointing a
16   firearm at somebody.
17           Those were going through my mind before I even
18   arrived on-scene.
19      Q    I understand that.  Putting aside April 29th,
20   and the day before, what you learned about the day
21   before, did you learn any information about anything
22   that happened prior to April 28th, with respect to any
23   criminal history, for example, of Mr. Barnhill, at the
24   time when you first were given the call?
25      A    No.  I -- that would have been too quick, in
```

# **EXHIBIT B**

Case 5:23-cv-00589-JGB-SP Document 72-1 Filed 02/23/26 Page 9 of 18 Page ID #:2792

Deposition Of:

# Joshua Bishop
## January 30, 2025

Henry Barnhill

vs

City of Hemet, et al.

Job Number 241938



CALIFORNIA
DEPOSITION REPORTERS

*When Every Word Counts . . .*

```
 1   BY MR. PACKER:
 2       Q    Okay.  Subsequent to April 29, had you been
 3   named in any lawsuits?
 4       A    No.
 5       Q    Okay.  Had you been reprimanded in any way by
 6   the South Gate Police Department for any uses of force
 7   on duty?
 8       A    No.
 9       Q    And what about by Hemet Police Department?
10       A    No.
11       Q    Okay.  Do you recall what your shift hours were
12   at the time of the incident on April 29, 2022?
13       A    Yes.
14       Q    What were those?
15       A    6:00 a.m. to 6:00 p.m.
16       Q    Do you recall what time this incident took
17   place?
18       A    Yes.
19       Q    And what time was that?
20       A    It was approximately around 7:30 in the
21   morning.
22       Q    Do you recall what the initial call you were
23   responding to was?
24       A    Yes.
25       Q    What was that?
```

```
 1      A     It was a call of a victim who was currently
 2   hiding in the office of a school from her husband,
 3   Mr. Barnhill.  And she had reported that Mr. Barnhill
 4   had threatened to kill her and point a -- pointed a
 5   firearm at her head the night prior to.
 6      Q     Okay.  Let me unpack that.
 7            She was currently, on April 29, hiding in her
 8   classroom.
 9            That's your understanding -- or that's --
10   excuse me.  That's what was broadcast to you?
11      A     No.
12      Q     Okay.  So what was broadcast -- let me ask you
13   this:  How did you learn this information that you just
14   described, her being in the classroom, him threatening
15   her, et cetera?
16      A     Well, I stated that she was in the front
17   office, not in the --
18      Q     Oh, I'm sorry.
19      A     -- not in the classroom.
20      Q     Okay.  Fair enough.
21            So where did you learn the information that she
22   was in the front office on April 29?
23      A     From a patrol -- or not a patrol, a detective
24   corporal who responded to the call and was speaking with
25   the victim in the front office.
```

```
 1    Q    Okay.  And who was that detective corporal?
 2    A    Corporal Reynoso.
 3    Q    Okay.  Is this Andrew Reynoso?
 4    A    Yes.
 5    Q    So Andrew Reynoso notified you of these facts
 6  over your radio; is that fair to say?
 7    A    Yes.
 8    Q    You also said that you were told Mr. Barnhill
 9  had made threats against this individual, the individual
10  that was hiding in the front office.
11         Where did you learn that?
12    A    Via the -- the MDT.  It's our mobile computer
13  that's in the vehicle.  It has a description of the
14  types of calls that we're going to, and that was part of
15  the call.
16    Q    Okay.  And then you mentioned that Mr. Barnhill
17  had pointed a weapon at the -- I'm just going to say
18  victim -- the night before; is that right?
19    A    Yes.
20    Q    Did you have any information that he had
21  pointed a gun at her on that day, on April 29, 2022?
22         MS. KORNBLAU:  Objection.  Vague and ambiguous.
23         But go ahead.
24         THE WITNESS:  No, just information that
25  happened the previous night.
```

```
 1   BY MR. PACKER:
 2        Q    Okay.  Did you have any specific information
 3   that Mr. Barnhill had a weapon on him on April 29th,
 4   2022?
 5             MS. KORNBLAU:  Objection.  Vague and ambiguous.
 6             But go ahead.
 7             THE WITNESS:  Yes.
 8   BY MR. PACKER:
 9        Q    So you had information he had a gun on him?
10             MS. KORNBLAU:  Objection.  Asked and answered.
11             Go ahead.
12             THE WITNESS:  Yes.
13   BY MR. PACKER:
14        Q    What was that information?
15        A    It was that the firearm that was used the night
16   previously was still outstanding and that he still was
17   in possession of it.
18        Q    Okay.  When you say "in possession of it," did
19   you understand that to mean it was on his person?
20        A    That is my understanding of it, yes.
21        Q    Okay.  But you were not specifically told it
22   was on his person?
23             MS. KORNBLAU:  Objection.  Vague and ambiguous.
24             But go ahead.
25             THE WITNESS:  Not specifically, no.
```

# EXHIBIT C

# DR # 2022-02719 - Crime/Incident Report Report

| REPORT DATE / TIME | BEAT / REPORTING DISTRICT / SUBDIVISION 4 / SUBDIVISION 5 | OCCURENCE START DATE / TIME - OCCURENCE END DATE / TIME |
|---|---|---|
| Apr 29, 2022 15:15 | 3 / 547 | Apr 29, 2022 07:36 - 18:00 |

**PRIMARY REPORTER**
Brett Maynard #10763

**ASSISTING PERSONNEL / TYPE(S)**
Pedro Aguila #10832 (Crime Scene Security)

**REPORT TAKEN LOCATION**
354 GARDENIA CIR, HEMET, CA 92543

MCSWEENY ELEMENTARY SCHOOL, 451 W CHAMBERS AVE, HEMET, CA 92543

354 GARDENIA CIR, HEMET, CA 92543

**STAT REPORTING**

| | |
|---|---|
| ☐ Glass Break | ■ Alcohol |
| ■ Officer Involved | ■ Pursuit |
| ☐ Juvenile | ☐ K9 Deployed |
| ■ Use of Force | ☐ Gang |
| ■ Domestic Violence | ☐ Hate Crime |
| ☐ Transient-Related | ☐ School Incident |
| ☐ AED Deployed | ■ Taser Deployed |
| ☐ Narcotics | ☐ Firework Related |
| ■ Confidential Victim (PC 293) | ☐ Graffiti |
| ☐ Courtesy Report | |

**NOTIFICATIONS**

| NOTIFICATION-1 MADE | NOTIFICATION DATE |
|---|---|
| Supervisor | Apr 29, 2022 07:36 |

**NOTIFICATION DETAILS**
Use of Force/Pursuit

| NOTIFICATION-2 MADE | NOTIFICATION DATE |
|---|---|
| Dispatch (MP/CHP180/SVS/RO/AFS) | Apr 29, 2022 07:36 |

**NOTIFICATION DETAILS**
Pursuit

| NOTIFICATION-3 MADE | NOTIFICATION DATE |
|---|---|
| Child Protective Services (CPS) | Apr 29, 2022 08:00 |

**NOTIFICATION DETAILS**
Incident Notification to Case Worker Ashley Bennet, 951-201-7102

## NARRATIVE

### Origin:

On 04/29/2022, at approximately 0736 hours, I responded to the McSweeny Elementary School located at 451 W. Chambers Ave. (City of Hemet, County of Riverside) reference an assault with a deadly weapon. The victim, who will be identified in this report as V1, told Hemet Police Dispatch that her boyfriend, Henry Barnhill, had pointed a firearm at her face the evening prior, and said Barnhill was waiting for her outside the school in a vehicle. The victim told Police dispatch she had been able to distance herself from Barnhill after they drove her child to school.

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| Brett Maynard #10763   May 2, 2022 13:20 (e-signature) | Catherine Tipton #8337   May 2, 2022 13:46 (e-signature) |
| **PRINT NAME** | **PRINT NAME** |
| Brett Maynard #10763 | Catherine Tipton #8337 |

At approximately 0742 hours, Cpl. Reynoso (#10550) arrived in the area and located the victim inside the school. The victim told Cpl. Reynoso that Barnhill was in a black Dodge Challenger outside the school and Cpl. Reynoso broadcasted that information over the radio.

I arrived in the area at approximately 0745 hours in a marked Hemet Police vehicle, and I was wearing a full Hemet Police Officer uniform (Class D) which included a black outer vest with clothe badge, and "POLICE" patches on front and back. Additionally, I had Hemet Police Department patches on both shoulders and a duty belt with attached equipment around my waist.

Within seconds of my arrival on scene I saw a black 2019 Dodge Challenger bearing a plate of 8RUU690 parked on the north side of Chambers Avenue near the intersection with South Gilbert St. I saw that was the only black Dodge Challenger on the street, and I broadcasted the vehicle's license plate information. Assisting uniformed Hemet Police officers Aguila (#10832) and Bishop(#10803) arrived on scene within seconds and parked behind it.

The two officers attempted a felony traffic stop using marked Hemet Police Department vehicles and forward facing solid red lamps. I parked behind the other officers and exited my vehicle to assist in the stop after activating my own forward facing solid red lamp. I watched as the vehicle started and fled from the stop at a high rate of speed. I broadcasted over my police radio that the vehicle was "taking off".

Based on the available information at that time, Barnhill was suspected to be in a vehicle matching the color, make, and model of the one fleeing from the traffic stop. Barnhill was suspected of assaulting his girlfriend by pointing a firearm at her face, which would be a violation of California Penal codes 273.5(a), 245(a)(2), and 417(a)(2). In the moment, Barnhill was believed to be a violent fleeing felon. Hemet Police officers Bishop and Aguila gave chase in the same marked police vehicle, and I gave chase behind them in my marked police vehicle.

Barnhill evaded both marked Hemet Police vehicles using forward facing red lamps and audible sirens for a total of approximately 1.4 miles throughout the City of Hemet. Barnhill's driving actions were reckless and he drove with wanton disregard for the safety of the public. During the pursuit, Cpl. Reynoso broadcast over the radio that Barnhill was believed to have access to a semi-automatic firearm and was a violent felon. Please see Officer Aguila's and Officer Bishop's supplemental reports regarding Barnhill's driving actions and actions taken at the termination point of the pursuit.

Barnhill stopped the vehicle in the area of Gardenia Circle and Magnolia Circle (City of Hemet, County of Riverside) and fled from the vehicle on foot as officers stopped their vehicles close behind him. I could see Barnhill was wearing an oversized, dark hooded sweatshirt which concealed his waistband. I exited my vehicle and watched as Barnhill turned away from officers as he ran and reached both of his hands towards the front of his waistband. Based on my training and experience, I know it is common for persons to conceal deadly weapons such as firearms in or near their waistband. As I watched Barnhill reach for his waistband I was fearful that he was attempting to produce a firearm.

I chased Barnhill on foot and gave commands to Barnhill to "show us your hands! Do it now, show us your fucking hands!" as he ran onto the property of the residence located at 354 Gardenia Circle. (City of Hemet, County of Riverside). Barnhill complied by lifting his hands up to his chest height, but was still running away from me and towards the front door of the residence. At that moment, I did not know whom the residence belonged to, and was unaware the residence was actually the registered address of the victim.

As I ran towards him, I saw Barnhill had a bunch of keys in his right hand, and was reaching for the front door handle. Based on my training and experience, I know it is common for violent fleeing felons to store deadly weapons including firearms inside residences. I also know it is common for fleeing felons to barricade themselves inside residences to

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| Brett Maynard #10763   May 2, 2022 13:20 (e-signature) | Catherine Tipton #8337   May 2, 2022 13:46 (e-signature) |
| PRINT NAME | PRINT NAME |
| Brett Maynard #10763 | Catherine Tipton #8337 |

prolong or attempt to prevent capture, or possibly take another person as a hostage. Based on those reasons, I was intent on preventing Barnhill from entering the residence and I tackled him away from the front door before he could open it. As I tackled him, I ordered him to, "get the fuck on the ground" multiple times.

I tried to grab Barnhill's right wrist with my left hand, but he pulled it away from me and towards his body. At the same time, Barnhill struck me in the chest with his left knee, in violation of 69 PC. I then regarded Barnhill not only as a violent fleeing felon, but also an assaultive and resisting violent fleeing felon. Again, I believed Barnhill was trying to retrieve a firearm from within his clothing, so I punched him in the front of his face with a closed right fist in an effort to distract him from reaching towards his clothing. This was effective, as Barnhill brought his hands up near his face as I said, "get on the ground" an additional time. Barnhill continued to resist my efforts to grab his right arm by flailing his arms around in the air, and I saw him pull his left arm away from Officer Aguila's grasp as well.

I heard Officer Bishop shout a warning, "taser , taser!" and I heard the audible noise of the taser being deployed in probe mode. I saw the taser was ineffective, as Barnhill was still able to manipulate his limbs and push against my chest with his left hand. Officer Aguila and I pulled Barnhill towards the ground and had to forcefully shove him face down into a semi-prone position. It should be noted, Barnhill was approximately 6'03" tall and weighed in excess of 250lbs. At the time, I stood 5' 08" and weighed just under 160lbs. I was using all of my body weight and momentum to try to force Barnhill to the ground, and I saw Officer Aguila was heavily involved in doing the same. Even with our efforts, Barnhill was able to pull his hand underneath his body and place them approximately shoulder-width apart in a "push-up" position. I felt Barnhill was tensing the muscles in his arms and shoulders as we continued to try to grab his arms while telling him to put his hands behind his back. Barnhill was shouting, "I'm on the ground, I'm not refusing" but even while saying that he was still tensing his muscles and pulling his hand away from me. The actions by Barnhill continued to show he was actively resisting my efforts to take him into custody and was not trying to surrender to me.

At one point, Barnhill shook my hands off of his right hand and I lost control of that limb. Barnhill pulled his right hand close to his body and reached towards the right front side of his waistband. In fear Barnhill was still trying to arm himself with a deadly weapon, I struck him in the right side of his face with my right knee one (1) time. This was effective, as Barnhill immediately brought his right hand up by his face in order to prevent me from striking his face again. I was able to pull Barnhill's right away from his face with both of my hands, and started to pull it behind his back, but he flexed the arm straight down by his side and near the front of his waistband again. Again, I feared Barnhill was reaching for a deadly weapon, and the firearm said to have been used in the crime against the victim was unaccounted for. It was at this point I saw Officer Bishop grab Barnhill by the hair as I used my full body weight to pry Barnhill's right arm and hand away from his waistband using my right elbow as a fulcrum against his right elbow. At that time, Cpl. Klinzing (#10345) ran up to the front door and used his right hand to assist me in pulling Barnhill's hands towards the center of his back. At that time I yelled, "got his hands!" and I was able to secure Barnhill in handcuffs without further use of force. I did not see any further use of force against Barnhill by any officer present after I shouted that his hands were secured.

Again, please see Officer Bishop's and Officer Aguila's supplemental reports for additional information regarding the apprehension of Barnhill and each officer's actions taken during the process.

**Summarized Interview of V1:**

I returned to the school and interviewed the victim who said she had been in a sexual dating relationship with Barnhill for approximately one (1) year and have been living together for that time. The victim said there have been multiple incidents of domestic violence which have been previously unreported due to extreme fear of Barnhill's anger and retaliatory remarks. The victim provided Barnhill's name, date of birth, and a photograph of him. I later utilized

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| Brett Maynard #10763   May 2, 2022 13:20 (e-signature) | Catherine Tipton #8337   May 2, 2022 13:46 (e-signature) |
| PRINT NAME | PRINT NAME |
| Brett Maynard #10763 | Catherine Tipton #8337 |